IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, et al., )
)
Plaintiffs, )
) CV 85 T 665 N
v. )
)
ALABAMA DEPARTMENT OF )
TRANSPORTATION, et al., )
)
Defendants. )

## NOTICE OF FILING

Pursuant to the Court's order dated July 17, 2002, (Doc. No. 6009), defendants submit the expert report of the following individual concerning the upcoming supplemental evidentiary hearings on Groups I and II:

David B. Lasater, Ph. D.

_____
MARION F. WALKER (WAL016)
Attorney for Defendants

**OF COUNSEL:**

**BERKOWITZ, LEFKOVITS, ISOM & KUSHNER,**
A Professional Corporation
1600 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203-5202
(205) 328-0480
(205) 244-3813

## CERTIFICATE OF SERVICE

I certify that the foregoing Notice of Filing has been served upon the following counsel of record by depositing a copy of same in the United States mail, properly addressed and postage prepaid, this 14th day of August, 2002:

Mr. Robert L. Wiggins, Jr.
Gordon, Silberman, Wiggins & Childs, P.C.
420 North 20th Street
1400 SouthTrust Tower
Birmingham, Alabama 35203

Mr. R. Scott Clark
Fitzpatrick, Cooper & Clark
1929 3rd Avenue North, Suite 600
Birmingham, Alabama 35203

Jim R. Ippolito, Esq.
Chief Counsel
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36130-3050

Alice Ann Bryne, Esq.
State Personnel Department
300 Folsom Administrative Building
Montgomery, Alabama 36130-2301

Mr. Andrew P. Campbell
Campbell, Waller & McCallum, L.L.C.
2100-A Southbridge Parkway, Suite 450
Birmingham, Alabama 35209

Cinda R. York, Esq.
Campbell, Waller & Loper, LLC
2100-A SouthBridge Parkway
Suite 450
Birmingham, Alabama 35209-1303

*Marion F. Walker*
OF COUNSEL

# Expert Rebuttal Report of David B. Lasater

## 1.0 Qualifications and Introduction

I am a partner in the international accounting and business advisory firm KPMG L.L.P. and in that firm's Forensic practice. I have been providing litigation support and expert testimony advisory services to private and federal, state, and local governmental clients since 1979. I have been accepted as an expert witness in statistical matters in both state and federal courts. I have previously provided statistical testimony in *Reynolds, et al., v. ALDOT*. My resume and my summary of testimony and publications are attached as Exhibit 1 to this report. My billing rate for the time spent in my preparation, analysis, writing, and testimony in this matter is currently $300 per hour. My compensation is independent of the trial outcomes in this matter.

I have been asked to evaluate the claims made by 82 persons who either testified at trial in 1992 or who submitted declarations to the Federal District Court in 1997 in the *Reynolds* matter in relation to the statistical analyses proffered by Plaintiffs' through the 1992 deposition and July 19, 2002 report of Dr. Edwin Bradley. I have also been asked to evaluate Dr. Bradley's analyses for their potential in informing the Court on *any* individual claims.

I understand that the claims of some of the 82 persons may be resolved as part of the Promotions Class settlement. In neither Plaintiffs' Exhibit 30, offered as part of his 1992 deposition, nor in his 2002 report, did Dr. Bradley specifically refer to any of the 82 persons. Rather, he performed a variety of calculations on longitudinal data for ALDOT-specific and general State employee job titles or classifications. Those electronic data reflect transactions (e.g., applications, evaluations of minimum qualifications, tests taken and scored, placement rankings on lists of Registers of pre-qualified potential hirees or promotees, and instances of prospective and hired employees) of the State of Alabama.

## 2.0 Summary of Opinions

2.1 Eighty-two (82) persons testified in the 1992 trial or made declarations to the Court in 1997 complaining either about the process that preceded their applications with the State of Alabama or about the processes that followed their applications for jobs with the State or with the Alabama Department of Transportation (ALDOT), specifically.

(a) For the persons who applied and complained about post-application processes at the State Personnel Department ("SPD") or complained that they would have applied for a State or ALDOT-specific job prior to 1979, neither Dr. Edwin L. Bradley's 1992 deposition nor his July 19, 2002 report

provides any evidence that supports their pre-1979 person-specific claims of adverse impact. It is my understanding that the data is simply not available.

