IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

    Plaintiffs,

v.

CIVIL ACTION NUMBER:
CV-85-T-665-N
**Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

    Defendants.

# REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR REFUND OF ALL FINES AND ACCRUED INTEREST PAID PURSUANT TO THE ORDER OF CIVIL CONTEMPT FOR ARTICLES II AND III

I

On October 14, 2004, the Court referred to the Special Master the Defendants' motion to terminate the ongoing civil contempt fines for Articles II and III and to refund the more than $4.75 million in fines previously paid. Docket № 7480 (Referral Order) Docket № 7405 (Defendants' Motion). The Plaintiffs and the Intervenors oppose the Defendants' motion, arguing that the Defendants have yet to fully comply with the requirements of the Consent Decree, including Articles II and III, and therefore the

Court should not terminate the agreed-upon civil contempt fines or return previously paid fines.

At the close of the recent December hearings on extension of the Consent Decree, the Court lifted the sanctions previously in place for contempt of Articles II and III. Docket № 7667 at 8. The Defendants have correctly noted therefore, that with regard to the motion to terminate the civil contempt fines, that the Court's ruling moots that issue, leaving before the Special Master only the question of whether the Defendants are entitled to a return of previously paid contempt fines for Articles II and III plus accrued interest thereon. *See* Docket № 7627 at 3-4 ("[T]he Court's [December] ruling moots the instant motion to the extent that it grants Defendants' request to lift the Articles 2 and 3 coercive civil contempt fines, the District Court did not address Defendants' additional request for a full refund of Articles 2 and 3 coercive civil contempt fines paid to date plus accrued interest.") Both the Plaintiffs and the Intervenors continue to oppose the return of any previously paid fines arguing that the Defendants' contempt of Articles II and III was the result of the Defendants' own inactions. Not surprisingly, the Defendants assert that compliance with Articles II and III was factually impossible and therefore, they should not have been held in contempt or voluntarily agreed to the entry of an order requiring them to pay civil contempt fines.

2

The analysis of the Defendants' motion for a refund and the Plaintiffs' and Intervenors' objections begin with an assessment of the purposes and objectives of Articles II and III, and the history leading to the modification by the Court of Article II's no-overlap provision.

II

A

Article II of the Consent Decree governs the development and validation of minium qualifications ("MQs") and authorizes their use as part of an examination process.[1]  Minimum qualifications are those job-related qualifications that are deemed to be miniumly necessary to perform the duties of a given job at the entry level position.  Article II requires that the Defendants use only MQs that have been validated pursuant to the Uniform Guidelines on Employee Selection Procedures ("Guidelines"). 29 C.F.R. § 1607 *et seq*.  The Guidelines ensures that the minium qualifications announced for a job and tested in an examination bear an authentic relationship to the knowledge, skills, and abilities ("KSAs") needed to perform the job.  By adhering to the

---

[1]  Article III requires, among other things, that only job selection criteria and procedures that have been validated in accordance with the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §1607 can be used by the State Personnel Department to fill positions at The Alabama Department of Transportation.  The use of validated minimum qualifications, as required by Article II, is an essential component of establishing lawful job selection criteria and procedures that comply with the Consent Decree.

3

dictates of the Guidelines, the Defendants assure that their hiring and testing procedures are designed in conformity with generally recognized principles of industrial psychology and can be applied in a nondiscriminatory and race-neutral fashion.

According to the Defendants, the contempt fines previously paid for noncompliance with Articles II and III, and all interest earned thereon, should be repaid to the Defendants because it was factually impossible to develop and implement MQs and examinations that complied with Article II as written. Docket № 7462 at 2-3. In particular, the Defendants contend that the "'no-overlap provision' of Article II made it impossible to achieve full compliance with Articles Two and Three before the expiration of the civil contempt sanction deadlines established in the Remedies Agreement and enforced through the Contempt Order." Docket № *Id.*, (footnote and citations to the record omitted) *see also* Docket № 7406 at 16 ("compliance with Articles Two and Three was factually impossible as long as the no-overlap provision remained in effect, the civil contempt fines paid due to such noncompliance were, in effect, criminally punitive, rather than coercive.") Not surprisingly, the Plaintiffs and the Intervenors assert that the existence of the no-overlap provision was not the cause of the Defendants' contempt and that the record does not support the Defendants' "factual impossibility" argument.

