IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

    Plaintiffs,

v.

CIVIL ACTION NUMBER:
CV-85-T-665-N
**Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

    Defendants.

# REPORT AND RECOMMENDATION

I

By Order of Reference, (Docket № 7877), this matter is before the Special Master on the Defendants' "Motion to Alter or Amend Judgement Regarding Refund of Articles II and III Contempt Fines." Docket № 7857. On March 4, 2005, the Special Master submitted a Report and Recommendation recommending that all contempt fines paid by the Defendants on Articles II and III be refunded. Docket № 7694. After the submission of the Report and Recommendation, the Court directed the Defendants to resubmit the refund request as a <u>Rufo</u> motion pursuant to Fed. R. Civ. P. 60(b). Docket № 7727. The matter was then taken up directly by the Court. While the Court rejected the earlier Report and Recommendation, it granted in part the Defendants' <u>Rufo</u> motion and concluded that the Defendants were "entitled to a refund of 85% of all fines and accrued

interest paid[1] pursuant to the 2000 order of civil contempt for Articles II and III" (Docket Nº 7845 at 12), because "the no-overlap provision made it impossible to develop minimum qualifications in a timely fashion." Id. at 7-8.  In granting this partial refund, however, the Court allocated 15% of the previously paid fines to Paragraphs 2(a) and (b) of Article II and Paragraph 2 of Article III.  In the Court's judgment, these paragraphs were not affected by the infeasibility of the no-overlap provision.

On September 9, 2005, the Defendants moved the Court to alter or amend its judgment and enter an order directing that the Defendants receive a 100% refund of the civil contempt fines paid for noncompliance with Articles II and III.  Docket Nº 7857. "In support of this motion, Defendants asserted, inter alia, that the Court should not have penalized Defendants for their failure to present evidence regarding their efforts to comply with Article II, ¶¶2(a) and (b) and Article III, ¶2 because, heretofore, the issue before the Court concerned Defendants' **full** compliance with the entirety of Articles II and III. . . ."  Docket Nº 7901 3-4 (emphasis in original).

Following a September 23, 2005 hearing on the Defendant's Motion to Alter or Amend, the Court entered an order granting the motion,

---

[1] Subsequent to the Court's Order authorizing an 85% refund, a question arose regarding the Defendants' entitlement to accrued interest associated with the civil contempt fines.  The Defendants asked the Court to amend its September 23, 2005 Order (Docket Nº 7876) to eliminate the interest component of the refund until the matter is resolved at a later date.  The Court did so on November 11, 2005.  Docket Nº 7916.

> to the extent that the issue of whether the defendants complied with Article II, ¶¶2(a) and (b) and Article III, ¶2 while still paying contempt fines and are thus entitled to a refund of contempt fines is referred back to Special Master González for a report and recommendation.

Docket № 7877 at 1. The issue to be determined then, is whether the Defendants were in compliance with Article II, ¶¶2(a)-(b) and Article III, ¶2, before the Court lifted the contempt fines, and if so, the amount of the refund to which the Defendants are entitled.

The Defendants contend that they complied with the disputed paragraphs before the Court lifted the contempt fines in December 2004 and are therefore entitled to a refund of any fines paid after complying with those provisions. The Plaintiffs and the Intervenors contend otherwise, and maintain that the Defendants are not entitled to a refund of the remaining civil contempt fines paid for alleged violations of Articles II and III.

II

The Plaintiffs and the Defendants filed a joint submission agreeing that the total amount of Article II and III civil contempt fines paid by the Defendants was $4,569,000 and that 85% of that sum, exclusive of accrued interest, was $3,883,650. Docket № 7852 at 1.[2] The Court had previously ordered that the Defendants receive a refund of

---

[2] The Intervenors declined to join the joint submission and requested additional time to review the Defendants' and Plaintiffs' calculations. Docket № 7851. It does not appear from the record that the Intervenors ever offered an alternative calculation to the $4.5m in civil contempt fines paid by the Defendants for Articles II and III.

3

85% of the civil contempt fines paid on Articles II and III. The remaining 15% of the fines were not refunded because the Court concluded that the fine "reflects that defendants inexcusably ignored other provisions of Articles II and III unrelated to the no-overlap provision." Docket № 7845 at 10-11

Using an argument that is not at all clear, the Plaintiffs assert that the "true amount" the defendants would have paid under the unambiguous language of the Contempt Order for alleged violations of Article II, ¶¶2(a) and (b) and Article III, ¶2 is $1,951,500. Docket № 7913 at 6. Based on the Plaintiffs' calculation, they contend that the 15% or $685,350, withheld from the refund amount "is already a nearly two-third reduction from what the defendants would have owed even if the no-overlap provision had never existed!" Id. at 6.

