IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

      Plaintiffs,

                                   CIVIL ACTION NUMBER

v.                               CV-85-T-665-MHT
                                **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

      Defendants.


# REPORT AND RECOMMENDATION

## I

By Order of Reference, (Docket № 7516), this matter is before the Special Master

on the Defendants' "Motion For A Finding of Compliance With Article VIII" of the

Consent Decree and for a refund of contempt fines paid by the Defendants since

September 2004.[1]  Docket № 7439.  In July 2005, the Defendants filed a motion for

summary judgment seeking a pretrial determination that they were in compliance with

---

[1]  The Defendants originally requested that all Article VIII contempt fines paid by the Defendants since December 4, 2003 be refunded.  Docket № 7439 at 8. However, that date was modified in a subsequent filing, and the Defendants now seek a refund for all fines paid after September 22, 2004, the date the Defendants filed their compliance motion.  Docket № 7816 at 51.

       The issue of the Defendants' entitlement to a refund has not been briefed. At any rate, until the Court establishes the dates by which the Defendants were in compliance with Article VIII's various paragraphs, the amount, if any, of contempt fine refunds cannot be calculated.  The issue of contempt fine refund should be taken up after the Court sets the date or dates of compliance.

Article VIII since at least September 22, 2004, when they filed their Motion for Compliance.  Docket № 7811.  The Defendants' motion for summary judgment is opposed by the Plaintiffs (Docket № 7832) and the Intervenors (Docket № 7829).

In a curious twist, both the Plaintiffs (Docket № 7814) and the Intervenors (Docket № 7812) also filed motions for summary judgment, asking the Court to deny the Defendants' request for a finding of compliance.  The Intervenors and the Plaintiffs make essentially the same arguments in support of their own motions for summary judgment as they make in opposing the Defendants'.

In support of the various motions for summary judgment, the parties have filed an evidentiary record consisting of declarations, expert reports, depositions, and a variety of ALDOT documents related to Article VIII.  At the request of the Special Master the parties met to explore ways to quicken the resolution of the referred Article VIII issues.  To this end, the parties proposed that the pending cross motions for summary judgment be converted into evidentiary submissions.  Accordingly, the Defendants' motion for summary judgment would be an evidentiary submission in support of their efforts for a finding of compliance with Article VIII, and the Plaintiffs' and the Intervenors' motions would likewise be evidentiary submissions in support of their arguments in opposition to the Defendants' motion for compliance.

On January 13, 2006, a hearing before the Special Master on the Article VIII issues was held in Birmingham, Alabama.  At that time the Special Master and the parties

affirmed their understanding of the procedural agreement explained above, and specifically agreed that in preparing this Report and Recommendation, the Special Master should rely upon the expert reports, depositions, and documents tendered in support of the various motions for summary judgment.

At the hearing, the Defendants noted that they have filed objections to the expert opinions of Dr. Joel Lefkowitz (Docket Nº 7854) and Dr. Craig Russell, (Docket Nº 7855)—the Plaintiffs' and Intervenors' expert witnesses respectively—as well as a motion to strike certain of the Plaintiffs' exhibits proffered in support of the Plaintiffs' motion for summary judgment. Docket Nº 7884. These motions are denied by a separate order entered today. Consequently, the evidentiary record includes the expert opinions of Drs. Lefkowitz and Russell, as well as the summary exhibits identified in the Defendants' motion to strike.

## II

Article VIII is divided into five paragraphs. It sets out certain requirements ALDOT is to use during the interview process. Paragraph one requires that all African Americans who appear on ALDOT Certificate of Eligibles ("COEs") be interviewed unless they cannot be located, fail to respond, or decline to sit for an interview. Paragraph two deals with the development, nature, and use of interview questions that can be asked of ALDOT job applicants. Paragraph three sets forth various requirements that ALDOT is to follow in the event an African American job candidate fails to appear

for an interview, and Paragraph four requires all ALDOT employees who conduct

interviews to first be trained in appropriate interviewing techniques.  The final paragraph

requires that ALDOT develop and use forms that will list the job-related qualifications of

each candidate interviewed.

The first two paragraphs of Article VIII—and particularly Paragraph two—receive

most of the parties' attention.  Paragraphs three through five are not strongly contested.

A

1

Article VIII, Paragraph One of the Consent Decree reads in part:

> *Interviews of black eligibles on a COE:* When black eligibles
> appear on a COE, [ALDOT] will schedule interviews with
> them and will conduct the interview before deciding whom to
> select for the job; provided, however, that if a black eligible
> cannot be located, fails to respond or declines an effort to
> schedule an interview after the efforts required by Paragraph
> 3 of this Article, . . . [ALDOT] may fill the position without
> conducting an interview of that applicant.

Consent Decree Article VIII, ¶1.

ALDOT insists that it has complied with the requirements of Paragraph One.  The

Plaintiffs dispute the Defendants' contention on three grounds:  First, that until at least

May 24, 2005, the Defendants did not interview candidates—black or white—who

appeared on multiple COEs after a candidate accepted a job off another COE.  Second,

that the Defendants use the ALDOT reemployment registers in an effort to circumvent

the requirements of Paragraph One.  And third, that the use of out-of-classification assignments provides the person so assigned a significant advantage at the time of examination because of the experience derived from incumbency.

2

"Prior to May 24, 2005, the State's policy, followed by ALDOT, was that when an applicant, black or non-black, who appeared on multiple COEs accepted a job from one COE, then that applicant was coded as 'hired' using an 'H' code on any remaining COEs that particular applicant appeared on."  Docket № 7816 at 8 (footnote omitted).  The Plaintiffs contend that ALDOT's use of the "H" code prevented African Americans from competing for certain positions in violation of Article VIII's requirement that all blacks on COEs be interviewed.  Docket № 7815 at 4.  According to Vivian Handy, the Assistant Personnel Director for ALDOT, who was tended by the Defendants as a 30(b)(6) witness, the practice of using the "H" code was approximately two years old at the time of her deposition in June 2005.  Docket № 7815, Exhibit 2 at 62-63.

