IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

     Plaintiffs,

                                  CIVIL ACTION NUMBER
v.                               85-cv-665-MHT
                            **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

     Defendants.

---

## ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION AND REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO RECOVER CONTEMPT FINES AND DEFENDANTS' MOTION FOR REFUND OF CONTEMPT FINES RELATED TO ARTICLE XV

**I**
**A**

The Defendants are again before the Court with a renewed attempt to recover $13,592,890.67 in contempt fines paid between February 8, 2000, and February 14, 2005.  On August 14, 2007, the Special Master recommended that a small portion of the previously paid Article XV contempt fines be returned, but that for the majority of the fines, the Court lacked the jurisdiction to order their return because they were correctly calculated, lawfully collected, and long ago

transferred from the Court's control to The United States Treasury, thereby stripping the Court of jurisdiction over the money.  Docket Nº 8235 at 3-7, (Report and Recommendation, (hereinafter "R&R")).  Critical to the conclusion of the R&R was the fact that counsel and the Special Master were operating with the understanding that all civil contempt fines had been deposited by the Clerk of Court into The United States Treasury.  This understanding was uniformly held by the parties and based on discussions that officials of the Clerk's Office had with counsel.

Following the filing of the R&R, the Defendants decided to again inquire of the Clerk, The Hon. Debra P. Hackett, regarding the actual location of the previously paid contempt fines.   According to Defendants' counsel, Chris Weller, Ms. Hackett orally informed him that civil contempt fines remained on deposit in a Regions Bank Money Market Account maintained for the benefit of the Court. Docket Nº 8241 at 4.  With this information in hand, the Defendants moved to reconsider the Report and  Recommendation "based . . . on the recent discovery of evidence establishing that the Court remains in possession and control of the civil contempt fines paid by Defendants. . . ." Id. at 1.   On the basis of the Defendants' representation that the Clerk retained possession of the contempt fine money, the R&R was withdrawn by the Special Master, (Docket Nº 8243), and the parties ordered to brief again the underlying issue of the Court's jurisdiction in light of the Defendants' assertion.  Docket Nº 8245.

2

In the interim, Chief Magistrate Judge Coody directed the Clerk of Court to file an affidavit that contained the following information: (1) the identity of the account or accounts into which the civil contempt fines paid by the defendants were deposited; (b) the date that each account was created, if known; (c) the designated holder or owner of each account identified; and (d) the total amount of civil contempt fines on deposit in each account.  Docket № 8244.

On September 4, 2007, Ms. Hackett filed her affidavit.  Docket № 8245.  In the affidavit, Ms. Hackett avers that all of the civil contempt fines paid by the Defendants, less amounts previously ordered returned to the Defendants, had been deposited into The United States Treasury to account 109900 which is for Miscellaneous Fines, Penalties and Forfeitures Not Otherwise Classified.  Id. at 2. In total, $13,592,890.67 in paid civil contempt fines were transferred to The United States Treasury.

In the end, nothing new was learned from Ms. Hacket's affidavit that was not known, briefed, and relied upon when the Defendants filed their initial motions and the Intervenors and Plaintiffs responded in opposition.  The evidence establishes conclusively that the Court does not retain possession of any civil contempt fines.

The failure to present any new evidence leaves much of the reasoning of the original R&R unchallenged.  Nevertheless, as was previously expressed by the Special Master, "[i]t would be a far better use of [the contempt fine monies if

3

they were used] to support ALDOT's efforts to enhance the operation and diversity of its workforce, [rather] than to have the money lost in the vastness of the federal government bureaucracy." 8235 at 11. At a minimum, the Defendants' Motion to Reconsider, and their revised arguments, gives the Special Master an opportunity to review anew the position of the parties on this important issue.

**B**

There are three motions pending. The first requests reconsideration of the earlier R&R. Docket № 8241. The second motion seeks the outright return, without limitation, of fines paid for the failure to timely comply with Article XV. Docket № 8178. The final motion seeks recovery of all other contempt fines with the caveat that recovered fines would be used to fund ongoing programs started under the Consent Decree and to pay attorneys' fees. Docket № 8179. These last two motions are the same motions that were resolved by the now-withdrawn R&R. There is no new evidence before the Court. The Defendants have, however, refined and extended their arguments regarding the ability of the Court to recall the funds from The United States Treasury and order their restitution to the State.

