IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

    Plaintiffs,

v.

CIVIL ACTION NUMBER
85-cv-665-MHT
**Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

    Defendants.

## REPORT AND RECOMMENDATION

**I**

Pending before the Special Master is the "Defendants' Position Statement Concerning [The] Appropriate Date [That] Reclassification Under Article 15 Should Have Occurred, (Docket № 8395), and the "Adams Intervenors' Motion for Partial Summary Judgment on Intervenors' Individual Contempt Claims Relating to Article 15 Reclassification Issues," Docket № 8415.  The Defendants' "Position Statement" is not tied to a motion but was filed pursuant to a request by the Special Master to brief issues related to the Intervenors' individual contempt claims under Article XV, ¶1.  The issues raised by the Defendants' Position Statement and the

Intervenors' response thereto are essentially the same as the issues raised by the Intervenors' Motion for Summary Judgment and the Defendants' response.

Since there is only one motion actually pending—the Motion for Summary Judgement—this R&R will address that motion. Nevertheless, the briefing associated with the Defendants' Position Statement will be relied upon as "supplemental" briefing to the Motion for Summary Judgement.

## II

### A

To say the history of litigation surrounding Article XV, ¶1 is complicated and protracted is an understatement; briefs are written and orders are issued, but yet the matters never seem to reach finality. Perhaps this time, the question of when the Defendants legally came into compliance with Article XV, ¶1 of the Consent Decree can be finally resolved.

B

Article XV of the Consent Decree grew out of negotiations between the Intervenors, the Plaintiffs, and the Defendants.  In 1993, before the Intervenors' involvement, the Plaintiffs and the Defendants negotiated the terms of a settlement agreement that included many race-conscious provisions.  Among the race-conscious provisions was Article XV that dealt with employee job reclassification at ALDOT.  As originally proposed, Article XV limited the opportunity for job reclassification to ALDOT's African American employees.  By January 1994, the Adams Intervenors had joined the lawsuit and objected to the race-conscious provisions of the proposed decree, including those contained in Article XV.  Because of the Intervenors' objections, the District Court directed the parties—the Intervenors, the Plaintiffs, and the Defendants—to negotiate anew with each other in an attempt to resolve the objections.

As noted, the Intervenors objected to the race-conscious nature of the proposed article, arguing that the reclassification of ALDOT employees should be performed without regard to race.  See Docket № 506.  The parties agreed on the need for race neutrality and by letter dated February 3, 1994, the Plaintiffs informed the Court that there was an agreement to

3

revise the language of Article XV. As reported to the Court by the Plaintiffs, "the only change to . . . Article [XV is] to remove the word "black" from each place that it appears so that the intervenor-movants can participate in the reclassification process." Docket № 7300 at 7, quoting Docket № 518 at 24.

On March 16, 1994, the Court approved the Consent Decree containing the agreed-to Article XV revisions. Docket № 553. Article XV's requirement that job reclassification under the Consent Decree be performed in a uniform manner across all ALDOT employees, was described by the Eleventh Circuit:

> Article 15 required the Department to conduct a study of all its employees (regardless of race) to determine if any employees were being assigned duties associated with a higher job classification (and thus higher pay level) than the one they currently had. If the study uncovered an employee "spending a majority of [his or her] working time in the performance of the duties and responsibilities of a higher job classification," the Department was required to reclassify the employee at the higher level (and therefore increase that employee's salary). Article 15 also required the Department "to monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on a

4

> regular or non-emergency basis are within the job description for [the] job they are holding."

Reynolds v. Roberts, 207 F.3d 1288, 1293-94 (11th Cir. 2000) (modifications and parenthetical in original).

In anticipation of the Court's approval of the Consent Decree, the State Personnel Department ("SPD") prepared a position description questionnaire to be answered by all ALDOT employees. This questionnaire, known as a "Form 40," was used to gather the information SPD needed to determine whether an ALDOT employee was entitled to reclassification under the provisions of Article XV, ¶ 1, of the Consent Decree. The Form 40 elicited from the employee a description of the job duties the employee performed. The employee's statement of actual duties listed on the Form 40 were then compared to the official position description of the job actually held by the employee.

What became apparent to SPD when working with the completed forms was that in answering the questions, some employees did not provide adequate information to enable SPD to make an appropriate reclassification decision. Consequently, by March 1996, SPD determined that it would initially reclassify those 85 persons whose Form 40s established an obvious need for reclassification.

In May 1996, SPD allowed ALDOT employees an opportunity to request a second review of their position to make sure they were properly classified in light of any changes in an employee's actual job duties since 1994, and because of ALDOT's new job classification structure.  By July 1996, all employees were notified of their placement in the new structure.  SPD allowed employees who disagreed with their classification to request reviews and submit additional information.  As a result of this secondary review, it was determined that approximately 800 ALDOT employees were due to be reclassified.

