IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


JOHNNY REYNOLDS, ET AL.,

    Plaintiffs,

v.

CIVIL ACTION NUMBER
85-cv-665-MHT
**Special Master González**


ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

    Defendants.


# REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON LAWRENCE KROMTIT'S INDIVIDUAL CONTEMPT CLAIMS

I

This case is before the Special Master on the Defendants' motion for summary judgment on the individual contempt claim of Lawrence Kromtit Docket №: 8441.  The Plaintiffs have filed objections to the motion, Docket №: 8672, contending that Kromtit was denied promotion and instatement to the Civil Engineer Administrator classification (currently called Transportation Administrator) because of the Defendants' contumacious conduct in falling to adhere to the terms of the Consent Decree.   Mr.

1

Kromtit has also filed non-instatement claims related to training, job rotation and out-of-classification assignments as well.

The Defendants believe they are entitled to summary judgment because Kromtit settled his instatement claim, suffered no individual injury, and fails to establish a causal connection between any alleged injury and Defendants' conduct.

II

Lawrence Kromtit received an undergraduate degree in science from the University of Jos in Nigeria, and later attended the Rose-Hulman Institute of Technology in Terre Haute, Indiana, where he received a master's degree in engineering in 1986. Docket № 8443-1, at 6-9 (Kromtit deposition). Although Mr. Kromtit sat for the Professional Engineering ("P.E.") exam in 1990, he did not pass and has not obtained a P.E. license. Id. at 9.

Kromtit was first employed by ALDOT in April 1991 as a Civil Engineer I in the Transportation and Planning/Modal Programs Division in Montgomery, Alabama. Id. at 11-12. He later received a provisional appointment in 1995 to the position of Graduate Civil Engineer ("GCE"). Id. at 12. Thereafter, in 1996 he transferred to the Sixth Division in Montgomery, where he worked as a GCE. Id. In accordance with Article 15, ¶1 of the Consent Decree, Defendants reviewed Mr. Kromtit's GCE

2

classification and recommended that he retain that classification.  In August 1998, Defendants provisionally appointed Mr. Kromtit to the Civil Engineering Manager classification (later re-titled "Transportation Manager").  Mr. Kromtit's Civil Engineering Manager  appointment was later made permanent in March 1999 through the backlog appointment process. Id. at 13.

Mr. Kromtit seeks instatement to the position of Civil Engineer Administrator/Transportation Administrator.  He also has non-instatement claims relating to the alleged denial of training, rotation, and out-of-classification assignment opportunities.

Mr. Kromtit claims that he was harmed because he was not provided training or the opportunity to rotate job duties or to work out of classification thereby better preparing him for promotion.  Docket № 8672 at 13.  Mr. Kromtit also alleges that he was denied the opportunity to compete for promotion through the provisional and backlog appointment process.  Id. at 14.

### III

### A

"The claimant bears the burden of proving by a preponderance of the evidence that he or she is an 'actual victim' of the Defendants' contumacious conduct and therefore entitled to make whole relief. In order

to state a *prima facie* case for failure to promote by reason of the Defendants' contempt, a claimant must identify the promotion sought, when it was sought, and the training or experience that qualified the claimant for the promotion; or that the claimant would have been qualified for a particular promotion but for the Defendants' contempt of specifically identified Consent Decree activities." Docket №: 6928, at 13.  For promotion claims, the Defendants will then have a chance to "show that the claimant did not receive the promotion due to legitimate reasons having nothing to do with Defendants' contempt." (Id. at 15.)  "Thereafter, the claimant will have the opportunity to demonstrate that the Defendants' proffered reasons are a pretext for excusing its admitted contempt." Id.

**B**

Summary judgment is authorized under Federal Rule of Civil Procedure 56(c) when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavit, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In short, everything in the record must demonstrate the absence of a genuine issue of material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  The party seeking summary judgment bears

4

the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog, 193 F.3d at 1246; citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

## IV

The Defendants believe they are entitled to summary judgment on at least three separate grounds:

- Kromtit settled and released his CEA/TA instatement claim as a result of his participation in the April 2005 Grievance Settlement and/or the May 2002 Promotions Settlement;

- Kromtit failed to present any evidence that his failure to obtain promotion to the classification was caused by Defendants' contempt; and

- Kromtit failed to present any evidence that Defendants denied him training, rotation, out-of-classification assignments or job duty assignment opportunities required by the Consent Decree or that the alleged denial thereof caused him individual harm.

Docket № 8443 at 8.

## A

### i

Defendants contend that they are entitled to summary judgment because Mr. Kromtit's instatement claim was settled and released pursuant to his participation in the April 2005 grievance settlement. Id. at 9. In his deposition, Mr. Kromtit acknowledged that he filed two grievances wherein

5

he specifically alleged that ALDOT discriminated against him on the basis of race by denying him a promotion to the TA classification. These are the grievances settled by the parties in April 2005.  See Docket № 8443-1, Ex. C, (Grievances of Lawrence Kromtit) and  Ex. A (Kromtit Deposition) at 22-26.