(b) For the persons who complained about the post-application hiring process or who complained that they would have applied and been a candidate in the process between 1979 and 1982, neither Dr. Bradley's 1992 deposition nor his July 19, 2002 report provides any evidence that supports their 1979-1982 person-specific claims of adverse impact. It is my understanding that the data is simply not available.

(c) For the persons who complained that they would have applied and been a candidate in the process in or after 1983, neither Dr. Bradley's 1992 deposition nor his July 19, 2002 report provides any evidence that supports their person-specific claims.

(d) For the persons who applied in or after 1983, neither Dr. Bradley's 1992 deposition nor his July 19, 2002 report provides sufficient evidence to support any person-specific claims of adverse impact.

2.2 Dr. Bradley processed data spanning nine years for his 1992 deposition and 11.25 years for his July 19, 2002 report. None of his reported analyses take into consideration any changes that may have been made in any of the SPD or ALDOT processes for any of the total 301 classifications (including the 86 ALDOT-specific classifications). Accordingly, his analyses are not descriptive of the State's processes at the classification level and are imprecise and insufficient for use in evaluating an individual claim.

2.3 Dr. Bradley assumes that there is an unchanging ratio of white and black candidates within a candidate pool for a given selection process event (e.g., the evaluation of applications, the evaluation of minimum qualifications, test development and scoring, the placement of persons on Registers, ALDOT requests for Certificates of Eligibles, and ALDOT vacancy fills) across the 11.25 years. Most of his analyses rely on averages without controlling for time-specific candidate pools, making those longitudinal analyses imprecise for use evaluating the SPD's or ALDOT's processes at any given time and cannot be safely used by the Court in evaluating individual adverse impact claims.

2.4 Dr. Bradley's analysis of blacks and whites representation among appointments compared to those filing an application is grossly oversimplified, is incomplete, and is misleading. I understand that a person's having been appointed from an SPD Certificate of Eligibles ("COE") represents the completion of several appointment processes, including self-selection by that candidate at various stages of those processes. Dr. Bradley's failure to control for candidates' self-selections causes his analysis to be misleading.

> For example, in the Clerical ("CLK") line of progression overall, the analysis of rejection code '02: Failure to submit qualifying certificates or documents showed that 42.08% of African-American applicants received this rejection code, compared to 32.96% of white applicants. This disparity yielded –25.43 standard deviations, which is statistically significant. Additionally, the adverse impact ratio is 78.3%, which is less than the 80% allowed under the Uniform Guidelines. (Bradley report, July 19, 2002, p.10.)

Said another way, 2,800 more applications from blacks would have been included in the candidate pool for the next processes if blacks had submitted qualifying documents at the same rate as whites.

Dr. Bradley does not observe in his report that the 10-percentage point difference (42.08% - 32.96%) results from candidates' own self-selections. I understand that a typing proficiency certificate must be submitted by clerical typist applicants. If they do not or cannot, then their applications are rejected and given a code '02. His omission makes his conclusion about adverse impact unreliable.

Further, he tests (in his Table E-4) the appointments of blacks and whites in the Clerical line of progression for proportionality *relative to the original applicant count* without controlling for the significant self-selection he had already found. He discovers a significant disproportionality (-10.68 standard deviations) in the rates of black (1.26%) and white applicants (2.16%) who get appointed.

Dr. Bradley does not evaluate the effects of self-selections on the result that less than one percentage point fewer blacks are appointed at the end of application-to-appointment process relative to their representation in the applicant pool. Dr. Bradley's tests are, at least, incomplete, and his results are unreliable.

2.5    In his July 19, 2002 filing, Dr. Bradley has reported only those analyses which produced either 1.65 or more standard deviations or an adverse impact ratio less than 80%. He omits reporting the analyses of all those classifications which revealed, even through his imprecise longitudinal methodology, *no statistical evidence of adverse impact*. He also omits reporting any results (if any) which reflect adverse impact against whites. Moreover, his interpretations that "Throughout [his] report, results with standard deviations that are negative (i.e., preceded by a minus sign) and adverse impact ratios that are less than 100% indicate practices where African-American employees [sic] at ALDOT are being treated less fairly than their white co-workers [sic]" is without authoritative foundation. By his assertion, any deviation from perfect parity among the two groups is immediately explicable as racial *treatment*. His conclusion is surprising and mistaken.