B

4

Article II, as originally agreed to, required that MQs bear a "manifest relationship to the skills, knowledge or abilities necessary to the performance of the job at entry . . . <u>and such skills, knowledge or abilities are not addressed in the examination process</u>." Article II ¶ 1(emphasis added to indicate the "no-overlap provision"). In other words, "the 'no-overlap' provision . . . prohibited knowledge, skills and abilities ('KSAs') utilized in the minimum qualification screen from being used again in the examination process." Docket № 5880 at 3-4. With the no-overlap provision in Article II in place, the Court approved the Consent Decree in March 1994. Based on the recommendations of Special Master Gaeta, the Court eventually eliminated the "no-overlap provision" from the Consent Decree (Docket № 7152) but not before a very long and tortured path of litigation compelled no other result.

The Eleventh Circuit has reviewed in detail the history and the purpose of the no-overlap provision and it is appropriate to review the conclusions of the court. Judge Carnes, writing for his colleagues has noted the following about the no-overlap provision:

> It is important to say at the outset what all the experts for both sides agreed upon at the hearing in this case: the no-overlap provision is novel in the field of employment testing. . . . [T]here is nothing in the record indicating that the no-overlap provision, variously described as 'novel' and 'unusual' has ever been used anywhere before. Nonetheless, for several years after the consent decree was adopted, a joint panel of experts–two selected by the plaintiffs and two selected by the defendants–worked to

5

>develop MQs and job examinations for ALDOT jobs that would comply with the no-overlap provision.
>
>. . .
>
>By the summer of 2001, SPD and its experts decided to strike out on their own to develop new MQs for some of the job classifications[.] . . . Despite all their efforts, the experts were unable to design any method for developing valid MQs that would comply with the no-overlap provision.
>
>On December 13, 2001, the defendants moved to modify the consent decree by removing the no-overlap provision of Article II ¶1 on the ground that the provision is contrary to accepted professional practice in the development of selection procedures, and it cannot reasonably be satisfied. . . . With the parties' consent, the district court appointed a special master to consider the issue and make recommendations to the court.

*Reynolds v. McInnes*, 338 F.3d 1221, 1224-25 (11th Cir. 2003).

After extensive litigation and multiple reviews by the Court and the Special Master, the Special Master ultimately recommended that the no-overlap provision of Article II be eliminated in its entirety as it was "not realistically feasible . . . and that the basic goal of consent decree I [could] be better achieved if the requirement is eliminated." Docket № 6984 at 4. The District Court adopted the Special Master's recommendation and on April 9, 2004, struck from the Consent Decree the no-overlap provision of Article II. Docket № 7192.

C

The decision of Special Master Geata to recommend the elimination of the no-overlap provision is in significant measure divorced from the larger history of the Defendants' noncompliance with Articles II and III generally. With respect to the current motion, the Defendants do not dispute their long history of noncompliance. Both the Plaintiffs and the Intervenors have extensively set out that history and it remains in material respects uncontradicted. *See, e.g.,* Docket № 7440 at 4-18 (Intervenors) *see also* Docket № 7442 at 4-17 (Plaintiffs). But as the Defendants note:

> [They] do not offer excuses for their inability to achieve compliance with Articles Two and Three prior to the Court's entry of the Contempt Order. The parties have exhaustively litigated Defendants' noncompliance, and that litigation ultimately resulted in the Remedies Agreement and the resulting Contempt Order. Rather, Defendants contend that resolution of the pending Motion to terminate concerns the facts and circumstances regarding Defendants' inability to achieve full compliance with Articles Two and Three on or before expiration of the civil contempt sanction deadlines established in the Remedies Agreement (Docket № 4247 at 11-12) and enforced through the Contempt Order. (Docket № 4284 at 46-47.

Docket № 7462 at 2-3 (footnotes omitted).