The Court allocated the Article II and III contempt fines between those activities affected by the no-overlap provisions and those not affected. The Court's actions have the effect of establishing the maximum amount attributable to the Defendants' noncompliance with Article II, ¶¶2(a) and (b) and Article III, ¶2. Moreover, the Court has already granted the Defendants' motion to alter or amend (Docket № 7877) and the only issue for the Special Master is to decide whether Defendants complied with Article II, ¶2(a) and (b) and Article III, ¶2 before the Court's termination of the civil contempt fines for Articles II and III on December 16, 2004. If the evidence shows that the Defendants did in fact comply, then the issue is what amount of the remaining fines, if

4

any, are the Defendants entitled to. The Plaintiffs' attempted recalculation is inconsistent with the Court's earlier allocation of contempt fines.

The compliance deadline set up by the Contempt Order for Article II, ¶¶(2)(a) and (b) is December 31, 2000. Docket № 4284 at ¶ 24. With respect to Article III, ¶2(a), the Contempt Order establishes a compliance deadline of June 1, 2000. Id. The Contempt Order does not establish specific deadlines for ¶¶2(b), (c), and (d) of Article III, although Article III has a general compliance date of August 30, 2000. Id.

### III

### A

Article II ¶2(a) mandates that ALDOT use only minimum qualifications ("MQs") that have been content validated. It further requires the Defendants to secure the approval of either the Court or the Plaintiffs before implementing any MQ.[3]

---

[3] Article II, Paragraph 2(a), of the Consent Decree requires as follows:

> 2. Consultation:
>
> (a) Subject to Article Four on Implementation of Personnel Projects, Personnel will forthwith utilize a content validation procedure to determine the appropriate minimum qualifications for the Highway Department job classes. Such determination and the SPD validation procedure will be subject to challenge by plaintiffs and no new minimum qualifications will be implemented without approval by the plaintiffs or the Court.

According to the Defendants, they have been in compliance with ¶2(a) since September 2001 when the State Personnel Department ("SPD") "established a standard set of procedures for the development of MQs." Docket Nº 7901 at 8. The procedures used by the Defendants to develop content valid MQs has been throughly examined and approved by the Court. Docket Nº 6537 at 17, and Docket Nº 6719. Since September 2001, "SPD has used [its] MQ development process . . . to develop MQs for both project and non-project classification, beginning with the completion of the first MQ . . . in November 2001." Docket Nº 7901 at 7.

The Intervenors dispute the contention that the Defendants complied with Article II, ¶2(a) simply by developing a method for producing content valid MQs. According to the Intervenors, the Defendants were not in compliance with ¶2(a) simply because they had a legitimate procedure for developing content valid MQs. Compliance required that the Defendants actually developed all of the required MQs. The Intervenors have pointed out many instances in which the Defendants failed to have validated MQs in place by September 1, 2001. See Docket Nº 7912 at 1-2.

Both the Intervenors and the Defendants are right. By September 2001, the Defendants had in place a method for developing content valid MQs. The Intervenors correctly point out that as late as May 12, 2003, "the defendants had a number of classifications as to which they had not yet begun the validation process required by Article II, ¶2(a). Docket Nº 7912 at 2. The issue to be decided is simple: does compliance with Article II, ¶2(a) require the Defendants to actually validate all the

6

required MQs, or is it sufficient for the Defendants to have established a procedure that will lead to the creation of valid MQs?

Article II, ¶2(a) requires the Defendants to "forthwith utilize a content validation procedure to determine the appropriate minimum qualifications for the Highway Department job classes." If one principle of law is well settled in this case, it is that the Court "may not impose obligations on a party that are not unambiguously mandated by the decree itself" and where an obligation is unambiguous, "the court must uphold [the] decree as written." Reynolds v. Roberts, 207 F.3d 1288, 1300 (11th Cir. 2000)(internal citations omitted). The language of ¶2(a) is unambiguous, it requires that the Defendants use content validation procedures to develop MQs for ALDOT. It does not mandate that all the MQs be completed by a date certain. Once the Defendants met the obligation of utilizing a content validation procedure to determine the appropriate minimum qualifications, they were in compliance with that part of ¶2(a). This the Defendants did by September 2001. The Civil Contempt Order deadline did not alter the straight forward unambiguous requirement of ¶2(a). See Docket № 4284 at ¶12 ("nothing in the [agreement for remedies of contempt] should be constructed to modify, alter, or amend the terms of Consent Decree I. . . ").