Ms. Handy further testified regarding the purpose behind the "H" code.  "The 'H' code was put into place . . . to help the divisions and bureaus in making selections of people who had not been offered a job.  . . . [T]he divisions and bureaus were allowed to [use the] 'H' [code] to show that [a job candidate was] hired for [a] particular classification. . . .  In other words, they couldn't be coded an 'H' for a civil engineer

5

manager if they accepted a graduate civil engineer position.  It would have to be for the same classification."  Id. at 61-62.

Article VIII, ¶1 of the Consent Decree specifically enumerates the instances in which ALDOT is relieved of its obligation to interview African Americans who appear on COEs.  While there may have been legitimate reasons for the  use of the "H" code by ALDOT, the "H" code nevertheless prevented blacks from being interviewed who would have otherwise been entitled to an interview under the requirements of Article VIII by virtue of their inclusion in a COE.  ALDOT must have recognized this fact because on May 24, 2005, the Assistant Transportation Director, Dan Morris, "announced a new interview policy with respect to black applicants."  Mr. Morris' directive reads as follows:

> This memorandum serves to announce a new interview policy with respect to black applicants.  Currently when a black applicant, who is on multiple COEs, accepts a job from one COE, that black applicant is coded as "H," meaning "hired," on all other COEs that the black applicant appears.  In current practice, once assigned as "H" code, the black applicant is not interviewed with respect to any of the remaining COEs on  which his or her name appears.
>
> Effective immediately, all black applicants on a COE must be interviewed regardless of the "H" code.  If a black applicant, however, cannot be located, fails to respond, or declines an effort to schedule an interview after the efforts required by paragraph 3 of Article Eight of the Consent Decree, then that applicant does not need to be interviewed.

Docket Nº 7816 Exhibit A.

The announcement of this "new policy" by Mr. Morris cured the objections the Plaintiffs had to the use of the "H" code and insures that the Defendants' current conduct

is in conformity with the requirements of Article VIII, ¶1.  The following colloquy on

January 13, 2005, between the Special Master and counsel for the Reynolds Plaintiffs,

Russell Adams, is instructive on this point.

> SPECIAL MASTER:  Well, let me ask you this, Mr. Adams.  Given Mr.
> Morris' May 2005 memorandum . . . indicating that the [H] code would no
> longer be an impediment to African-American eligibles being interviewed
> for positions, how does that affect the plaintiffs' position?
>
> MR. ADAMS: After May 5th, 2005–
>
> SPECIAL MASTER: Yes, sir.
>
> MR. ADAMS: That the defendants would be in compliance as it related to that
> provision of interviewing eligibles to the extent that we know that they are
> interviewed.  . . . I can't say that they have interviewed everybody they're
> supposed to, but as far as the "H" code goes, that would no longer be an issue.

January 12, 2006 hearing before the Special Master on Article VIII, at 11-12.

(Hereinafter "Transcript").

3

When an employee leaves State employment, he or she can ask to be placed on a

reemployment register for their classification.  The issue is whether the State's use of a

"reemployment register" is covered by Paragraph One of Article VIII. The Plaintiffs

maintain that it is, (Docket № 7832 at 4-6), while the Defendants maintain that it is not.

Docket № 7847 at 1-3.

Paul Thomas, Manager of Recruitment and Examinations in the Examinations

Division of The Alabama State Personnel Department, testifies by affidavit that:

> Although called a "register," the maintaining of eligible employees for reemployment is more accurately called a list of names rather than a register.  I say it is not a "normal" register because in cases of reemployment there are significant differences between a normal employment register and a "reemployment register."  For example, with reemployment there is no exam given, no recruitment, and no advertisement for the job.  Exams, recruitment, and advertisement are all part of the establishment of employment registers.  Furthermore, there is no score or rank on any reemployment list or "reemployment register."  A normal employment register has the score and rank of all eligible employees on it.

Docket № 7847, Exhibit 1, at 1-2.

The State Personnel Board Rules define the terms "Reemployment Register" and "Eligible Register."  The term "Eligible Register" is synonymous with the term "Certificates of Eligibles" used in Article VIII.  "A 'Reemployment Register' is a list of names of persons who have been laid off, or who have resigned in good standing and requested within the time prescribed in these rules that they be so listed."  State Personnel Board Rule 670-X-3.01(c)(1).  "An 'Eligible Register' [or COE] is a list of names of persons who have successfully competed by examination arranged in order of their final rating."  Id. at §3.01(c)(3).

State Personnel Board Rules do a good job of describing the unique nature of reemployment registers.  In Rule 670-X-9.02(3)(a) the State Personnel Board explains the requirements for being listed on a reemployment register and how this register of former State employees operates.  That Rule states:

(3) Reemployment Register.

(a) <u>In Case of Resignation</u>. Any person who has held a permanent appointment in the classified service from which he has resigned in good standing shall be entitled to have his name placed on a reemployment list for certification to vacancies in the classified service, providing he so requests in writing.  The name of each such person shall be placed on the reemployment list considered most appropriate by the Director.  Each name placed on a reemployment list shall remain thereon for a period not longer than two years from the effective date of resignation.  Provided, however, that the Director may extend this period one year at a time for not more than two additional years upon the presentation in writing of satisfactory evidence that the former employee has, through appropriate training or experience, maintained his qualifications for the work involved.

State Personnel Board Rule 670-X-9.02(3)(a) reprinted in Docket № 7847 at 2.

On the other hand a COE is established after an examination and is composed of persons with passing grades.  Unlike a reemployment register, the names on a COE are listed in the order of their final ratings starting with the highest.  State Personnel Board Rule  670-X-9-.02(1).  There is nothing competitive about appearing on a reemployment register.  The persons listed on that register have already been through the competitive hiring process.  Their listing on the reemployment register is "a procedural and administrative device to track and identify persons eligible for reemployment under Rule 670-X-9-.02(3)."  Docket № 7847, Exhibit 1 at 2.  Those applicants on a COE are currently involved in the competitive hiring process.