Some background regarding the payment of civil contempt fines is in order.

**II**

**A**

By August 1999, the Defendants had stipulated to their contempt of
the Consent Decree.  Docket № 4147.  On the basis of that stipulation, the
Court, on January 31, 2000, entered an agreed-to order finding the
Defendants in contempt of the Consent Decree and approving the parties'
Agreement on Remedies for Contempt, ("Agreement on Remedies").
Docket № 4247.  Among other things, the Agreement on Remedies
established deadlines for compliance with the Consent Decree's various
provisions.  The Agreement on Remedies also created a framework for the
imposition of coercive civil contempt fines in the event the deadlines were
not met.  Unfortunately, the Defendants failed to meet many of the
deadlines, and were required to pay contempt fines beginning in February
2000.

In all, the Defendants paid $19,367,000 in fines during the term of
their contempt.  Docket № 8179 at 1.  Between 2000 and 2006, the
Defendants were refunded a total of $5,774,109.33, leaving
$13,592,890.67 of previously paid contempt fines unrefunded.  Of the

approximately $13.6M in fines, a total of $2,219,500.00 is attributable to contempt of Article XV.  Docket № 8224 at 1.

The Defendants seek the outright refund of the civil contempt fines paid for noncompliance with Article XV.  They contend that they were prevented from complying with the Article in a timely manner because of delays not attributable to their actions, and as such, are entitled to have the Article XV fines returned.  Docket № 8178 at 1.  With regard to the remainder of the civil contempt fines, i.e., $11,373,390.00, the Defendants propose that if those fines are refunded, they will "be used to fund ALDOT training and recruiting programs . . . [and] to pay any outstanding and/or future attorneys' fee awards."  Docket № 8179 at 2.

**B**

It is undisputed that the fines were deposited into the miscellaneous receipt account within the U.S. Treasury designated as "Fund Group 109900 Miscellaneous Fines, Penalties, and Forfeitures, Not Otherwise Classified."  As such the monies are now within the control of The Department of Treasury.  The Appropriations Clause of the United States

Constitution, Article I, § 9, Cl.7, provides:  "No money shall be drawn from the Treasury but in consequence of appropriations made by law. . . ."[1]

Realizing, however, that from time to time, the United State government receives funds to which it is not entitled, the Congress has for years included in the general appropriation act for The Department of Treasury language that allows it to refund money erroneously received by the federal government.  In particular, Congress appropriates funds under 31 U.S.C. §1322(b)(2) for the refund of money erroneously deposited into the Treasury's miscellaneous receipt accounts:

> (b) Except as provided in subsection (c) of this section, necessary amounts are appropriated to the Secretary of the Treasury to make payments from –
> . …
>
> (2) the United States Government account "Refund of Moneys Erroneously Received and Covered" and other collections erroneously deposited that are not properly chargeable to another appropriation.

31 U.S.C. §1322(b)(2).

---

[1]  In Knote v. United States, 95 U.S. 149, 154 (1877), the Supreme Court stated: "[I]f the proceeds have been paid into the Treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Monies once in the Treasury can only be withdrawn by an appropriation by law."

To effectuate payment from the appropriation authorized by Section 1322(b)(2), The Department of Treasury has established account 20X1807. This account is defined as follows:

> Section 3045—Procedures for Using Account 20X1807, "Refund of Moneys Erroneously Received and Covered"
>
> When agencies can trace the amount subject to refund as having been erroneously credited to an appropriation account, the refund claim is chargeable to that appropriation whether it is lapsed, current, reimbursable or non-reimbursable.  Agencies may charge account 20X1807 only when collections are deposited into Treasury as miscellaneous receipts and the amount to be refunded is not properly chargeable to any other appropriation.

1 Treasury Financial Manuel ("TFM") 6-3045, quoted in Docket № 7873 at 7-8.

According to the Defendants, "[o]nce the Court has entered an order directing that a refund of contempt fines be made, the Clerk of the Court is authorized under 31 U.S.C. § 1322(b) and 1 TFM 6-3045 to disburse [the] refund from the designated account." Docket № 8206 at 2.  The Intervenors' position is that the contempt fines are beyond the reach of the Court because they are now property of the United States, having been deposited into The United States Treasury and having been "paid by the

8

Defendants pursuant to a valid and lawfully entered order. . . ."  Docket №

8200 at 2 <u>see</u> <u>also</u> Docket № 8199 at 1.