Shortly after the Plaintiffs and Intervenors were notified of the initial reclassification decision related to the 85 project class employees, the Plaintiffs moved to enjoin further implementation of Article XV.  Docket № 1069.  The motion was opposed by the Defendants and Intervenors.  The Court referred the reclassification issues to mediation before Magistrate Judge Carroll.  Docket № 1087.  As a result of the mediation, the Plaintiffs agreed to file specific objections to any of the proposed initial (85) reclassifications they opposed.  On July 18, 1996, the Plaintiffs objected to 78 of the 85 proposed reclassifications.  Docket № 1161.  All 78 reclassifications objected to were white ALDOT employees.  The Plaintiffs'

initial objections were rejected by the Court because it found them to be inadequate.  Docket № 1165.  The Defendants then filed a plan for reclassification on December 17, 1996—the date from which they now alleged compliance.  Docket № 1442.  Thereafter a new round of objections and responses ensued until, on January 21, 1997, the Intervenors filed a motion asking the Court to enforce the plain language of Article XV and order ALDOT to implement the reclassifications.  Docket № 1495.

On February 12, 1997, the Court referred the Intervenors' and Plaintiffs' Article XV reclassification issues to Magistrate Judge Coody.  Docket № 1537.  Then on June 16, 1997, the Court ruled that the Defendants were not using the correct date for analyzing Article XV reclassification claims and that the correct date was in April 1994.  Docket № 1931.  Following the Court's ruling, a revised list of individuals who were clearly performing out-of-class duties as of the new date was prepared.

On May 6, 1998, the Magistrate Judge Coody issued his Recommendation in which he determined the Plaintiffs' motion to enjoin implementation of Article XV should be denied, and the Intervenors' motion to enforce Article XV should be granted.  The Magistrate Judge went

further, however, and relying on the District Court's March 1998 finding of classwide liability, (Docket № 2523 at 68), also recommended that the reclassification of employees performing out-of-class duties be allowed only if the Defendants could show by clear and convincing evidence that the out-of-class duty assignments were not the product of discrimination. Docket № 2651 at 32.  The Defendants and Intervenors objected to the Recommendation.

In early 2000, the Eleventh Circuit issued its opinion <u>Reynolds v. Roberts</u>, 202 F.3d 1303 (11th Cir. 2000), reversing the Court's finding of classwide liability in the Reynolds case.  This reversal undercut Judge Coody's recommendation since he had relied on the earlier finding of classwide liability to support the proposed modification of Article XV's reclassification requirement.  <u>See</u> Docket № 2651 at 31-32.  Therefore on April 24, 2000, the Court vacated the 1998 Magistrate's Recommendation regarding Article 15 reclassification and remanded the issues to the Magistrate Judge for reconsideration in light of the Eleventh Circuit's opinion.  Docket № 4419.

On January 31, 2000, the Court entered the Civil Contempt Order and the Agreement on Remedies.  Among other things, the Agreement on

8

Remedies required the Defendants to affirmatively demonstrate full compliance with Article XV by February 29, 2000.  Docket №. 4284, at 27.  84 F.Supp.2d at 1347. The Defendants failed to meet the February deadline and thereafter began paying coercive sanctions.

On March 22, 2001, the Court denied without prejudice the Plaintiffs' motion to enjoin implementation of Article XV and the Intervenors' motion to enforce the Article.  Docket № 4879.  The Court explained its decision by indicating that it would allow each party to "recharacterize and update the issues before the Court in keeping with the current status of th[e] litigation."  Id. at 1.  Almost three weeks later on April 16, 2001, the Plaintiffs renewed their motion to hold the Defendants in contempt for noncompliance with Article XV, and to "prohibit [them] for implementing any reclassifications  . . . , without first demonstrating that such reclassifications are not the product of racial discrimination. . . ."  Docket № 4925 at 17.  In the alternative, and very closely related to the primary request for relief, the Plaintiffs sought a modification of the Consent Decree to essentially impose the same requirement on the Defendants that Magistrate Judge Coody had recommended in May 1998.  Id. at 17-18.

After initially referring the matter to Magistrate Judge Coody in April 2001, the Court later vacated that order and sent the motion to the Special Master for a report and recommendation on April 30, 2003. Docket № 6667. Finding that the Defendants had in fact implemented Article XV as intended by the Consent Decree, the Special Master recommended that the Plaintiffs' renewed motion for contempt be denied. See Docket № 7532 at 27 ("The fact is that the Defendants have implemented Article XV as intended and there is nothing inconsistent with the Consent Decree's many provisions or untoward in the way the Defendants have acted. "They have acted as they agreed to act in terms of implementing the reclassification requirements of Article XV"). The Court agreed, and by order dated December 6, 2004, (Docket № 7579), adopted the findings and recommendation of the Special Master and denied the Plaintiffs the requested relief.

In the Interim, on May 27, 2003, the Defendants moved the Court to lift the Article XV sanctions. Docket № 6777. The motion was opposed by the Intervenors, (Docket № 6820), while the Plaintiffs did not object. Docket № 6819 at 1. The Defendants renewed their motion to lift sanctions on August 27, 2004. Docket № 7411. In the renewed motion,

the Defendants stated that as of "April 2004, the reclassifications were completed."[1] Id. at 1. The motion to lift sanctions remained with the Court until October 29, 2004, when the Court referred the matter to the Special Master. Docket № 7526. The motion was never acted on by the Special Master because by order dated January 28, 2005, the Court determined the motion to be moot since the Court had earlier lifted the fines on Article XV effective December 16, 2004. Docket № 7667 at 13.