The 2005 agreement dismissing many of the plaintiffs' grievances, is by its own terms not a release or waiver.

> NOW THEREFORE, in reliance upon the foregoing representations, the grievances attached hereto as Exhibit 1 are dismissed.  The parties agree that if any of the grievances contained on Exhibit 1 is reasserted, defendants will not and are not required to process it under the Revised Complaint Procedure [o]r any other grievance procedure.

Id. Ex. D.

The effect of the dismissal is to protect ALDOT from having to process any reasserted grievances through its grievance procedure.  It does not waive or release such claims and specifically recognizes that such claims may be "reasserted."  The grievance settlement did not resolve Mr. Kromtit's instatement claim.

### ii

Defendants argue that through Mr. Kromtit's participation in the Promotion Class settlement, (Docket № 4700), that he settled all pre-Fairness Hearing discrimination-based claims.  Docket № 8697 at 4.  By

6

participating in the Promotion Class settlement, Kromtit agreed to release all "non-contempt . . . claims . . . for race discrimination seeking monetary relief, . . . and all individual non-contempt . . . claims to instatement . . . ." Docket № 4700 at 41. By its terms, the Promotion Class settlement did not resolve any instatement claims arising from the <u>contempt</u> of the Consent Decree.  Only non-contempt claims for instatement arising prior to May 2002 have been released including those related to claims of discrimination.

### iii

Even if the grievance and promotion settlements did not resolve Mr. Kromtit's instatement claim, the Defendants nevertheless argue that summary judgment is appropriate because Mr. Kromtit cannot establish that the defendants' contempt affected his promotion opportunities. Docket № 8443 at 12.  Mr. Kromtit alleges that during the provisional appointment process that he did not have a fair opportunity to compete for promotion and that his efforts to secure promotion through the regular appointments process utilizing a Certificate of Eligibles was thwarted because of the defendants' contempt.  Docket № 8672 at 14.

### 1

It is undisputed that Mr. Kromtit was not appointed to the CEA/TA classification during the provisional or backlog appointment process.

Appointment through that process was the product of negotiation between the parties and approval by the Court, and the fact that Mr. Kromtit was not appointed through that process is not alone sufficient to make out a claim that he was injured as a result of the Defendants' contempt.

Mr. Kromtit also claims that he was not hired as an CEA /TA through the regular appointment process even though his qualifications were superior to those of the individuals hired. Docket № 8575 at 6. The Defendants contend that it was Mr. Kromtit's choices rather than their contempt that affected his opportunity for CEA /TA appointment. They note that Kromtit's application limited the geographic areas where he was willing to work to the area contiguous to Montgomery county and thus limited his opportunities for appointment to the CEA /TA line. Docket № 8443 at 19-20. They also contend that there is no evidence to support the claim that his qualifications were superior to the qualifications of those persons selected.

Prior to the creation of the registers for the CEA/TA classification in July 2003, ALDOT relied on provisional appointments and then backlog appointments to fill positions. Provisional appointments were generally made permanent through the backlog process. Mr. Kromtit received two provisional appointments, one as a Graduate Civil Engineer in 1995, and another as a Civil Engineering Manger in 1998. The latter appointment,

(re-titled "Transportation Manager"), was made permanent in March 1999. Docket № 8443-1 at 12-13.

Defendants have produced unrebutted evidence that appointments through the provisional and backlog process were administered in a race-neutral manner. Docket № 8443 at 13-14. Mr. Kromtit has failed to produce material evidence that he was better qualified than any of the white persons provisionally appointed. At most, he has asserted that he had better educational credentials then many of those promoted to the CEA classification during the relevant period. Docket № 8672 at 9. That alone, however, is not sufficient to establish a genuine issue of fact regarding Mr. Kromtit's claim that those promoted were less qualified than he.

### 2

Through the regular appointment process, Mr. Kromtit applied for the CEA/TA position four times, three of those times were during the pendency of the Consent Decree. Mr. Kromtit was placed on the register each time he applied, but his announced geographical limitations and his low test scores affected his placement on the Certificate of Eligibles. Id. From the time the CEA/TA register was established in July 2003 through the termination of the Consent Decree in December 2006, there were 24 CEA/TA appointments made from the certification lists, of which 5 (or 21%)

were African-American. Id. at 20. Of the 24 CEA/TA appointments of the register between 2003 and 2006, 11, or 46% were made in locations where Mr. Kromtit was willing to work. Id.

Mr. Kromtit further restricted his promotion opportunities by indicating in two of his three applications that he was not available for overnight travel. That decision affected his CEA/TA promotion opportunities because three of the 11 CEA/TA appointments in the counties of his preferences required overnight travel. Consequently, he could not be considered for those appointments. Moreover, as noted, while his test scores were high enough to appear on the register, they were not always high enough for his name to appear on the certificate of eligibles from which the CEA/TA appointments were made. Id. at 21. The Claimant has not rebutted the Defendants' evidence regarding the effect that his self-imposed location preferences, his unwillingness to travel over night and his lower test scores had on his ability to secure a regular appointment to the CEA/TA position.