3

2.6 In his July 19, 2002 filing, Dr. Bradley has reported that 1.65 standard deviations is the appropriate standard to apply in his tests of statistical difference. He states, "When testing to determine whether a procedure has adverse impact *against* a protected group, such as African-Americans, a one-tailed assumption is appropriate." (Bradley report, July 19, 2002, p. 5, emphasis mine.) His standard is incorrectly applied if the initial (null) hypothesis he begins with is: There are *no differences* between blacks and whites. Such an hypothesis would lead to a two-tailed test (i.e., reflecting no predisposition to a directional result) and a 1.96 standard deviation benchmark.

2.7 Dr. Bradley offers no discussion of the apparent conflicting conclusions that arise when an adverse impact ratio is within Uniform Guideline standards (80% or greater) and yet the related standard deviations exceed 1.65, or the converse. Dr. Bradley asserts that an adverse impact ratio of less than 100% or identically equal rates of experience between blacks and whites as indicating adverse impact without providing any further analysis or citing any authority for his opinion. His reported conclusions in those instances are without foundation.

2.8 Dr. Bradley offers no organizational or process framework to support his summary analyses of aggregated data across lines of progression. He pursues the statistical goal of getting more observations into a computation without any reported inquiry that the SPD's or the ALDOT's hiring processes operate at the aggregate, line of progression level. Accordingly, the Court cannot safely conclude that Dr. Bradley's results are descriptive of any process he analyzes or use his analyses in evaluating any individual claims.

2.9 Dr. Bradley offers no discussion of the implications for his analysis of the incompleteness of the State's electronic data for years 1983, 1984 and 1985. Accordingly, the Court cannot safely conclude that Dr. Bradley's results are descriptive of any process he analyzes or use his analyses in evaluating any individual claims.

2.10 Dr. Bradley asserts that the existence of electronic data makes the analysis of the SPD and ALDOT hiring processes straightforward.

> Using [the electronic] information, it is relatively straightforward to evaluate the results of testing and selection policies, practices, and procedures, and their impact on African-American applicants, at ALDOT. The data have been provided in a computer readable format that permits the calculation of reliable statistics about the racial effect, or disparate (adverse) impact of such policies and procedures. (Bradley report, July 19, 2002, p. 4)

The numerous assumptions and omissions in Dr. Bradley's report lead to the conclusion that the analysis is not "straightforward." Rather, the experiences of

4

individuals are conditioned by many variables which Dr. Bradley has not controlled in his statistical tests.

> Inferences based on statistical tests or procedures are limited by a variety of considerations. Underlying assumptions, specification of a correct set of hypotheses, sample size, power, and other considerations can affect the reliability and usefulness of statistical analyses. Problems arising from these considerations are common to all statistical procedures used in systemic discrimination models. (R.Paetzold and S. Willborn, *The Statistics of Discrimination*, 1998, at 5:43)

Dr. Bradley's analyses are, at best, incomplete, and, in their current form, his statistics are unreliable. Conclusions from them are similarly unreliable for use in evaluating any individual claims.

### 3.0 Bases for my opinions

Each of the opinions summarized above are based upon my reading, familiarity with, or analysis of the following:

(a) The electronic Employee Action Log History, Job Application History, Certified Out History and employee Action Log for the years 1983 – 1994 prepared by the State Personnel Department;

(b) The available 1997 declarations of each person who alleged one or more specific complaints about

   (1) their actual application experience,
   (2) their decision(s) to not apply, or
   (3) their opportunity(ies) to apply;

(c) Compilations of applications, Certificates of Eligibles, and correspondence between the State and persons who alleged one or more specific complaints about their actual application experience or their decision(s) to not apply;

(d) Summaries of testimony of the 82 persons given at trial in 1992;

(e) A listing of ALDOT-specific job classifications prepared through consultation with Mr. Steve Dukes of the State Personnel Department;

5

(f) The 1992 deposition testimony of Dr. Edwin Bradley and exhibits proffered in that deposition;

(g) The July 19, 2002 Expert Report of Dr. Edwin Bradley;

(h) Various motions and briefs filed in the *Reynolds* matter; and

(i) Discussions with counsel and various State executives.