No one can argue that the Defendants' conduct in "implementing" Articles II and III in the years after the entry of the Consent Decree and leading up to the Contempt Order and for many years thereafter warrants anything other than harsh criticism. The Defendants recognized their own actions for what they were and

consented to the entry of the Contempt Order with its regime of coercive sanctions. But the sometimes sorry history of the Defendants' compliance with the Consent Decree is not the issue that must be resolved. The issue to be resolved is whether under the law it is appropriate to impose civil contempt sanctions for noncompliance when one of the requirements of a consent decree for which fines are being imposed—in this instance the no-overlap provision—is later determined to be not feasible. If civil sanctions were unauthorized as a result, then any fines paid should be refunded.

D

The Eleventh Circuit has very clearly set the parameters of when a court can and should invoke its considerable powers of civil contempt. The Court can use its powers of civil contempt for essentially two purposes, either to coerce compliance with its orders, or to compensate a party for losses suffered because of contumacious conduct. *United States v. City of Miami*, 195 F3d 1292, 1298 (11th Cir. 1999), *cert. denied*, 531 U.S. 815 (2000). The touchstone of contempt, however, is that the contemnor has the ability to comply with the court's coercive order and through that ability the means of purging the contempt. *See Newman v. Graddick*, 740 F.2d 1513, 1524-25 (11th Cir. 1984)("Since contempt is a conditional sanction, the person in civil contempt must be given the opportunity to bring himself into compliance. *Lance v. Plummer*, 353 F.2d 585, 592 (5th

8

Cir.1965). Thus, inability to comply is a complete defense to a contempt citation. *United States v. Rylander*, 460 U.S. 752 (1983); *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984). A person in civil contempt holds "the keys to his prison." See generally, 3 C. Wright, Federal Practice and Procedure § 704 (2d ed. 1982)").

In this instance, because of the failure of the no-overlap provision as a requirement of Article II, the Defendants were as a matter of law precluded from bringing themselves into full compliance with the mandates of Articles II and III. As such, they could not purge the contempt for which they were being fined. While recognizing the validity of the Defendants' legal arguments, the simple fact is that the history of the Defendants' noncompliance with Articles II and III rests on much more than the existence of the no-overlap provision. Nevertheless, the no-overlap provision was the focus of considerable effort and litigation and undoubtedly delayed the development and administration of various MQs and exams as the courts litigated and ultimately determined the factual impossibility of compliance with the no-overlap provision. The Intervenors have spoken to the delay caused by the litigation regarding the continued validity of the no-overlap provision.

> Both the Special Master (in findings adopted by the District
> Court) and the Eleventh Circuit have amply explained how
> further proceedings on the no-overlap issues continue to
> delay full implementation of the decree. Moreover, until the
> defendants achieve full compliance with the provisions of
> the decree–and specifically here, the MQ and testing

9

> provisions of the decree–they continue to pay coercive sanctions under the District Court's January 31, 2000 contempt order. . . .
>
> Further litigation over plaintiffs' soundly rejected and now-frivolous arguments concerning the no-overlap provision of the consent decree will only further delay implementation of the selection procedures required by the decree. That delay is completely contrary to recent orders of both the Eleventh Circuit and the District Court. . . . The no-overlap provision is unworkable and fundamentally flawed. The problems with the no-overlap provision are inherent ones, not ones that depend on the nature of any particular job classification. . . .

Docket № 7059 at 17-18.

As long as the no-overlap provision remained a part of Article II of the Consent Decree, it was factually impossible to comply with the requirements of the Consent Decree and therefore impossible for the Defendants to purge the contempt that rested on their failure to fully implement the provisions of Articles II and III.

**ACCORDINGLY**, it is recommended that the Court GRANT the Defendants' motion for refund of all fines and accrued interest paid for contempt of Articles II and III. Docket № 7405. That portion of the Defendants' motion (Docket № 7405) asking the Court to terminate the civil contempt fines for Articles II and III should be DENIED as MOOT since the Court had previously ordered the suspension of said fines. *See* Docket № 7667 at 13. The Defendants should certify to the Court the amount they have

10

paid as civil contempt fines for Articles II and III and seek from the Court an order directing the Clerk of Court to return said amounts to the Defendants.

Any objection to this Report and Recommendation must be filed with the Clerk of Court by 4:00 p.m. on 28 March 2005. Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED this 4th day of March 2005.


/s/ C. A. González
SPECIAL MASTER