Addressing the Intervenors' argument that only by completing the development of all MQs will the Defendants be in compliance with ¶2(a), the Defendants correctly note the following:

> Accepting the Adams Intervenors' argument that compliance with Article II, ¶2(a) required completion of all MQs by the contempt fine deadline would be inconsistent with the Court's previous finding that compliance with ¶2(a) was not affected by the no-overlap provision. Specifically, as held by the Court, "the no-overlap provision made it impossible to develop minimum qualifications in a timely fashion." Therefore, if compliance with ¶2(a) required the completion and implementation of all MQs, then by definition, compliance with ¶2(a) was affected by the no-overlap provision, and Defendants would be entitled to a refund of any civil contempt fines attributable to their noncompliance with Article II, ¶2(a). If, on the other hand, as urged by Defendants, ¶2(a) required only that Defendants develop and utilize a content validation procedure to determine the appropriate MQs for Highway Department classifications, then Defendants met that requirement as of September 2001 and are entitled to a refund of any fines paid after their compliance.

Docket № 7901 at 10-11 (internal citations to the record and added emphasis omitted).

The Defendants met the requirements of Article II, ¶2(a) in September 2001, nine months after the start of Article II contempt fines and 39 months before the Court lifted the Article II fines in December 2004.

B

In addition to determining when and whether the Defendants complied with Article II, ¶2(a), the Court has also directed the Special Master to offer a recommendation on whether the Defendants complied with Article II, ¶2(b) of the Consent Decree. Paragraph 2(b) addresses the Defendants' use of interim appointments to fill job vacancies, and requires the Defendants to follow the provisions of Article IV when

8

making interim appointments.[4] In their current motion to Alter or Amend, the Defendants claim to have "never been out of compliance with the substantive requirements of ¶2(b)." Docket № 7918 at 5.

Despite the statements in the current motion about never being out of compliance with ¶2(b), the Defendants on May 12, 2003, reported to the Court that as of that date they "had not yet fully complied with Article Two paragraph 2(b)." Docket № 6729 at 5. Attempting to avoid the obvious implications of their earlier statement with respect to compliance, the Defendants argue that "the basis of that concession was not [the] failure to comply with any affirmative requirement of ¶2(b), but rather, the lack of an interim selection procedure **required by Article IV.**" "In other words, the substantive obligation regarding the interim selection procedure is established in Article IV and not Article II, ¶2(b)." Docket № 7918 at 5 (emphasis in original).

While the Defendants have never stipulated or otherwise been found in Contempt of Article IV that is really beside the point. Whatever the reason for the Defendants' failure to comply with ¶2(b) the simple fact is that at least as late as May 2003 they were acknowledging their own failure. The failure to establish in a timely fashion the interim selection procedure required by Article IV, does not excuse failing to comply with Article II, ¶2(b), it in fact makes it inevitable. The Defendants May 2003 filing with the Court

---

[4] Article II, ¶2(b) of the Consent Decree provides that: "Appointments in the interim between the effective date of this Decree and the completion of the requirements of this Article shall be governed by the provisions of Article Four of this Decree entitled Implementation of Personnel Projects."

9

recognized that fact and the new argument of the Defendants does not contradict nor diminish their failure to comply with ¶2(b) in a timely fashion.

It is most certainly the case that as of May 12, 2003, the Defendants were not in compliance with Article II, ¶2(b).  Whether the Defendants were in compliance sometime after May 2003 and before the December 2004 decision of the Court to lift the Article II contempt fines cannot be made on the basis of the record before the Special Master.  Until such evidence is produced by the Defendants and tested by the Plaintiffs and the Intervenors, there is no basis upon which to find that the Defendants had complied with Article II, ¶2(b), before the Court lifted the contempt fines in December 2004.

## IV

### A

The Order of reference requires the Special Master to determine whether the Defendants complied with Article III, ¶2 of the Consent Decree prior to the contempt fines being lifted.  If so, the Defendants are entitled to a refund of all or a portion of the fines previously paid.  Article III, ¶2 provides:

> 2. Highway Department Program: The Highway Department will develop and implement a program designed to achieve the following:
>
> (a) Assuring to the extent practicable that black employees are provided with equal opportunities to be assigned to duties of the jobs they hold comparable to the assignment of white employees on such job to such duties, provided that this is not intended to require all employees on a job to be assigned to the same duties or to require the assignment of anyone to duties which they are not qualified to perform after normal training and/or orientation.

>(b) Developing a procedure for informing employees regarding career paths within the Highway Department.
>
>(c) Providing an equal opportunity to black employees for participation in training programs comparable to training programs in which white employees on the same job participate.
>
>(d) Developing a system for monitoring the progress of the above procedures.