By its plain language, Article VIII, ¶1, applies to "black eligibles [who] appear on a COE."  By any reading, Article VIII is limited to persons who appear on COEs who are engaged in a competitive employment process.  The purpose of Paragraph One is to

ensure that African Americans who are listed on a COE have the opportunity to be

interviewed for the position before a decision is made.

Article VIII, ¶1 does not implicate the Defendants' use of reemployment registers.

There is essentially no relationship between COEs and reemployment registers except

that before you can be placed on a reemployment register, you must have first been hired

through the competitive process including being listed on a COE.  ALDOT should be

permitted to use reemployment registers without fear that doing so violates Article VIII,

¶1.

3

By any measure the Defendants' use of out-of-classification assignments is very

minimal, approximately twelve out 4000 employees were working out of classification at

the time the Defendants filed their motion for a finding of compliance.[2]  There is no

evidence that African American employees of ALDOT are disadvantaged in the

competitive hiring process because of the very few employees who work out of

classification.

4.

The Defendants were in compliance with Article VIII, Paragraph One by May 24,

2005, when ALDOT abandoned its practice of using the "H" code.

---

[2]  Counsel reported at the hearing on January 13, 2005, that as of December 2005, the number of persons working out of classification was down from twelve to eight.  Transcript at 65-66.

III

A

1

The heart of the dispute between the parties is over the implementation of Paragraph Two of Article VIII, and in particular whether the Defendants are entitled to a finding of compliance.  Paragraph Two is one sentence long.[3]  It requires, among other things, ALDOT to devise and implement job-related and content-valid "standard format interview questions" for job applicants.  The questions are intended to help identify the most appropriate applicant for a particular job.

The issue of whether the Defendants have implemented the "standard format interview questions" required by Paragraph Two has suffused this litigation with contention and factual disputes.  Thousands of pages of exhibits, briefs, depositions, affidavits, and expert reports have been submitted in support of one version or another.  Despite the intensity with which the parties litigate, the issue is rather straightforward.

---

[3]  Paragraph Two reads:  *"Standard interviews*: [ALDOT] will develop and use standard format interview questions which will to the extent practicable be designed to elicit objective non-discriminatory job related information relating to the applicant and the job to be filled."  Consent Decree,  Article VIII, ¶2.

2

Since the entry of the Consent Decree, there have been three distinct sets of interview questions developed pursuant to Paragraph Two.  The first group consists of questions develop by either Auburn University Montgomery ("AUM"), or Valtera, or Work Skills First.  The questions developed at this stage are called "structured oral interview ("SOI") questions.  According to the Defendants, while SOIs are not necessarily required for the State to be in compliance with Article VIII, they nevertheless chose to use SOIs "as the method of complying with the standard format interview question requirement" of Paragraph Two.  Docket Nº 7816 at 13, n. 7.  The Court has previously held that the interview process required by Paragraph Two of Article VIII must be validated, "objective, non-discriminatory, and job related."  Docket Nº 2652 at 2.[4]  "It is ALDOT policy that when an interview for a vacant job takes place, SOI questions are used."  Docket Nº 7816, Exhibit C at 2.

---

[4]  "The Court agrees with the magistrate judge[] . . ., that the interview process 'must be administered in compliance with the consent decree and other orders of the court.' This means that the interview procedure must comply fully with article VIII of the consent decree I, which requires, among other things, that the interview process be 'objective,' 'non-discriminatory,' and 'job related.' The court further agrees with the magistrate judge that the term 'job related' means 'validation.' See Barbara Lindemann & Paul Grossman, Employment Discrimination Law (3d ed. 1996), at 135 ("job related ... is satisfied through validation.") see also Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §1607.5 (general standards for validity studies). . . ."  Docket Nº 2652 at 2.

i

The development of the SOIs by ALDOT began when the Defendants contracted with AUM to develop structured oral interview questions for the various ALDOT job classifications.  The evidence clearly establishes that the SOI questions developed under the supervision of AUM comply with Article VIII, ¶2 of the Consent Decree.  The evidence also establishes that SOI questions were developed using the following process: (1) a job analysis study was performed that "resulted in the identification of the domain of work behaviors, knowledge, skills, and abilities ('KSAs') important for effective job performance" Docket № 7816, Exhibit H at 3, ¶12(a); (2) "work behaviors and KSAs were [then] judged by subject matter experts ('SMEs') as important to effective entry-level performance in the job classifications." Id. at 5, ¶12(c).

Once the job analysis is completed, the KSAs identified, and the judgments of the SMEs solicited, AUM then developed SOI questions for various ALDOT job classifications.  For each job classification that AUM developed SOI questions, AUM prepared a Technical Report that contained documentation on the procedure used for developing the SOIs for a particular job classification.

There were approximately five job classifications for which AUM did not create SOI questions.  For these questions, ALDOT turned to Valtera and Work Skills First consultants.  Valtera and Work Skills First also developed additional SOI questions to be used with some of the classifications for which AUM had earlier developed SOI questions.  According to Dr. Buster, "[t]hese additional SOI questions were developed in

13

some cases where existing AUM SOI questions had potentially experienced heavy use" or where the AUM generated SOI questions failed to address areas or topics relevant to a particular classification.  Docket Nº 7816, Exhibit L at  6.

The Defendants have submitted the reports of Drs. Tippins, McDaniel, and Buster in support of the contention that the additional SOI questions developed by Valtera and Work Skills First are valid, job related, non-discriminatory, and compliant with Paragraph Two of  Article VIII and the Uniform Guidelines.  Dr. McDaniel testified as to the six-step process used by Valtera and Work Skills First to develop the additional SOI questions.  According to Dr. McDaniel the six step process was:

Step 1:      Identify Qualifying KSAs;

Step 2:      Identify [SMEs];

Step 3:      Develop Structured Oral Interview Questions and Response Anchors;

Step 4:      Review/Revise [SOI] Questions and Response Anchors;

Step 5:      Establish the Validity of the [SOI] Questions and Response Anchors by linking them to Qualifying KSAs.