One thing is clear, there is statutory authority to support the refund of

previously paid fines to the extent necessary to correct a mistake that has

resulted in the erroneous deposit of money into the Treasury.

The plain meaning rule governs statutory construction.  <u>Miccosukee</u>

<u>Tribe of Indians of Fla. v. Southern</u>, 304 F.3d 1076, 1087 (11th Cir. 2004).

Under this rule the Court looks to the actual language used in a statute to

decide its meaning.  <u>CBS Inc. v. PrimeTime 24 Joint Venture</u>, 245 F.3d

1217, 1224 (11th Cir. 2001).  Absent ambiguity, no additional inquiry is

allowed or required.  <u>U.S. v. Mandhai</u>, 375 F.3d 1243, 1248 (11th Cir.

2004); <u>CBS. Inc.</u>, 245 F.3d at 1222.  No assertion is made that §1322(b) is

ambiguous, and therefore the Court must look to its plain meaning.

There is scant legal authority interpreting the provisions of 31 U.S.C.

§ 1322(b)(2), but as the Defendants have noted, "the plain meaning of [the]

term "erroneously received" is sufficiently broad to encompass a myriad of

circumstances when it is discovered that, for one reason or another, <u>the</u>

<u>contested funds should not have been received and deposited into the</u>

<u>Treasury</u>."  Docket № 8250 at 3 (emphasis added).  Likewise, the Plaintiffs

9

have said that "the term 'erroneously deposited' is broader than 'erroneously collected' and covers not only improperly collected fines but also the instant situation where the fines were properly collected but subsequently deposited into the wrong account."  Docket № 8249 at 9-10.

### III

The Agreement on Remedies to which all of the parties were signatories provided the foundation for the Civil Order of Contempt entered by the Court in January 2000.  Both the Agreement on Remedies, (Docket № 4247 at 7), and the Contempt Order, specifies that contempt fines "shall be paid into the registry of the court on a weekly basis"  Docket № 4284 published at Reynolds v. Alabama Dept. of Transportation, 84 F.Supp.2d 1339, 1351 (M.D. Ala. 2000).

In settlement agreements reached after the Civil Order of Contempt was entered, the Intervenors and the Plaintiffs, specifically discussed the disposition of civil contempt fines.  The Plaintiffs' Settlement Agreement provides as follows:

> § V.1.d.  Subject to this Agreement, no party waives its right to argue to the Court what the disposition should be of the contempt fine money.
>
> . . .

10

§ V. 3.  Subject to paragraph 1.d of the Moratorium part of this Settlement Agreement, the moratorium agreement will have no effect on any parties' right to claim any fine funds paid into the Court Contempt Fine Fund for contempt.

Docket № 4700 at 25, 39.

The Intervenors'' Settlement Agreement contains almost identical

language to § V. 3. of the Plaintiffs' agreement:

8.  Subject to paragraph 7(e) above, the moratorium agreement will have no effect on any parties' right to claim any fine funds paid into the Court Contempt Fine Fund for contempt.

Docket № 4923 at 7.

According to the Defendants, the depositing of civil contempt fines

"into the Federal treasury, where they could not be released absent proof

of an erroneous deposit, was contrary to the unambiguous agreement of

the parties. . . . and fundamentally alters what the clear language of the

agreements indicate the parties bargained for."  Docket № 8247 at 8.   In

the Defendants' reply brief, they go on to state that "under the plain terms

of the Settlement Agreements, deposit of any of the civil contempt fines

into the United States Treasury was clearly erroneous because it effectively

thwarted the specific and expressed intention of the parties to maintain the

11

funds in a manner that would allow subsequent claims thereto."  Docket № 8250 at 3.

The Plaintiffs concede the validity of the Defendants' argument and note "that the parties never intended for the contempt fines to escheat to the U.S. Treasury . . . ."  Docket № 8249.  The Intervenors, on the other hand, continue to contest the Defendant's reading of the settlement agreement between themselves and the Defendants.