---

[1]The Defendants' Supplement to the Motion to Lift Sanctions for Noncompliance With Article XV reads:

**COMES NOW** the Defendants and respectfully submit the following supplement to the Motion to Lift Sanction . . . with Respect to Article Fifteen of the Consent Decree filed May 27, 2003, (Docket № 6777):

1. In the Motion filed May 27, 2003, Defendants stated that the reclassification under Article 15 paragraph 1(b) had not been completed.

2. In early Spring 2004, counsel for the Plaintiffs and Adam-Intervenors were notified that the Defendants were going to implement the reclassifications.

3. In April 2004, the reclassifications were completed.

4. With the completion of the reclassification, the Defendants are in compliance with all portions of Article 15 that are not awaiting a ruling from the District Court.

WHEREFORE, Defendants renew their request that sanctions be lifted for noncompliance with respect to Article 15.

Docket № 7411 at 1.

On March 28, 2007, the Defendants filed a motion to recover Article XV contempt fines, Docket № 8178. In the R&R on the motion, the Special Master recommended that the Defendants be refunded any Article XV contempt fines paid after May 27, 2003.

In recommending a refund, the Special Master noted the following:

> From the outset of this case, Article XV was beset by a combination of forces that thwarted its timely implementation. Motions were filed that in retrospect, and as the case unfolded, had no basis in law, decisions were sometimes slow in coming, and confusion about precisely how to operationalize the requirements of the Article abounded. The Intervenors correctly observe that at no time did the Court instruct the Defendants to suspend their implementation efforts. Docket № 8232 at 3. Rather, the Defendants unilaterally stopped implementing the reclassification project when the Plaintiffs filed their first motion to enjoin implementation in June 1996.
>
> The fact is that it would have been imprudent for the Defendants to have proceeded once a motion for an injunction had been filed, (Docket № 1069), and referred to mediation before Magistrate Judge Carroll. Docket № 1087. When the litigation over Article XV got started the Defendants hands were largely tied. They would continue at their own risk with an implementation plan that was the subject of competing motions to enjoin, renewed motions to enjoin, appeals, arguments before the Court, and vacated recommendations.
>
> Nevertheless, by their own admission the Defendants were in contempt of Article XV's reclassification requirements, as well as other provisions of Article XV, at the time the Court entered the January 31, 2000 Order of Civil Contempt. Nor were they able to purge themselves of the contempt within the time allowed by the Contempt Order.

12

> With the filing of the motion to lift sanctions on May 27, 2003, (Docket № 6777), the Defendants put before the Court an opportunity to review the complicated history of the Defendants' efforts to comply with the reclassification requirements of Article XV. As noted above, the Court never ruled on the merits of the motion.

Docket № 8253 at 23-24.

The Court adopted the R&R's recommendation and order that the Defendants be refunded $838,500 in Article XV fines paid into registry after May 27. Docket № 8299.

## C

The Defendants' contend that they were in compliance with Article XV by December 17, 1996, when they filed their reclassification proposal with the Court. The Defendants' claim is inconsistent with their own judicial admissions regarding compliance and numerous Court findings. As late as January 31, 2000—the date the Court entered the Order of Civil Contempt—the Defendants had acknowledged that they were not in compliance with the Article. They further agreed to comply with Article XV, ¶1 by February 29, 2000, Docket № 4247 at 13. Again they failed to do so and between February 29, 2000 and December 16, 2004, paid $2.2M in

13

civil contempt fines for Article XV. Try as they might the Defendants cannot escape the implications of their own admissions.

Moreover, in response to the Defendants' Motion for Partial Summary Judgment on the Intervenors' Individual Contempt Claims, the Special Master relied on the May 27, 2003 date to find that the Intervenors were precluded from asserting claims for individual contempt of Article XV past that date. Docket № 8399. The recommendation specifically noted that the Defendants were in compliance with the Article as of May 27, 2003. Id. at 8. Without objection from the Defendants, the recommendation was adopted by the Court. Docket № 8425.

### III

**ACCORDINGLY**, it is RECOMMENDED that the Intervenors' Motion for Partial Summary Judgment, Docket № 8415, be GRANTED, and that the date by which the Defendants came into compliance with Article XV, ¶1 be conclusively established as May 27, 2003.

If the Court adopts the May 27, 2003 date as the date of compliance, it is further RECOMMENDED that the Court direct that the Intervenors'

claims for individual contempt of Article XV, ¶1 be transferred to Judge Gordon for mediation at Judge Gordon's convenience.

Objections to this Report and Recommendation must be filed with the Clerk of Court by August 26, 2009. Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED This 5th day of August 2009.

/s/ C. A. González
SPECIAL MASTER