The Claimant has not produced any evidence that raises a genuine issue of material fact that the defendants' contempt resulted in his not being promoted to CEA/TA. The Defendants are entitled to summary judgment on Mr. Kromtit's instatement claim.

**B**

**i**

In addition to his instatement claim, Mr. Kromtit also alleges non-instatement claims. He alleges that he was denied the training required by the Consent Decree and that such training would have better prepared him for promotion. The evidence establishes that ALDOT provided Mr. Kromtit 3,194 hours of training in 139 different training courses, by any measure an impressive amount of training. Docket № 8443-1 at 64. The only specific training that Mr. Kromtit identified that he did not receive was bridge training but admits that he never requested it. Docket № 8443-1 at 69. Moreover, he has failed to present evidence that the lack of training, if there was a lack, affected his ability to be promoted to CEA/TA. Finally, the training provision of the Consent Decree, Article XVI, required the Defendants "to ensure to the extent practicable that interested black employees are receiving their fair share of participation in . . . training courses." Docket № 8443 at 24 quoting Consent Decree. This the Defendants clearly did with respect to the training provided to Mr. Kromtit. The Defendants are entitled to summary judgment on the training claim.

**ii**

Mr. Kromtit claims that he was not properly rotated through the various job duties of the CEA/TA classification. Defendants, on the other

11

hand contend that since Mr. Kromtit participated in the Employee Development Program, ("EPD"), and completed the training module for the CEA/TA classification in December 2004, the rotation (and training) requirements of the Consent Decree have been satisfied.  See Docket № 8443-1 at 66 (Kromtit testifying about his participation in the EDP.)  It has been long established that the EPD program satisfies the job rotation requirement of the Consent Decree.  Docket № 7899 at 21 (R&R) adopted in part by Docket № 7969 and supplemented by Docket № 8124 and adopted by Docket № 8134.  The Defendants are entitled to summary judgment on the job rotation claim for the period after Mr. Kromtit completed the EPD course.

**iii**

Mr. Kromtit claims that his lack of out-of-classification assignments deprived him of the opportunity to supervise ALDOT employees prior to his participation in the EDP program and as a result, he was poorly prepared for his performance on two of the three CEA/TA examinations he took. Docket № 8672 at 8.  According to Kromtit, he "was never assigned the higher duties of his classification, including district engineer, and was never allowed to supervise employees and only performed the duties of his specific job assignment prior to the EDP program." Id.

In his deposition, Mr. Kromtit identified James Kelley, a white ALDOT employee who was appointed out-of-classification, to the CEA/TA job in 2000, three years before taking the CEA examination. Id. According to Mr. Kromtit, Kelley had less seniority than he, and Kromtit felt that he should have been appointed as acting Division Construction Engineer and provided that experience. Kelley was later promoted to the CEA/TA position.

> A.  There is another instant with James Kelly. [sic] You know, he was acting Division – Division Construction Engineer –
> . . .
>
> A.  When it was open.
>
> Q.  James Kelly?
>
> A.  James Kelly.  At the time, to the best of my knowledge, I believe – I don't know if he was eligible to even take the exam. So I am saying that at that time, I was – I probably should have been considered for that acting position before him.
>
> . . .
>
> A.  But in seniority, I was – I have – I was promoted to TM, Transportation Manager, before him.  So, what I am telling you is, I was more qualified and more experienced to have held that position than him. [sic].
>
> . . .
>
> A. So to me, I was overlooked for that position.

Docket № 8443-1 at 72-73.

13

According to Mr. Kromtit, Kelley received an advantage in the CEA/TA examination because he gained the supervisory experience that went along with job duties and was tested in the CEA/TA examination. Id. at 76. Mr. Kromtit testified:

> A. I have told you before that part of the exam is dealing with supervision. And when you are not doing that, I believe it put[s] you in a very disadvantaged position to answer the question.

Id. at 76-77.

There is clearly an advantage derived from being in the position for which one is to be tested prior to testing being given. The job testing examines the knowledge, skills, and abilities necessary to do the job at issue and experience in that job is an obvious plus. One of the more obvious advantages of first-hand experience in a management role is the experience of supervising colleagues and subordinates. Mr. Kromtit has established that he was bypassed for an out-of-classification appointment in favor on an individual with less seniority, less education and less experience than he. He also testified that he was at a disadvantage on that part of the CEA/TA exam dealing with supervision of subordinates. Docket № 8443-1 at 76.

Applying the degree of deference required at the summary judgment stage to the inferences raised by Mr. Kromtit's testimony, Mr. Kromitit

14

should be allowed to present evidence at a hearing that in failing to provide him an opportunity to serve out-of-classification that he was at a disadvantage in taking the CEA/TA exam.

## V

**ACCORDINGLY,** it is recommended that the Defendants' Motion for Summary Judgment, Docket № 8441, be GRANTED IN PART and DENIED IN PART in conformity with this Report and Recommendation.

Objections to this Report and Recommendation must be filed with the Clerk of Court by January 10, 2011.  Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED this 8th day of December 2010.


/s/ C. A. González

SPECIAL MASTER