My opinions are also based on my training and experience and my familiarity, based on my previous work and testimony, with the subject matter and issues in this case.

## 4.0 Adverse Impact Analyses

Evidence of adverse impact is usually evaluated through the use of the four-fifths (4/5) (or 80%) rule or through reference to the statistical significance of differences in selection rates between two groups of people. The four-fifths rule appears in Section 4D of the Uniform Guidelines on employee selection procedures.

> "A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact."

A different level of analysis of adverse impact is available through tests of significance of the selection rates between two groups. More precisely, the difference between an *observed* selection rate and the *expected* selection rate can be described in probabilistic terms. That is, for a specified expected selection rate, the difference can be described as having occurred by *chance* with a calculated probability. The calculated probability can then be compared to a benchmark standard, often five percent (5%). If the chance of occurrence is 5% or less, the observed selection rate is said to be significantly different from the expected selection rate.

The chance occurrence (say, 5%) has a mathematical analog expressed as *standard deviations*. The standard deviations have, themselves, become part of the lexicon in adverse impact calculations. In tests of hypothesized differences (e.g., Hypothesis: whites and blacks are equally represented in a process), 1.96 standard deviations is the benchmark equivalent to a five percent random chance occurrence. Said another way, if a difference between an observed selection rate and an equal-expected selection rate

is calculated to be 1.96 standard deviations, that difference, theoretically speaking, could be observed by random chance one out of twenty times.

Tests of hypotheses for race effects using comparisons of two racial groups are informative only if all other variables affecting or potentially affecting the data are controlled.

### 5.0 Reservation of the right to supplement or amend this report

Should additional information be presented to me, I reserve the right to evaluate the effect of that information on my opinions expressed in this report and to supplement or amend this rebuttal report.

Respectfully submitted,

_____
David B. Lasater, Ph. D.

August 14, 2002
_____
Date

7

# Bio



**David B. Lasater**
Partner

345 Park Avenue
New York, NY 10154-00102

Telephone 212-872-6518

Suite 1200
Financial Center
505 20th Street North
Birmingham, AL 35203

Telephone (205) 324-2498

dlasater@kpmg.com

## Background

Mr. Lasater is a partner in KPMG's Forensic/Dispute Analysis Services Practice.

He has provided extensive financial, statistical, and economic consulting in diverse industries including: financial services, specialty finance, high-tech and other manufacturing, assembly, distribution, telecommunications, and energy.

He has consulted in securities litigation, employment litigation, accountants' malpractice, intellectual property, breach of contract, lender liability, predatory pricing, fraudulent conveyance, franchise disputes, and U.S. Tax Court cases. He has provided numerous instances of expert deposition and courtroom testimony.

David is a graduate of The University of Texas at Austin where he received a Ph.D. (Accounting Research, Capital Markets, and Quantitative Methods) and a Masters in Professional Accounting. He has an undergraduate degree in accounting (B.B.A.) from the University of Houston. He is a CPA since 1980 (Texas and New York licenses) and is a member of the American Economic Association, the American Statistical Association, the American Accounting Association, and the American Institute of Certified Public Accountants.

### Selected Litigation Engagement Experience

#### Securities Litigation

Applied capital markets and other financial economics & statistical modeling to measure damages to investor classes in numerous Rule 10b-5 cases. Engagements include disputes involving equity and debt securities in the motion picture, pharmaceutical, cosmetic distribution, environmental services & engineering, and packaged software industries.

Presented the quantum of market-based damages to the Securities & Exchange Commission in a Rule 10b-5 disgorgement action.

Provided counsel with analyses of a swaps and swaptions portfolio in a dispute involving over $100 million of alleged underpayment of incentive compensation to the portfolio manager.

Provided counsel with forensic analyses of loan portfolio management by a publicly-held financial services company in a shareholder derivative action.

Provided counsel of a major broker/dealer with sample-based investor suitability analyses of U.S. sales of more than 30 oil & gas and real estate limited partnerships.