Consent Decree Article II, ¶2(a)-(d).

The Contempt Order deadline for compliance with Article III, ¶2(a) is June 1, 2000. Docket № 4284 at ¶28. The deadline for compliance with Article III, ¶2(b)-(d) is August 30, 2000. Id.

B

The Intervenors long ago conceded that the Defendants were in compliance with Article Three, ¶2. Docket № 6783 at 11-12. In their show cause response (Docket № 7736) to the Defendants' Motion for a Refund of Article II and III Civil Contempt Fines, (Docket № 7736 at 4-6) the Plaintiffs challenge the Defendants' contention that they were in compliance with Article III, ¶2(a) but did not assert specific objections to subparagraphs (b), (c), or (d) of ¶2. In their response to the Defendants' Motion to Alter or Amend (Docket № 7913), however, the Plaintiffs do not restate their objection to ¶2(a), but rather, contend that the Defendants' arguments are limited to those provisions specifically addressed by the Court in its Order and that other subparagraphs of Article III that were presumably unaffected by the no-overlap provision are not discussed. Docket

11

Nº 7913 at 6-7 ("A cursory review of Article III identifies numerous other provisions which are not affected by the no-overlap provision. For example, Article III, ¶3. . .").

Of course, issues with respect to Article III, ¶3 or any paragraph of Article III other than ¶2 are not before the Special Master and will not be considered. See, Docket Nº 7877 (the issue before the Special Master is "whether the defendants complied with Article III, ¶2 while still paying contempt fines. . . "). The Court's Order of Reference is specific and must be followed.

The Defendants' unrebutted arguments and citations to the record clearly establish that they complied with Article III, ¶2 by October 12, 2001. Docket Nº 7901 at 17-19. The position of the Defendants is persuasive and the Special Master adopts it as his own. In their response to the Defendants' Motion to Alter, (Docket Nº 7913 at 7) the Plaintiffs note that "[i]n the event the special master believes that the defendants' claimed compliance dates for those provisions justifies a refund, the plaintiffs believe that the defendants should be required to demonstrate their burden of proving compliance with those provisions." This the Defendants have done to the satisfaction of the Special Master and based on the evidence in the record. The Plaintiffs have offered no arguments to contradict the Defendants claims with respect to these subparagraphs of Article III, ¶2. It is certainly not enough for the Plaintiffs to simply state that the Defendants have not met their burden of establishing compliance and then offer **no** argument and **no** citation to the record which supports their contention. If the Plaintiffs had an argument to rebut the Defendants' positions with respect to subparagraphs (b), (c)

and (d) of Article III, ¶2, they should have laid it out in their many opportunities to reply to the Defendants' Motion for a Refund (Docket № 7728) and motion To Alter or Amend (Docket № 7857).  This the Plaintiffs never did.  The only specific subparagraph of Article III, ¶2 that the Defendants address—albeit in a very limited way—is ¶2(a).  Docket № 7736 at 5-6.  There only specific argument with respect to ¶2(a) is that "the defendants have never moved for a finding of compliance with this provision nor have they ever demonstrated full compliance with it as required to avoid contempt fines." Id.

C

Article III, ¶2(a) requires the Defendants to ensure that black ALDOT employees have an equal opportunity "to be assigned to duties of the jobs they hold comparable to the assignment of white employees on such jobs to such duties[.]"  The Defendants assert that they were in compliance with Article III, ¶2(a) "no later than July 25, 2001."  Docket № 7901 at 14.  In complying with Article III, ¶2(a), the Defendants established two different procedures:  one involving what has become known as a Form 40 procedure, and the other a proportionality program.

A Form 40 is used to monitor the duties assigned "to each employee in each classification to ensure equal opportunity for African American employees."  Docket № 7901 at 14.  The SPD which administers the Form 40 process developed the procedure in 1993.  The Form 40's are distributed and completed on a quarterly basis "or when there has been a significant change of duties within a classification or an out of classification assignment or reclassification."  Id.  Since 1997, Frank Topping, the EEOC Coordinator

in the ALDOT human resources bureau has overseen and monitored the Form 40 process.

The proportionality plan is used by ALDOT to allocate assignments to black employees at rates proportional to their representation in the relevant job classifications. The Arthur Anderson Group developed a program to report on the proportionality of ALDOT's work force. Id. at 15. The Plaintiffs' have not disputed the Defendants' description of the Form 40 process or the proportionality plan.