Step 6:      Obtain SME Sign-Off.

Docket Nº 7816, Exhibit K at 14.

The process developed and implemented by AUM, or Valtera and Work Skills First to design SOI questions and additional SOI questions complies with Article VIII, ¶2 of the Consent Decree.  The structured interview questions are designed to elicit non-discriminatory, job-related and content-valid job information consistent with the

requirements of Article VIII and the uniform guidelines.  See generally the affidavit

testimony of Mr. J. Brett Becton and Dr. Katherine Jackson,  Docket № 7816, Exhibit H,

and Exhibit I, and reports of Drs.  Tippins, McDaniel, and Buster, Docket № 7816,

Exhibits J, K, and L.  See also Plaintiffs' Expert Report by Dr. Joel Lefkowitz, Docket №

7747 at 5 ("In accordance with the intent of the decree, and with close scrutiny from I/O

psychology experts representing both plaintiffs and defendants, AUM (often in

collaboration with SPD) developed in a professional manner comprehensive and thorough

job analysis for all the relevant ALDOT job titles, and subsequently developed in a like

professional manner job-related questions to be used in conducting SOIs.")

3

The Defendants have developed SOI questions for all ALDOT Project Job

Classifications and all Non-Project ALDOT-Specific Job Classifications.  Docket №

7972 and Docket № 7963, Exhibit A at 2.

SOI questions have also been developed for all Statewide General Job

Classifications used by ALDOT except Archivist, Senior.  Regarding this classification

Cynthia Jackson, an employee of SPD working on the Transportation Team, testifies by

affidavit as follows:

> 10.     The Archivist, Senior job classification is . . . new to ALDOT.  The
> Archivist, Senior position for ALDOT was established on November 21,
> 2005.  SPD anticipates that the SOI questions and corresponding content
> validity report for the Archivist, Sr.  job classification will be complete by
> the end of April 2006.

Id. at 2-3.

The Defendants have expended tremendous energy and money in the development of SOIs. By almost any measure they have achieved substantial compliance with this effort. For those job classifications that have been identified by the Defendants for terminations, or that are direct appointment, it would be unwarranted and unnecessary to require the Defendants to develop SOI questions pursuant to the requirements of the Consent Decree.

For the remaining job class where the Defendants have acknowledged that SOI questions are in the developmental stage, the Intervenors and the Plaintiffs maintain that until all applicable classifications have SOI questions, there can be no finding of compliance. Docket Nº 7829 at 3-4 (Intervenors), Docket Nº 7832 at 8-10 (Plaintiffs). Because ALDOT's job classifications are constantly changing, with old classifications being eliminated and new classifications being established, it is impossible to conclude at any one time "that all applicable classifications have SOI questions." What can be determined and what the Defendants have conclusively shown, is that they have in place a procedure for developing SOI questions, that when applied leads to valid SOI questions for ALDOT job classifications in a timely manner.

Had the Defendants stopped with the development of the SOI questions the issue of compliance with Article VIII, ¶2 would have been quickly resolved. Instead, a well conceived and executed policy got off track when ALDOT employees were permitted to introduce into the interview process supplemental questions that were not developed in a

16

manner consistent with Article VIII or even the process used to develop the SOI questions.

ii

In addition to developing SOI questions AUM was also asked to create and implement a training program on interviewing techniques and practices to comply with Article VIII, ¶4.  The result was the "Alabama Department of Transportation Interview and Selection Training Manual" ("Manual") Docket № 7816 Exhibit N.  The Manual, published sometime around June 2003, authorized the use of supplemental questions.  See Docket № 7816 Exhibit K at 5.

According to the Defendants, "[a]fter the SOI questions were developed and implemented, some ALDOT interviewers found that it was necessary to ask supplemental questions, i.e., questions in addition to the already-created SOI questions, due to unique requirements of a particular vacant job."  Docket № 7816 at 23.  ALDOT interviewers who sought to use supplemental questions arguably did so because the Manual "clearly contemplates that there may be a need for supplemental interview questions."  Id.  The Manual states: Upon reviewing the [SOI] questions  . . . , you may find it necessary to write additional questions to address some of the unique requirements of the position."  Id. Exhibit N, at 23.

The questions developed through the ALDOT interview process are called "supplemental questions."  The development of these supplemental questions falls into three groupings: (1) those developed prior to January 20, 2004; (2) those developed after

17

January 20, 2004; and (3) those that ALDOT may develop in the future using its "Guide for Developing and Validating Supplemental Structured Interview Questions for Specialized Positions Within a Job Classification at ALDOT." (Hereinafter "Guide").

The Intervenors and the Plaintiffs challenge the Defendants' use of any supplemental questions developed prior to January 20, 2004.  According to the Intervenors and the Plaintiffs, the supplemental questions used prior to January 20, 2004, were not validated in any way, nor were they job related.  Docket № 7500 at 8 (Plaintiffs) and Docket № 7813 at 6 (Intervenors).  The evidence is ample that the supplemental questions used prior to January 20, 2004, were not developed consistent with the requirements of the Consent Decree, nor were they job related and validated as those terms are commonly understood and used throughout this lawsuit and the Uniform Guidelines.  Dr. Buster testified by deposition that he was unaware of any review by his department of ALDOT supplemental interview questions before January 20, 2004. Docket № 7813, Exhibit C at 42.

While taking issue with the Intervenors' and the Plaintiffs' assertions, the Defendants contend that the objections to the use of supplemental questions before January 20, 2004 are now moot since they "have implemented new policies and procedures since January 20, 2004, to ensure that supplemental interview questions will, to the extent practicable, be designed to elicit objective non-discriminatory job related information. . . . "  Docket № 7831 at 3.