The Intervenors contend that the only thing their settlement agreement indicates is that the moratorium agreement[2] does not have any impact on any right to seek a refund, whatever that right might be.  "If there is a contractual or legal right 'to claim any fine refund,' it has to be found in or created by some other language."  Docket № 8248 at 2.  The Intervenors read their settlement agreement too narrowly.

The reference in Paragraph 8 of the Settlement Agreement to the "Court Contempt Fine Fund" and the right of any party to "claim any fine refund" is clearly intend to be broader than a limitation on the impact of the moratorium agreement.  Its plain language specifically reserved the right of

---

[2]  The moratorium agreement was part of the larger settlement agreement between the Intervenors and the Defendants.  As a part of the settlement, a moratorium for a period of time was imposed on the payment of contempt fines for many of the Consent Decree articles.  Docket № 4923 at 4–7.

the Intervenors and the Defendants to seek a final disposition of the civil contempt fines paid into the Contempt Fine Fund.  The transfer of those funds to The Untied States Treasury clearly thwarts the agreed-to bargain.

The Intervenors assert that there is nothing in their Settlement Agreement that directed the Clerk to maintain possession of the contempt fines.  Consequently, her decision to transfer the fines to the federal treasury was likely consistent with standard operating procedures, and as such, the transfer could not have been erroneous.  While the Clerk surely acted consistent with applicable procedures in transferring the fines to the U.S. Treasury, that transfer was nevertheless inconsistent with the intent of the parties in agreeing to a regime of coercive contempt fines.  As the Defendants and the Plaintiffs insist, the parties intended to retain the ability to argue about the appropriate final disposition of any paid contempt fines. When the Clerk transferred the fine money to The United States Treasury, the ability of the parties to argue to the Court what the disposition should be of the contempt fine money was impaired because of the restrictions on the Court's ability to order the recoupment of those funds from the federal treasury.

The transfer of the contempt fines from the registry of the Court to the federal treasury was contrary to the intention of the parties and was therefore "erroneous" as that term is used in 31 U.S.C. § 1322(b).  The term "erroneously deposited" is broader than "erroneously collected" and covers not only improperly collected fines but also the situation where fines that are properly collected, but subsequently deposited into the wrong account.  The contempt fines should be returned to the Court's registry.

## IV

The Defendants have moved the Court for a refund of all coercive civil contempt fines paid for alleged noncompliance with Article XV of the Consent Decree.  Docket № 8178.  According to the Defendants, the delays that "thwarted [their] attempts . . . to comply with Article 15 and implement the reclassification in a timely manner are not attributable to [their] actions[,]" and as such the Article XV fines were erroneously paid and should be returned.  Id. at 1.

Pursuant to the Agreement on Remedies, the Defendants began paying Article XV fines on February 29, 2000.  The fines continued through December 16, 2004.  See Docket № 8224 at 23.  In all, Defendants paid $2,219,500 in civil contempt fines related to Article XV.

14

The Plaintiffs and Intervenors oppose the Defendants' motion on several grounds. The Plaintiffs contend that even if Defendants were legally excused from their failure to timely comply with the reclassification requirements of Article XV, ¶ 1, there were several other provisions in the Article that the Defendants failed to implement within the time provided, and consequently, the imposition of contempt fines was authorized by the Agreement on Remedies.   Docket № 8201 at 1-4.

The Intervenors assert that the failure to timely implement the employee reclassifications was the fault of the Defendants, that their motion for a refund is untimely, and that the "Defendants do not propose to apply any refunded fines to a remedial purpose."  Docket № 8199 at 4.   Of course, if the fines were erroneously collected, the Defendants are under no obligation to use the returned funds for a "remedial" purpose.

**A**

Article XV has been actively litigated since almost the day the parties agreed to the Consent Decree.  The Defendants' actions in implementing the Article are among the most litigated issues in the case since the Special Master's appointment in October 2002.  Even though the Consent Decree has expired, the parties continue to litigate the same questions: Did the Defendants properly and timely implement Article XV, and if not, whose fault is it?

Article XV's[3] requirement that job reclassification under the Consent Decree be performed in a uniform manner across all ALDOT employees has been described by the Eleventh Circuit:

Article 15 required the Department to conduct a study of all its employees (regardless of race) to determine if any employees

_____

[3] Article XV's reclassification requirements are found in Paragraph 1:

1. **Reclassification program:** Following the effective date of this Decree, the following steps will be taken:

(a) All employees then working for the Highway Department in the classified service will be provided with a Form 40 on which they may list the job duties which they are performing and the percentage of time spent on each such job duty. Such filled-out Form 40s will be subject to review and approval or revision by such employee's supervisor or supervisors. Any disagreement will be resolved by a job study analysis by the Personnel Department, subject to challenge by plaintiffs' counsel.