### Employment Litigation

Provided statistical analyses of liability and damages in several class action Title VII matters. Deposition and numerous instances of courtroom testimony.

Provided statistical consultation to outside counsel of a rental car company whose pricing policies in a major metropolitan area were alleged to produce disparate impact. Case dismissed on summary judgment.

Assisted counsel in evaluating the claims of a mutual fund money manager who was alleging disparate pay and promotion under Title VII. We performed relative performance analyses and rebutted the statistical assertions of the plaintiff's economist expert. Deposition testimony.

### Accountants' Malpractice Liability

Assisted counsel in two separate cases involving government contractor/manufacturers. Significant analyses were required of the companies' contract accounting and overhead cost determination.

Assisted counsel in an accountant's malpractice case in which loan losses incurred by a financial institution were alleged to result, in part, from the external auditor's negligent credit review.

Assisted counsel in an accountant's malpractice case in which damages were alleged from the accounting method choice and related mispricing of government contracts. Courtroom testimony.

### Breach of Contract Damages

Provided extensive accounting, financial, and statistical analyses of damages in two separate alleged breach-of-contract cases involving major international financial services companies. The cases included the withdrawal of a Eurobond underwriting and the withdrawal of a tender offer. One case required substantial capital markets modeling of consequential damages. The other required trial-ready data base construction and analyses of five years of a full range of a 100-division investment bank's managerial reports.

Provided counsel with lost profits damages in a publishing industry right-of-first-refusal breach of contract dispute. We calculated lost profits for past and future sales of the children's books that were the subjects of the dispute.

Assisted counsel in the measurement of damages in a breach of contract dispute between a major U.S. gas transmission company and owners of 1,500 supplier gas wells across a 10-year period.

Expert witness in a case concerning damages to a cable-TV network resulting from the breach by one of its Multiple System Operator affiliates of the latter's affiliation agreement with the network; deposition testimony.

### Franchise Disputes

Provided counsel with sales and profit analyses in a franchise termination dispute involving the home furnishing industry.

Provided expert testimony during arbitration in a profit-split dispute between two franchisees and their electronic company franchisor. Cost allocation and differential cost assignment to company owned stores and franchisee stores were at issue.

### Post-acquisition Disputes

Assisted counsel in measuring the amount and consequential effects of alleged overpayment by the acquiring company in numerous purchase price disputes.

Expert witness in a post-acquisition dispute in which contingent liabilities, the determination of patent infringement damages, and the economic determination of a settlement premium were at issue. Two depositions and courtroom testimony.

### Intellectual Property Damages

Expert witness involving lost profits damages in a case involving electrical connectors for CATV installation. Deposition and testimony.

Provided counsel with alternative, fully-integrated business valuation, cash flow, and financial statement models for use in assessing lost profits damages in a patent infringement/antitrust counterclaim case involving optical fiber manufacture.

Assisted counsel with lost profits damages in a patent infringement case involving hospital patient monitoring equipment.

### Fraud Investigations

Assisted counsel in engagements involving multinational, illegal securities and banking transactions, fraudulent conveyances by and between related cable-TV companies, funds flows and inventory misstatement in a network of automotive dealerships, and funds flows of a domestic franchisee of a Scandinavian manufacturer of hotel equipment.

### Tax Disputes

Assisted counsel in obtaining approval of shareholder basis calculations using Rev. Proc. 81-70 statistical sampling methodology.

Assisted counsel in a U.S. Tax Court case involving a major high technology company's international transfer prices (I.R.C. §482) and cross-border allocations of research and development costs (I.R.C. §861).

Assisted counsel in a U.S. Tax Court case involving change in a Fortune 500 company's stock price as evidence of the economic character of various transactions.

Assisted Arthur Andersen state and local tax experts by assessing the statistical validity of significant sales tax audits.

### Other

Critiqued opposing economists' and other financial experts' analyses in lender liability and product-warranty liability cases. Provided counsel with alternative statistical and financial measurements of direct and consequential damages.

Assisted counsel through the business valuation of a money management ($1 billion) and brokerage firm in a partnership dissolution. Deposition testimony.

Forensic analysis of ten years of oil & gas investments and reinvestment of proceeds for a determination of pre-marital assets in a high net worth divorce case. Deposition and courtroom testimony.