The Defendants maintain that they have been in compliance with Article III, ¶2(a) since July 25, 2001, the day they moved for compliance with Article XI, ¶11, (Docket Nº 5118), which according to the Defendants "specifically details the requirements for a proportionality plan." Id. at 16. The Court ultimately granted the Defendants' request for a finding of compliance with Article XI on September 9, 2002. Docket Nº 6164.

Article XI, ¶11 requires ALDOT to "take affirmative steps to have eligible black employees . . . receive assignments at rates proportional to their representation in the relevant job classifications to the better in-house jobs title at [ALDOT]." Article III, ¶2(a) requires ALDOT to design and implement a program to "[a]ssur[e] to the extent practicable that black employees are provided with equal opportunities to be assigned to duties of the jobs they hold comparable to the assignment of white employees on such job to such duties. . . ."

To be sure, both Article XI and Article III have proportionality requirements. Whether they are equivalent so that a determination that the Defendants are in compliance with one article (Article XI) is tantamount to being in compliance with another article's

14

proportionality requirement (Article III, ¶2(a)) is not clear from the state of the record. The Special Master is not sufficiently familiar with the requirements of Article XI, ¶11 and the litigation surrounding it to make the determination that the "Defendants' compliance with the proportionality plan component of Article III, ¶2(a) occurred not later than July 25, 2001, when the Defendants filed their compliance motion" with regard to Article XI.  Docket №º 7901 at 16.

Whether the Defendants were in compliance with Article III, ¶2(a) on or after July 25, 2001, cannot be made on the basis of the record before the Special Master.  Until evidence (or argument based on evidence already in the record) is produced by the Defendants with regard to the relationship between the proportionality requirements of Article XI, ¶11, and Article III ¶2(a) and that evidence is tested by the Plaintiffs, there is no basis upon which to find that the Defendants had complied with Article III, ¶2(a), on July 25, 2001.

V

Apportioning between the two articles the $685,350 that the Plaintiffs and the Defendants agree represents 15% of the total contempt fines paid is the next step in the analysis.  The approach the Defendants have proposed is reasonable, workable, and consistent with the Court's determination that 15% of all Article II and III contempt fines are to be allocated to activities unaffected by the no-overlap provision.  See  Docket №º 7917 at 6-8.

First the $685,350 is divided evenly between the two articles ($342,675) and then within each article, the fines are divided on an equal basis depending on the number of subparagraphs that are at issue. There are two subparagraphs at issue in Article II and four in Article III. A refund amount is then calculated for each subparagraph based on the number of months the Defendants were in compliance with the subparagraphs before the Court's December 2004 decision to terminate Article II and III contempt fines. The following chart adapted from the Defendants' brief allocates the fines according to the formula just described.

| ARTICLE & SUBPARAGRAPH | FINES ALLOCATED TO PROVISION | FINE DEADLINE vs. COMPLIANCE DATE | MONTHS OF COMPLIANCE | PRORATED REFUND REQUESTED |
|---|---|---|---|---|
| II, ¶2(a) | $171,337.50 | 12/31/00 & 09/01/01 | 39 of 48 mos | $139,211.72 |
| II, ¶2(b) | $171,337.50 | 12/31/00 Undetermined | Undetermined | Undetermined |
| III, ¶2(a) | $85,668.75 | 06/30/00 Undetermined | Undetermined | Undetermined |
| III, ¶2(b) | $85,668.75 | 8/30/00 & 10/12/01 | 25 of 39 mos | $ 54,915.87 |
| III, ¶2(c) | $85,668.75 | 8/30/00 & 10/12/01 | 25 of 39 mos | $ 54,915.87 |
| III, ¶2(d) | $85,668.75 | 8/30/00 & 10/12/01 | 25 of 39 mos | $ 54,915.87 |
| **TOTAL Recommended REFUND** | | | | **$303,959.33** |

   **ACCORDINGLY**, it is recommended that the Defendants' Motion to Alter or Amend (Docket № 7857) be GRANTED IN PART and DENIED IN PART.   It is recommended that the Defendants be found to have been in compliance with Article II, ¶2(a) on September 1, 2001.  It is recommended that the Defendants be found in compliance with Article III, ¶¶2(b), (c), and (d) on October 12, 2001, and that consistent

17

with the reasoning set forth above, that the Defendants be refunded $303,959.33 in remaining Article II and Article III contempt fines.  It is further recommended that additional evidence be submitted on the issue of compliance with regard to Article II, ¶2(b) and Article III, ¶2(a).

Objections to this Report and Recommendation must be filed with the Clerk of Court by December 22, 2005.  Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED  this 5th day of December 2005.

/s/ C. A. González
SPECIAL MASTER