18

The post-January 2004 procedure for developing supplemental questions has been described as a "stop-gap" procedure.  According to the Defendants, the stop-gap procedure required ALDOT interviewers who wished to use supplemental interview questions to submit the proposed supplemental questions in writing to Frank Topping, Chief of the ALDOT Bureau of Human Resources.  Mr. Topping then forwarded the supplemental questions to SPD where they are reviewed by an I/O Psychologist and a State Personnel Analyst III.  Docket № 7816, Exhibit L at 14.  Dr. Buster has described the SPD review process as a "two-pronged approach."

> First a State Personnel Analyst III on the Transportation Team possessing extensive experience and familiarity with ALDOT classifications completed a linkage matrix where he/she rated the relationship between the proposed questions and the qualifying KSAs from the job analysis.  Second, an Industrial/Organizational Psychologist on the Transportation Team (either [Dr. Buster] or a Psychologist under [his] supervision), reviewed the questions and response standards, available documentation, and the resulting linkage ratings.

Id. at 15.  Unless the proposed supplemental questions are approved by an SPD I/O Psychologist, they cannot be used during the interview process.  Docket № 7816 at 23-24.

The approved supplemental questions are then asked in addition to the original SOI questions that had been previously developed.  Id.  By any measure, the Defendants' use of supplemental questions is minimal.[5]  The issue, however, is not whether the

---

[5]  The use of supplemental questions by the Defendants has not been widespread.  Between January 2004, and July 2005, ALDOT interviewers used supplemental questions in only twelve job classifications.  Within those twelve classifications, there were only 23 requests to use supplemental questions with a total

(continued...)

development of supplemental questions under the stop-gap procedure is minimal, it surely

is; the question is whether the development of supplemental questions during the period

after January 2004 complies with Article VIII.

The Intervenors argue that any supplemental questions generated through the stop-

gap procedures are not compliant with the Consent Decree nor validated or job related.

Docket № 7813 at 7-9.  In support of their position, the Intervenors point to a number of

alleged shortcomings in the Defendants' stop-gap procedures.

> Even after January 20, 2004, it is undisputed that additional interview
> questions have  not been developed in accordance with the specific
> procedures set forth in the ALDOT/AUM Interview Manual, which was
> developed for use in implementing the AUM structured oral interviews
>
> It is undisputed that the additional interview questions have not been
> developed using subject matter experts ("SMEs") other than the
> interviewer, who may or may not be an SME. The ALDOT/AUM Manual
> instructs interviewers that they should "utilize SMEs to develop the
> additional structured interview questions."
>
> Even after January 20, 2004, there has been no meaningful determination of
> job-relatedness. In some instances, questions have been approved where
> they link to as few as 2% of the job-related KSAs.  In some instances, the
> 2% of KSAs include KSAs as general and generic as the "ability to actively
> listen to and communicate with others . . ." That particular KSA appears to
> have been linked by the analyst simply because interview questions
> generally involve the ability to communicate orally.

--------------------------------

[5](...continued)
of 106 supplemental questions being submitted to SPD for review.  Docket № 7816 at
24.  Of the 106 submitted questions, 38–or 35.8%–of the questions were not permitted
by SPD.   According to counsel for the Defendants, the last request to use
supplemental interview questions came a year ago in February 2005.  Transcript at 94.

It is undisputed that the additional interviewer-generated questions have not been reviewed according to consistent standards of KSA-linkage or job-relatedness.

Additional interview questions have sometimes been approved without any response standards, with the express indication that such response standards are "not required." This, too, is contrary to the ALDOT/AUM interview manual.

In some of the review packets, the SPD analyst did not expressly indicate whether individual questions are approved or disapproved, and did not expressly indicate whether additional interview questions are job-related. In fact, Dr. Buster testified that SPD did not approve or recommend any questions, but rather left the determination whether to use submitted questions to Mr. Topping, who has no formal training to make such determinations.

Docket № 7813 at 7-9 (citations to the record omitted).

In response to these objections, the Defendants, in part, contend that the Intervenors' objections are misplaced because they place too much emphasis on the AMU Manual as the preferred method for developing supplemental interview questions. While the Manual may authorize the use of supplemental interview questions and contains a section describing how to write such questions, (Docket № 7816 Exhibit N at 23-25), according to the Defendants, it is not the only valid method for doing so. See Docket № 7831 at 5 ("The Consent Decree must guide the court, not blind adherence to the AUM Manual. "The procedures the Defendants have implemented, and continue to improve upon, have resulted in a process that leads to supplemental interview questions that are objective, non-discriminatory, and job related"). Assuming the Defendants are correct and that they are not restricted to the procedures set out in the Manual, then the issue is

21

whether the stop-gap procedure employed by the Defendants has led to valid and job-related supplemental questions. The answer seems clearly to be no.

The Defendants' efforts to develop supplemental interview questions under the stop-gap procedures falls short of the standards required by the Consent Decree. When assessed in its totality, the stop-gap process appears at times dangerously *ad hoc* in execution and skimpy in detail. If not expressly, then intuitively, the Defendants realized that the procedure they were using was inadequate to the task it was put. Docket № 7813 Exhibit C at 155-63. Why else spend the considerable sums to replace the "stop-gap" procedure with the new Guide?

Consider the detailed process to be followed, the careful record keeping required by the Guide, and the exacting nature of the original SOI question development procedure. To develop the Guide, ALDOT commissioned a professionally prepared nine-step process that takes twenty pages to explain in general and more than a dozen appendices of additional instructions and forms to fully implement. This in comparison to a process where ALDOT interviewers submit a proposed supplemental question to Mr. Topping's office, who then in turn passes the proposed questions on the SDP with little substantive documentation. Dr. Buster testified:

> Q.    There's no documentation under the stop-gap process
>       of how the ALDOT interviewer has gone about
>       developing the supplemental questions, is there?
>
> A.    Not that we get. . . .
> . . .

22

> Q. And so in terms of SPD's review under the stop-gap process, SPD gets the questions, the supplemental questions, correct?
>
> A. Correct.
>
> Q. Any response standards if they've drafted some?
>
> A. Correct.
>
> Q. And I think usually a request to use supplemental questions, like a cover letter or something?
>
> A. Correct.
>
> Q. Does SPD have anything else, any other documentation provided to it by ALDOT under the stop-gap process concerning these supplemental questions?
>
> A. Specific to them, no. We of course, have the original job analysis. But specific to these supplemental questions, no.