(b) To the extent that such completed Form 40s establish that the subject employee is spending a majority of [his or her] working time in the performance of the duties and responsibilities of a higher job classification, or is spending an amount of time on such duties and responsibilities substantially equal to that of a majority of incumbents in such higher job classification, the Highway Department will request the Personnel Department to reclassify such employee to the higher job which is most appropriate for the duties and responsibilities on which the employee is spending a majority of his or her working time, and the Personnel Department will approve such request if such request is consistent with the findings of Personnel's classification review and its classification plan.

Consent Decree, Article XV, ¶1(a)-(b).

were being assigned duties associated with a higher job classification (and thus higher pay level) than the one they currently had. If the study uncovered an employee "spending a majority of [his or her] working time in the performance of the duties and responsibilities of a higher job classification," the Department was required to reclassify the employee at the higher level (and therefore increase that employee's salary). Article 15 also required the Department "to monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on a regular or non-emergency basis are within the job description for [the] job they are holding."

Docket Nº 7532 at 6, quoting Reynolds v. Roberts, 207 F.3d 1288, 1293-94

(11th Cir. 2000)(modifications and parenthetical in original).

In anticipation of the Court's approval of the Consent Decree, In December 1993, the State Personnel Department ("SPD") prepared a position description questionnaire to be answered by all ALDOT employees.  This questionnaire, known as a "Form 40," was used to gather the information SPD needed to determine whether an ALDOT employee was entitled to reclassification under the provisions of Article XV, ¶ 1, of the Consent Decree.  The Form 40 elicited from the employee a description of the job duties the employee performed.  The employee's statement of actual duties listed on the Form 40 were then compared to the official position description of the job actually held by the employee.

What became apparent to SPD when working with the completed forms was that in answering the questions, some employees did not provide adequate information to enable SPD to make an appropriate reclassification decision.  Consequently, by March 1996,  SPD determined that it would initially reclassify those 85 persons whose Form 40s established an obvious need for reclassification

In May 1996, SPD allowed ALDOT employees an opportunity to request a second review of their position to make sure they were properly classified in light of any changes in an employee's actual job duties since 1994, and because of ALDOT's new job structure.  By July 1996, all employees were notified of their placement in the new structure.  SPD allowed employees who disagreed with their classification to request reviews and submit additional information.  As a result of this secondary review, it was determined that approximately 800 ALDOT employees were due to be reclassified.

Shortly after the Plaintiffs and Intervenors were notified of the initial reclassification decision related to the 85 project class employees, the Plaintiffs, in June 1996, moved to enjoin further implementation of Article XV.  Docket Nº 1069.  The motion was opposed by the Defendants and

Intervenors.  The Court referred the reclassification issues to mediation before Magistrate Judge Carroll.  Docket № 1087.  As a result of the mediation, the Plaintiffs agreed to file specific objections to any of the proposed initial (85) reclassifications they opposed.  On July 18, 1996, the Plaintiffs objected to 78 of the 85 proposed reclassifications.  Docket № 1161.  All 78 reclassifications objected to were white ALDOT employees. The Plaintiffs initial objections were rejected by the Court because it found them to be inadequate.  Docket № 1165.  Thereafter a new round of objections and responses ensued until, on January 21, 1997, the Intervenors filed a motion asking the Court to enforce the plain language of Article XV and order ALDOT to implement the reclassifications.  Docket № 1495.

On February 12, 1997, the Court referred the Intervenors' and Plaintiffs' Article XV reclassification issues to Magistrate Judge Coody. Docket № 1537.  Then on June 16, 1997, the Court ruled that the Defendants were not using the correct date for analyzing Article XV reclassification claims and that the correct date was in April 1994.  Docket № 1931.  Following the Court's ruling, a revised list of individuals who were clearly performing out-of-class duties as of the new date was prepared.