Expert witness in matters concerning state mortgage interest law and Federal Truth-in-lending; depositions and courtroom testimony.

Assisted counsel in assessing opposing statistical expert's statistical analysis for consolidating asbestos claims.

Served for five years (1993-1998) as quality control partner for business valuations produced by the New York office Corporate Finance practice.

Assisted in the purchase investigation of a New York money center bank.

Consulted New York law firms in a variety of operating and financing matters.

Consulted creditors on the feasibility and disclosure completeness of debtors' Ch. 11 plans of reorganization and valuation of Newco equity.

### RELATED PROFESSIONAL ACTIVITIES

"Option Pricing and Business Valuation," published in the proceedings of *Business Litigation*, Defense Research Institute, (New York, May 1999).

"Causation and Damages in Federal Securities Cases" speech presentation as a faculty member, ALI-ABA course: The Prosecution and Defense of Shareholder Litigation Against Directors and Officers, Washington, May 28-29, 1992.

Co-author and instructor of Arthur Andersen's firmwide training in quantitative methods and damages analysis.

### PREVIOUS AFFILIATION

Prior to joining KPMG, David was a partner of Arthur Andersen's Litigation Services practice (1988-2002), and before that, David was a member of the accounting faculty, Graduate School of Business, Michigan State University.

David B. Lasater
Fed. R. Civ. P. 26(a) Disclosures

Trial testimony:

*Honeywell, Inc. v. American Flywheel Systems, Inc.* (1996) (Arizona State Court)
*Johnny Reynolds v. Alabama Department of Transportation* (1996, 1997) (Federal District Court – Middle District Alabama)
*Cynthia Stix-Bennett v. James D. Bennett.* (1998) (Connecticut State Court)
*FDIC v. Arthur Andersen* (1998) (AAA - Arbitration)
*Taylor Publishing Co., Inc. v. Jostens* (1998) (Federal District Court - Eastern District of Texas)
*Eloise Cobell, et al., v. Bruce Babbitt* (1998) (Federal District Court – District of Columbia)
*Martin v. City of Birmingham* (2001) (Federal District Court – Northern District of Alabama)

Deposition testimony:

*Johnny Reynolds v. Alabama Department of Transportation* (1996) (Federal District Court – Middle District Alabama)
*Honeywell, Inc. v. American Flywheel Systems, Inc.* (1996) (Arizona State Court)
*In re: JWP, Inc.* (1996) (Federal District Court – Southern District of New York)
*Frontline Systems, Inc. v. Fasfax, Inc.* (1996) (Federal District Court – Arizona)
*Eloise Cobell, et al., v. Bruce Babbitt* (1998) (Federal District Court – District of Columbia)
*Shaun Neal, et al., v. City of Detroit Law Department* (1999) (Michigan State Court)
*Couldock & Bohan, Inc. v. Societe Generale Corp.* (1999) (Federal District Court – Connecticut)
*Senior Industries, Inc. v. Thomas & Betts, Inc.* (2000) (Federal District Court – Northern Illinois)
*Bridenstine, et al. v. Kaiser-Francis Oil Co.* (2000) (Oklahoma State Court – Beaver County)
*Johnston Industries, Inc., et al. v. Milliken & Co., Inc., et al.* (2000) (Alabama State Circuit Court)
*Rowland W. Day, II v. Meyer, Duffy & Assoc., Inc.* (2001) (Federal District Court – Southern District of New York)
*Air & Gas Technologies, Inc. v. Atlas Copco Compressors, Inc.* (2001) (Federal District Court – New Jersey)
*Ohaus Management Group, Inc. d/b/a Chester Precision v. Worthington Precision Metals, Inc.* (2002) (Federal District Court – Connecticut)

### David B. Lasater
### Fed. R. Civ. P. 26(a) Disclosures

**Publications:**

"Causation and Damages in Federal Securities Cases," published in the proceedings of *Shareholder Litigation Against Directors & Officers*, ALI-ABA (Washington, D.C., May 1992).

"Option Pricing and Business Valuation," published in the proceedings of *Business Litigation*, Defense Research Institute, (New York, May 1999).