Docket № 7813 Exhibit C at 169-71.

Mr. Topping, who is offered as a 30(b)(6) witness by ALDOT regarding the stop-gap procedure, testified that he was unaware of any rules or guidelines as to when supplemental interview questions are appropriate. Docket № 7813 Exhibit D at 42. ("Q. And do you know of any specific rules or guidelines as to when supplemental questions are appropriate or are not appropriate? A. If we have guidelines, I'm not aware of any.") Mr. Topping also testified that he did not have any information about how supplemental questions are to be developed.

> Q. Do you know what the guidelines are for the interviewer to make the determination as to whether or not to write some supplemental questions?

23

A.    Really, I do not. . . .

Q.    Do you know how those questions – how the interviewer, what goes into developing and writing those questions?

A.    No.

Docket № 7813 Exhibit D at 40.

Mr. Topping's involvement in the development of supplemental questions is on the margins.  He has no approval authority over supplemental questions (Id. at 28), has no knowledge of the validation processes required by the Uniform Guidelines (Id. at 42), relying instead on SPD to provide the expertise necessary to validate any supplemental questions.  Id. at 49-50.

When asked to describe the involvement of SMEs in the development of supplemental interview questions under the stop-gap procedure, Dr. Buster testified:

Q.    My question was:  Do they use subject matter experts?

A.    And my response would be I'm sure the person – at least the person writing the question is a subject matter expert.

Q.    Well, what do you base that on?

A.    Well, I mean, I guess common sense for one. But they're going to have to know something about the job to develop the questions as well.  Talk to Frank Topping. He does review who is involved in the interviews. And so Frank Topping also would provide some legal (sic) of review.

Q.    Do you know if these ALDOT hiring managers involved anyone else in the process besides themselves, [in] the question development process?

A.    I can't tell you from interview to interview whether they're involving people outside themselves.  Frank Topping probably could.

24

Docket № 7813 Exhibit C at 75-76.

Dr. Buster's assumption that Mr. Topping was performing a meaningful assessment of SME usage or any sort of oversight of the stop-gap procedure is not supported by the evidence.  The conclusion suggested by the evidence of the back and forth between Dr. Buster and Mr. Topping is that no one was ensuring that the stop-gap procedure was being applied in the fashion necessary to ensure compliance with Article VIII or the Uniform Guidelines.

The stop-gap procedure intended to develop validated supplemental interview questions does not adhere to the requirements of the Uniform Guidelines nor satisfy Article VIII, ¶2 of the Consent Decree.  See generally, Expert Report of Craig Russell Docket № 7748 at 3-4.  With the development of the Guide and its eventual implementation, however, the Defendants appear to have a process in place that will lead to content valid supplemental questions.

iii

The  "Guide for Developing and Validating Supplemental Structured Interview Questions for Specialized Positions Within a Job Classification at ALDOT" ("Guide") is the product of an extensive and concerted effort by the Defendants.  It is a process that in the opinion of the Special Master will more likely than not lead to validated and job related supplemental questions once implemented.  The Guide is a joint effort by Valtera,

25

WorkSkills First, and the SPD—the same entities involved in the original development of

SOI questions.  The Guide is intended to provide

> detailed instructions for developing and documenting the job
> relevance of structured interview questions that may be used
> to supplement the existing post-certification of eligibles
> structure interviews in [ALDOT].  In this context, the words
> "document the job relevance" means ensuring that the
> interview questions measures the [KSAs] that are necessary to
> perform the job for which the questions were written.

Docket № 7816 Exhibit T at 1.

Drs. Tippins, McDaniel and Buster have all provided reports or testimony that the

Guide is consistent with the Uniform Guidelines and the requirements of Article VIII, and

that questions developed using the Guide will be job-related, content-valid interview

questions.  See 7816 at 33-34 and record citations indicated therein).  The nine-steps

process and the numerous sub-steps described in the Guide for developing supplemental

structure interview questions are substantial, well designed and fully comport with the

Uniform Guidelines and the Consent Decree. [6]

---

[6]  The nine steps are as follows:  (1) Identify the positions and the SMEs to be
used in the process; (2) Review and revise the existing Job Analysis to identify new
qualifying tasks and KSAs; (3) Conduct a review of the task/KSA work products; (4)
Write supplemental structured interview questions; (5) Develop response anchors; (6)
Link the supplemental structured interview questions to the new qualifying KSAs; (7)
Conduct a review of the  supplemental structured interview work products; (8) Submit
the structured interview questions and all related documentation to ALDOT and SPD
for review and approval; and (9) Administer supplemental structured interview
questions when approved by ALDOT and SPD.  Docket № 7816, Exhibit J at 11.

The Intervenors' and the Plaintiffs' challenges to the Guide are general in nature and essentially contend that the procedures embodied in the Guide will not lead to questions that are job related in part  because they are not based on the original job analysis reports and because there are insufficient safeguards in the way supplemental questions are reviewed.  Docket № 7829 at 11-13 (Intervenors) and Docket № 7747 (Plaintiffs).

The Guide is a thorough process that bases supplemental questions on a job analysis that results in a list of qualifying tasks and KSAs.  The requirements for conducting the job analysis are very detailed and the resulting product is subject to professional review both at ALDOT and SPD.  Docket № 7816, Exhibit K at 10-11.  The fact that a new job analysis may be conducted does not violate the Uniform Guidelines if the job analysis is undertaken consistent with the Guidelines.  Under the Guide, there are thirteen detailed steps that must be followed to assess the original job analysis and determine whether a supplemental job analysis is necessary.  Docket № 7816, Exhibit T at 10-11.  Through this process, the task and KSA statements are developed that are specific to the job for which supplemental questions are needed.  All of the documentation generated through the supplemental job analysis including the qualifying KSA statements and tasks must be reviewed by either an SPD I/O Psychologist or a State Personnel Analyst III.