19

On May 6, 1998, the Magistrate Judge Coody issued his
Recommendation in which he determined the Plaintiffs' motion to enjoin
implementation of Article XV should be denied, and the Intervenors' motion
to enforce Article XV should be granted.  The Magistrate Judge went
further, however, and relying on the District Court's March 1998 finding of
classwide liability, (Docket № 2523 at 68), also recommended that the
reclassification of employees performing out-of-class duties be allowed
only if the Defendants could show by clear and convincing evidence that
the out-of-class duty assignments were not the product of discrimination.
Docket № 2651 at 32.  The Defendants and Intervenors objected to the
Recommendation.

In early 2000, the Eleventh Circuit issued its opinion <u>Reynolds v.
Roberts</u>, 202 F.3d 1303 (11th Cir. 2000), reversing the Court's finding of
classwide liability in the Reynolds case.  This reversal undercut Judge
Coody's recommendation since he had relied on the earlier finding of
classwide liability to support the proposed modification of Article XV's
reclassification requirement. <u>See</u> Docket № 2651 at 31-32.  Therefore on
April 24, 2000, the Court vacated the 1998 Magistrate's Recommendation
regarding Article 15 reclassification and remanded the issues to the

Magistrate Judge for reconsideration in light of the Eleventh Circuit's opinion.  Docket № 4419.

On January 31, 2000, the Court entered the Civil Contempt Order and the Agreement on Remedies.  Among other things, the Agreement on Remedies required the Defendants to affirmatively demonstrate full compliance with Article XV by February 29, 2000.  Docket №. 4284, at 27, 84 F.Supp.2d at 1347. The Defendants failed to meet the February deadline and thereafter began paying coercive sanctions.

On March 22, 2001, the Court denied without prejudice the Plaintiffs' motion to enjoin implementation of Article XV and the Intervenors' motion to enforce the Article.  Docket № 4879.  The Court explained its decision by emphasizing that it would allow each party to "recharacterize and update the issues before the Court in keeping with the current status of th[e] litigation."  Id. at 1.  Almost three weeks later, April 16, 2001, the Plaintiffs renewed their motion to hold the Defendants in contempt for noncompliance with Article XV, and to "prohibit [them] for implementing any reclassifications . . ., without first demonstrating that such reclassifications are not the product of racial discrimination. . . ."  Docket № 4925 at 17.  In the alternative, and very closely related to the primary request for relief, the Plaintiffs sought a modification of the Consent Decree to essentially impose

the same requirement on the Defendants that Magistrate Judge Coody had recommended in May 1998. Id. at 17-18.

After initially referring the matter to Magistrate Judge Coody in April 2001, the Court later vacated that order and sent the motion to the Special Master for a report and recommendation on April 30, 2003. Docket № 6667. Finding that the Defendants had in fact implemented Article XV as intended by the Consent Decree, the Special Master in November 2004, recommended that the Plaintiffs' renewed motion for contempt be denied. See Docket № 7532 at 27 ("The fact is that the Defendants have implemented Article XV as intended and there is nothing inconsistent with the Consent Decree's many provisions or untoward in the way the Defendants have acted. "They have acted as they agreed to act in terms of implementing the reclassification requirements of Article XV"). The Court agreed, and by order dated December 6, 2004, (Docket № 7579), adopted the findings and recommendation of the Special Master and denied the Plaintiffs the requested relief. At long last the uncertainty around the Defendants' plan for implementing the reclassification requirements of Article XV was over.

In the Interim, on May 27, 2003, the Defendants moved the Court to lift the Article XV sanctions. Docket № 6777. The motion was opposed by

the Intervenors (Docket № 6820) while the Plaintiffs did not object. Docket

№ 6819 at 1.  The Defendants renewed their motion to lift sanctions on

August 27, 2004.  Docket № 7411.  In the renewed motion, the Defendants

stated that as of "April 2004, the reclassifications were completed."  Id. at 1.

The motion to lift sanctions remained with the Court until October 29, 2004,

when the Court referred the matter to the Special Master.  Docket № 7526.

The motion was never acted on by the Special Master, in part, because by

order dated January 28, 2005, the Court determined the motion to be moot

since the Court had earlier lifted the fines on Article XV effective December

16, 2004.  Docket № 7667 at 13.