> Supplemental interview questions are linked to qualified KSAs in two ways.  First, questions are written with reference to a qualified KSA(s).  That is, one needs to identify a qualified KSA first and then write a question to assess the qualified KSA.  At least two ALDOT staff and one SPD staff

27

person must review each item.  Second, each interview question when
finalized is linked to one or more  qualified KSAs using a survey.  The
survey results must be also reviewed by at least two ALDOT staff and an
SPD staff person. . . .

In brief, the interview questions are based on a job analysis that identifies
KSAs that are: Important, Needed at entry, and Linked to work tasks.

Docket Nº 7816, Exhibit K at 11-12.

The process that will be used under the Guide to develop supplemental structured

oral interviews is consistent with the requirements of the Uniform Guidelines and the

objections to the process  appear to be more conclusory than substantive.  The

overwhelming evidence supports the future use of the Guide as a way of developing

content valid supplemental interview questions that comply with Article VIII.

The Plaintiffs and the Intervenors spend considerable energy arguing that since the

Guide has never actually been used to develop supplemental questions that it cannot form

the basis for a finding that the Defendants are in compliance with Article VIII.  As stated

by counsel for the Plaintiffs, "as long as [ALDOT is] still developing questions they're

not in compliance."  Transcript  at 97.

All that can reasonably be determined at this stage is that application of the Guide

by ALDOT will more likely than not lead to supplemental interview questions that are

validated and job related.  To refuse the Defendants' request for a finding of compliance

because of some probability that ALDOT might in the future apply the Guide is to stand

the whole process for finding compliance on its head.  ALDOT is not a static entity.  Its

employment needs change over time and ALDOT must be able to respond to those

changes in a timely and systematic fashion.  The Guide will facilitate not only ALDOT's ability to adapt to its changing environment, but to ensure that as it adapts its employment policies are consistent with the best professional practices, and that those practices satisfy the requirements of the Consent Decree.  The fact that the Guide may be used in the future is no impediment to finding that the Defendants are now in compliance. If the potential future use of the Guide is sufficient to forestall a finding of compliance, then it is hard to imagine a situation where the Defendants will ever be in compliance with Article VIII as the potential need for supplemental questions evolve over time.

When the Defendants abandoned the stop-gap procedure in favor of the Guide and compete the training of ALDOT employees on the use of the Guide, July 2005,[7] (Transcript at 123) they were in compliance with the requirement of Article VIII, ¶2 that the Defendants use "standard format interview questions."  Because the Defendants clearly contemplate that in the future there may be a need for additional supplemental questions, it is critical that they have in place a properly designed process for question development.  It is equally critical that those who will be charged with executing that process are trained on the appropriate procedures to follow.  Since the Defendants have met both conditions, they should be found in compliance with ¶2.

IV

---

[7] It is unclear from the record the exact date in July 2005 when the Defendants completed training appropriate ALDOT employees on the use of the Guide.  For purposes of fixing a date of compliance, therefore, the Special Master recommends that the Court adopt the last day of July 2005 as the date by which the Defendants achieved compliance with Article VIII, Paragraph Two.

A

1

The Intervenors contend that the Defendants are not in compliance with Article VIII, ¶2 because they "have implemented a policy whereby eligible candidates on a [COE] are chosen to participate in the interview process (or not) on the basis of race." Docket № 7813 at 21.  In particular, the Intervenors complain that ALDOT's interview process is race conscious in that it excludes certain non-black applicants from the selection process on the basis of race while requiring that all African Americans who appear on a COE must be interviewed.  This interview policy was clearly set forth by ALDOT when on March 15, 2004, ALDOT's Assistant Transportation Director informed ALDOT's Bureau Chiefs and Division Engineers that:

> Under the Consent Decree and in accordance with State Personnel procedures it is not necessary to interview every non-black on a COE. Henceforth, you must interview all blacks and only those non-blacks on the COE which you wish to interview.  Thus, if you have a COE with 50 names on it and 20 of them are black and 30 of them are non-black, you must interview all 20 blacks but you might interview only two, three or more non-blacks.

Docket № 7813 at Exhibit F.  Until March 15, 2004, the Defendants interviewed every person on a COE.  Docket № 7831 at 17.

The Intervenors state their allegations with respect to Defendants' interview policies as follows:

> It is undisputed that ALDOT's interview policy effectively operates to permit the exclusion of non-black candidates from being asked <u>any</u> interview questions at all.  This no-interview

30

> policy violates Article Eight, ¶ 2's requirement that interviews
> be "standard," "objective," "non-discriminatory," and "job
> related."  By implementing this discriminatory interview
> policy, the defendants are imposing an unconstitutional and
> un-validated selection criterion–race–to eliminate eligible
> candidates on a COE from participation in the interview
> process, in violation of Article Eight, ¶ 2.  By evaluating and
> excluding eligible candidates on the basis of race, the
> defendants are implementing interviews that are neither
> standard, nor non-discriminatory, nor job related, nor valid.
> The defendants' implementation of interviews under this
> race-conscious interview policy violates the race-neutral
> provisions of the consent decree, and particularly Article
> Eight, as well as federal statutory and constitutional
> provisions protecting against racial discrimination.

Docket № 7829 at 6-7 (emphasis in original).

The Intervenors believe this policy is on its face racially discriminatory in clear violation of Title VII and the Equal Protection Clause of the United States Constitution.[8] The Intervenors may well be right, and at a very minimum, the abrupt change in policy announced March 15, 2004, has the real possibility of upsetting morale within the ALDOT work force and turning routine employment decisions into potential claims of unfair employment practice.  In short, the policy makes little sense.  As unwise and fraught with legal issues as the policy might be, the question before the Court is narrow: Does ALDOT's policy of no longer interviewing all non-black applicants on a COE violate Paragraph Two of Article VIII?

2

---

[8]  Other than to assert that the Defendants' interview policy violates Title VII and the Constitution, the Intervenors have not briefed these issues in any substantive way.