**B**

From the outset of this case, Article XV was beset by a combination

of forces that thwarted its timely implementation.  Motions were filed that in

retrospect, and as the case unfolded, had no basis in law, decisions were

sometimes slow in coming, and confusion about precisely how to

operationalize the requirements of the Article abounded.  The Intervenors

correctly observe that at no time did the Court instruct the Defendants to

suspend their implementation efforts.  Docket № 8232 at 3. Rather, the

Defendants unilaterally stopped implementing the reclassification project

23

when the Plaintiffs filed their first motion to enjoin implementation in June 1996.

The fact is that it would have been imprudent for the Defendants to have proceeded once a motion for an injunction had been filed, (Docket № 1069), and referred to mediation before Magistrate Judge Carroll.  Docket № 1087.  When the litigation over Article XV got started the Defendants hands were largely tied.  They would continue at their own risk with an implementation plan that was the subject of competing motions to enjoin, renewed motions to enjoin, appeals, arguments before the Court, and vacated recommendations.

Nevertheless, by their own admission the Defendants were in contempt of Article XV's reclassification requirements, as well as other provisions of Article XV, at the time the Court entered the January 31, 2000 Order of Civil Contempt.  Nor were they able to purge themselves of the contempt within the time allowed by the Contempt Order.

With the filing of the motion to lift sanctions on May 27, 2003, (Docket № 6777), the Defendants put before the Court an opportunity to review the complicated history of the Defendants' efforts to comply with the reclassification requirements of Article XV.  As noted above, the Court never ruled on the merits of the motion.

The reclassification methodology ultimately used and the individuals entitled to reclassification were known and in place by the May 27 motion to lift sanctions.  The fact that the Defendants had not yet completed the reclassification by that date understandably resulted from the uncertainty that they, and all the parties, labored under because of the Plaintiffs' renewed motion for finding the Defendants in contempt of Article XV.  In the Special Master's opinion it would have been unwise for the Defendants to proceed.  To do so would have invited more litigation and more legal maneuvering as the Plaintiffs sought to prevent the Defendants from acting.

Civil contempt sanctions are designed to (1) coerce a party into complying with a court's order or (2) compensate a party for losses suffered as a result of the contemptuous conduct.  United States v. City of Miami, 195 F.3d 1202, 1293 (11th Cir. 1999).  The civil contempt power of the courts is limited to "the least possible power adequate to the end proposed."  Mercer v. Mitchell, 90 F.2d 736, 765 (11th Cir. 1990).  In this case, by the May 27, 2003 motion to lift sanctions the Defendants had done all they could do to comply in the absence of definitive rulings by the Court.

It is not enough to say that the Court did not specifically direct the Defendants to cease implementation.  The fact is that the nature of the litigation then underway made it impossible for the Defendants to do what they were required to do.  What else were the Defendants to do but wait on the Court to resolve the issue?  Until the final ruling on the Plaintiffs' motion for contempt, the Defendants were subject to having anything they did with regard to implementing the reclassifications undone.  Factors outside the Defendants' control impeded complete compliance, and no legitimate coercive purpose was served by having the Defendants pay fines when there was nothing else the Defendants could do to achieve compliance until given the go ahead by the Court.

**C**

The Plaintiffs contend that under the Agreement on Remedies, even if the Defendants were in compliance with the Article's reclassification requirements, they failed to show compliance with the Article's other provisions and as such, were nevertheless required to pay fines.  See Docket № 8201 at 1-3 ("Thus, even if the defendants were in compliance with the reclassification paragraph, the defendants would have been subject to the same fine schedule set forth in [Agreement on Remedies] for

26

each provision [of Article XV] for which they failed to demonstrate compliance").

While objecting to the Defendants motion, the Plaintiffs offer no evidence in support of their objections.  Instead they submit summary statements from which it is impossible to extract the evidence on which they rely.  See Id. at 3 ("The evidence is undisputed that the defendants had not completed multi-grade job studies for all classifications prior to the deadlines in the contempt order. . . .  "The evidence is also undisputed that the defendants have not complied with the prohibition on out of classification assignments in Article Fifteen prior to the deadline date").  While the issues may be undisputed from the Plaintiffs' perspective, they are very much disputed from the Defendants' perspective.  The Defendants have submitted compelling and unrefuted evidence establishing their compliance with all the provisions of Article XV by the time of the filing of the motion to lift sanctions.