The Intervenors rest their argument on the assumption that Paragraph Two of Article VIII precludes ALDOT's current interview policy.  Paragraph One of Article VIII clearly requires that all blacks on a COE be interviewed, but says nothing with respect to non-blacks who appear on the COE.  Paragraph Two, on the other hand, is directed not at who is interviewed but at the nature of the questions to be asked those selected for interviews.  Paragraph Two reads:

> 2. <u>Standard interviews</u>: [ALDOT] will develop and use standard format interview questions which will to the extent practicable be designed to elicit objective non-discriminatory job related information relating to the applicant and the job to be filled.

There is no ambiguity in the clear terms of Paragraph Two.  This paragraph deals with one issue:  the nature of the questions to be asked applicants and the development of those questions.  It has nothing to do with who gets interviewed.

According to the Intervenors, Paragraph Two is implicated because the current ALDOT interview policy is not "standard," "objective," "non-discriminatory," or "job related."  The Intervenors' reading of Paragraph Two is not supported by the plain and clear meaning of the paragraph.  The paragraph describes the nature of the information that the interview questions must be designed to elicit, and requires that the questions must be standard, <u>i.e.</u>, asked of all persons interviewed.  Excluding some persons from the interview process on the basis of race—as unwise as it may be—is simply not implicated by the requirement that ALDOT must "develop and use standard format interview questions."

The Eleventh Circuit has held that "the same rules that govern contract interpretation" govern the interpretation of consent decree terms since "a consent decree is essentially a form of contract." Reynolds v. Roberts, 202 F.3d, 1303, 1312 (11th Cir. 2000).  When the provisions of a contract are clear and unambiguous, a court cannot apply the rules of contract construction and must enforce the contract as written. Southland Quality Homes, Inc. v. Williams, 781 So.2d 949, 953 (Ala.2000) ("[i]f a contract is unambiguous on its face, there is no room for construction and it must be enforced as written").

The plain language of Paragraph Two does not require ALDOT to interview anyone white or black.   If the interview questions to be used are validated, job-related, and asked of all applicants actually interviewed, then the Defendants are in compliance with Article VIII, ¶2.

The Intervenors' reading of Paragraph Two requires the Court to accept the proposition that using and developing "standard format interview questions" is tantamount to requiring that all persons on a COE be interviewed because to do otherwise is inconsistent with the intent of Article VIII and the Uniform Guidelines.[9]  It is not

---

[9]   The following exchange between counsel for the Intervenors and the Special Master makes the Intervenors' basic argument clearly:

SPECIAL MASTER:  And when Judge Thompson required that job relatedness essentially meant validated under the uniform guidelines, why wasn't he at that juncture simply referring to the . . . development of questions and then the application of those questions to the interview pool?

(continued...)

possible to read Paragraph Two to this effect.  Application of the Uniform Guidelines <u>to Paragraph 2</u> concerns the methodology used by ALDOT in developing interview questions, not the method by which those to be interviewed are selected.  Again, while the current ALDOT interview policy of interviewing all blacks and only those whites otherwise selected off the COE may be unwise, its does not violate Article VIII, ¶2 which is the only question before the Special Master.


V

The Defendants have been in compliance with Paragraphs 3, 4, and 5 of Article VIII since the filling of the Defendants' motion for compliance, 22 September 2004.  The Defendants have amassed a wealth of evidence, nearly all of it uncontradicted and unchallenged, to support a finding of compliance with Paragraphs 3, 4, and 5.  With

---

[9](...continued)

MR. BROWN:  Our response would be that Paragraph 2 uses the precise word, "develop," meaning that the process is important as well as the outcome itself.  In other words, that the process must also meet the standards of a valid selection procedure.

It is a procedure that they use and part of that procedure is the manner in which the state has decided to winnow their field of candidates, and to do that solely on the basis of a candidate's race, in our view is in violation of the guidelines and in violation of Paragraph 2.

SPECIAL MASTER: If there were no African Americans on the [COEs] would all white candidates still have to be interviewed under this article ?

MR. BROWN:  I think they would, I think they would in order for them to be standard interviews.  Everyone should have equal access under the standardization prong of Paragraph 2.

Transcript at 40-41.

34

respect to Paragraph 3's requirements to ensure follow up contact is made with black applicants that fail to appear for interviews the Defendants have in place procedures and practices that comply with the requirements of the Consent Decree.  See  Docket Nº 7816 at 39-41 and Exhibits B, C, and E.

Article VIII, ¶4's  requirement that ALDOT employees who conduct interviews must be trained has been satisfied by the Defendants.  On behalf of ALDOT, AUM has prepared a training program through which all ALDOT employees who participate in the interview process must pass through before that employee can conduct any interviews. Docket Nº 7816 Exhibit B.  The training is designed to instill in those who conduct interviews for ALDOT position an awareness and training in those interview techniques and procedures designed to "minimiz[e] to the extent practicable any disadvantage to black eligibles in the interview process."  Docket Nº 7816 Exhibit H.  The Defendants have been in compliance with Article VIII, ¶4 since September 22, 2004.

The available and uncontradicted evidence establishes that the Defendants have been in compliance with Paragraph 5 since September 22, 2004.


VI

**ACCORDINGLY**, it is Recommended that the Defendants' Motion for a Finding of Compliance with Article VIII be GRANTED and that as respects each individual paragraph of Article VIII that the Defendants be found in compliance as of the following

dates:  Paragraph One, May 24, 2005; Paragraph Two, July 31, 2005; Paragraphs Three, Four, and Five, September 22, 2004.

It is further Recommended that the Defendants' Motion for Summary Judgment (Docket № 7811); the Intervenors' Motion for Summary Judgment (Docket № 7812); and the Plaintiffs' Motion for Summary Judgment (Docket № 7814) all be DENIED AS MOOT.

Objections to this Report and Recommendation must be filed with the Clerk of Court by March 10, 2006.  Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.


IT IS SO RECOMMENDED this 21st day of February 2006.


/s/ C. A. González_____
SPECIAL MASTER