The Special Master has reviewed the arguments of the Defendants contained in their brief, Docket № 8224 at 12- 21, and the documents cited in support, and finds the arguments compelling and convincing.  Some paragraphs of Article XV were not subject to the Contempt Order and Agreements on Remedies, such as the multi-grade requirements of ¶3(a)-

(c).[4]  See Docket № 8224 at 13-18.  For other paragraphs of Article XV, ¶¶

1(c)-(e), (2), and (4), the Defendants have established their compliance by

at least May 27, 2003.  Id. at 12-13, 18-21.

## D

The Intervenors contend that the Motion to Recover Article XV Fines

should be barred because the Defendants are guilty of laches.  Docket №

8232 at 12.  The party seeking to establish laches must show there was (1)

a delay in asserting the claim (2) the delay was inexcusable and (3) the

delay caused undue prejudice.  Ex parte Lightwood Techs LLC.-- So.2d --

WL1229206 (April 27, 2007).

There can certainly be no claim of prejudice to the Intervenors in the

return of a portion of the Article XV contempt fines to the Defendants as

---

[4]  With regard to the multi-grade requirements of Article XV, ¶3(a)-
(c), the Eleventh Circuit has noted that the Consent Decree's provisions
related to multi-grade studies are not included in the 2000 Contempt Order
and Agreement on Remedies.

Disputes about the Article Fifteen classifications continued,
however, and further proceedings eventually resulted in an
omnibus civil contempt order issued in January 2000, which
found the defendants in contempt for failing to obey aspects of
the consent decree, including some provisions of Article Fifteen
but not the ones relating to the two [multi-grade job]
classifications at issue in this appeal.

Reynolds v. McInnes, 338 F.3d 1201, 1208 (11th Cir. 2003).

they have no interest in the funds.  Moreover, because the Court never passed on the merits of the May 2003 request to lift sanctions, the current motion to recover Article XV contempt fines, and more importantly the proposed disposition of that motion, is a natural outgrowth of the earlier effort to lift sanctions.  The delay in filing the current motion is not unreasonable and was certainly foreseeable.

## E

If the Court adopts this recommendation, the Defendants should report the amount of Article XV fines paid between May 28, 2003, and December 16, 2004.  That amount should then be returned to the Defendants outright as erroneously collected.

## V

Aside from the Article XV fines that the Defendants believe should be returned immediately, the Defendants recommend that all other returned contempt fine money should be used to enhance ALDOT training and recruiting programs, and to pay outstanding and future attorneys' fees. Docket № 8179 at 5-7.  The Plaintiffs and Intervenors object to the Defendants' suggested use, and instead believe that the funds should be used to pay or offset compensatory relief that the Court might order for individuals affected by the Defendants' noncompliance with the Consent

Decree.  Docket Nº 8249 at 3-6 (Plaintiffs) and Docket Nº 8248 at 6 (Intervenors).

Until the Court acts on the recommendation regarding the return previously paid contempt fines to the registry, it is premature to resolve issues involving the final disposition of the fine corpus. If the Court rejects the recommendation made herein, then there will be no funds to distribute. if the Court approves the recommendation, then a more careful consideration of the use of such funds will need to be made than the current arguments of the parties allows for.

**VI**

**ACCORDINGLY**, it is ORDERED that the Motion For Reconsideration (Docket Nº 8241) be GRANTED; it is further RECOMMENDED that the Motion to Recover Contempt Fines (Docket Nº 8179) be GRANTED IN PART and DENIED IN PART; and that the Motion For Refund Of Contempt Fines Related To Article XV (Docket Nº 8178) be GRANTED IN PART and DENIED IN PART.

The contempt fines previously paid by the Defendants and now on deposit within the United States Treasury, should be recalled from the Treasury as erroneously deposited, and returned to the Court's registry. The civil contempt fines paid on Article XV between May 28, 2003, and

December 16, 2004, should then be returned outright to the Defendants as erroneously collected.  The Defendants should report to the Court the amount of Article XV fines paid between May 28, 2003, and December 16, 2004.  The remainder of the civil contempt fines should remain within the registry until the Court determines their final disposition.

Objections to this Report and Recommendation must be filed with the Clerk of Court by December 21, 2007. Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

This 30th day of November 2007.

/s/ C. A. González
SPECIAL MASTER