IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

     Plaintiffs,

                              CIVIL ACTION NUMBER
v.                            85-cv-665-MHT
                          **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

     Defendants.

**REPORT AND RECOMMENDATION  ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON KENNETH LARKIN'S
INDIVIDUAL CONTEMPT CLAIM**

**I**

Before the Special Master is the defendants' Motion for Summary

Judgment concerning the individual contempt claim of Kenneth Larkin.

Docket № 8450.  Larkin has responded in opposition, (Docket № 8482), and

the defendants have replied, Docket № 8501.  The motion is now ripe for

resolution.

# II

Kenneth Larkin, a high school graduate, began working for ALDOT in April 1978 as a laborer in its Seventh Division in Troy, Alabama.  On March 18, 1985, Larkin was promoted to Highway Maintenance Technician I.  By 1994, he had moved to ALDOT's Sixth Division in Montgomery and was again promoted, this time to Highway Maintenance Technician II.  In 1998, pursuant to the requirements of Article XV of the Consent Decree, Larkin was reclassified from a HMT II to a Highway Maintenance Technician II/III.  And in August 2008, he was promoted to his current position of Transportation Maintenance Technician Senior in the Sixth Division.

Through his individual contempt claim, Larkin seeks make-whole relief and instatement to the Highway Maintenance Superintendent classification ("HMS")[1]  Docket № 8483-2 at 3.

Larkin's allegation regarding the effect of the defendants' contempt on his individual employment history is not atypical of the claims made by other claimants.  He alleges, for example, that the defendants failed to rotate him through the various HMT II/III job duties in violation of the Consent Decree,

---

[1]  The HMS classification was recently retitled "Transportation Maintenance Superintendent."

and neither was he permitted to work out-of-classification in the Highway Maintenance Superintendent position.  Docket № 8482 at 6.  According to Larkin, had he rotated into the better job duties, or had he benefitted from out-of-classification job assignments, he would have been better prepared and qualified for promotion to the HMS position.  *Id*.  Larkin now seeks that promotion through these proceedings.

Larkin believes that because of the defendants' contempt he was never given a fair opportunity to compete for promotion to HMS through the provisional appointment process, the backlog appointment process, or the regular promotion process.  Docket № 8482 at 12-13.  He also believes that defendants' contempt affected his opportunities for training.

The defendants make three general arguments in support of their motion for summary judgment:  First, that Larkin declined an offer of promotion to the HMS position and therefore cannot now seek instatement; second, that the failure of Larkin to obtain a promotion to the HMS classification was not caused by defendants' contempt of the Consent Decree; and third, that the defendants did not deny him training, rotation, or out-of-classification assignments as required by the Consent Decree.  Docket № 8451 at 8.

3

**III**

**A**

"The claimant bears the burden of proving by a preponderance of the evidence that he or she is an 'actual victim' of the Defendants' contumacious conduct and therefore entitled to make whole relief.  In order to state a *prima facie* case for failure to promote by reason of the Defendants' contempt, a claimant must identify the promotion sought, when it was sought, and the training or experience that qualified the claimant for the promotion; or that the claimant would have been qualified for a particular promotion but for the Defendants' contempt of specifically identified Consent Decree activities." Docket № 6928, at 13.  For promotion claims, the Defendants will then have a chance to "show that the claimant did not receive the promotion due to legitimate reasons having nothing to do with Defendants' contempt." (*Id.* at 15.)  "Thereafter, the claimant will have the opportunity to demonstrate that the Defendants' proffered reasons are a pretext for excusing its admitted contempt."  *Id.*

**B**

Summary judgment is authorized under Federal Rule of Civil Procedure 56(c) when all "pleadings, depositions, answers to interrogatories, and

4

admissions on file, together with the affidavit, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, everything in the record must demonstrate the absence of a genuine issue of material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog*, 193 F.3d at 1246; citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

When making the determination of whether summary judgment is proper, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Hinson v. Edmond*, 192 F.3d 1342, 1348 (11th Cir. 1999). The Court also must "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555 (11th Cir. 1990).

**IV**

**A**

**1**

Defendants believe they are entitled to summary judgment on Larkin's instatement claim because he declined an offer of promotion to the HMS classification in December 2005. Larkin does not dispute that he declined the promotion in 2005, but says he did so because the position required overnight travel which he was unable or unwilling to do at the time.

> Q. . . . Our records reflect that you declined an appointment to the Highway Maintenance Superintendent position; is that correct?
>
> A. Right. That's the one Hales (sic) got.
>
> Q. . . . And why did you decline the position?
>
> A. Overnight travel.

Docket № 8451-2 at 17 (depo. page 52).

Defendants argue that Larkin's decision to decline an offer of promotion establishes that it is Larkin's personal choices rather than the defendants' contempt that affected his promotion opportunities. Docket № 8451 at 10. Larkin disputes the defendants' position and maintains that declining a single

6

HMS promotion does not act as a waiver of his individual contempt instatement claim.  Larkin is correct.

ALDOT employees routinely decline specific job opportunities or promotions for any number of reasons, including overnight travel and do so without penalty.  The fact that state workers can refuse promotions without adverse consequences is attested to by the Alabama State Personnel Board regulations regarding removal of names from employment registers.  One of the bases upon which a name can be removed from a register is that the eligible employee has "decline[d] three offers of positions in the class for which the register was established[.]"  *See* Administrative Code Ala., Chapter 670-X-9-.02(5)(a)(2) (SPD Personnel Selection Procedures) *see also* Docket № 8501 at 15 n.13.

The fact that Larkin may have declined a job promotion for entirely legitimate reasons does not end the inquiry of whether he has a claim for instatement on the basis of the defendants' contempt of the Consent Decree. Larkin's actions do not operate as a waiver of an individual contempt instatement claim.

Irrespective of Larkin's decision regarding the 2005 promotion, defendants' assert that Larkin's instatement claim is nevertheless subject to

summary judgment because he cannot establish that their contempt affected his promotion opportunities through the provisional, backlog or regular appointment process.

## 2

Registers for the HMS classification were establishment in June 2004. Prior to the creation of the employment registers, ALDOT relied upon provisional appointments in assigning individuals to the HMS classification.

There was only one HMS provisional appointment made during the term of the Consent Decree.  That appointment was given to Jimmy Walker, a white employee of ALDOT in August 1994.  Docket № 8428 at 8.  Larkin did not know Walker's job qualifications or even that he had received a provisional appointment to the HMS classification in 1994.  Docket № 8451-2 at 11-12 (depo. pages 30-32).  Moreover, five months before Walker received his provisional appointment, and ten days before the Consent Decree was entered, Larkin was promoted to HMT/II.  The likelihood that he would have been promoted that same year directly from the HMT II position to the supervisory position after just five months is uncertain at best and at any rate, Larkin has not introduced any evidence to suggest that in August 1994, he possessed the skills, knowledge and experience necessary to function as an

HMS.  Defendants are entitled to summary judgement on Larkin's claims regarding ALDOT's provisional appointment process.

### 3

Larkin also contends that he should have been appointed to the HMS classification through the backlog appointment process.  The backlog process involved three rounds of appointments to critical positions in the Department of Transportation.  Appointment through the backlog procedure was the product of negotiation between the parties and approval by the Court.  The first round of backlog appointments occurred in 1999 and converted many of the provisional appointments that had been made years earlier into permanent appointments.  The second and third rounds of the backlog process occurred in August 1999 and April 2000.

In his brief, Larkin complains that the backlog appointment process was the product of defendants' contempt because it was based on selection standards that were not validated as appropriate for employee selection. Docket № 8482 at 8.  That is true, but the plaintiffs themselves—and for good reasons—agreed to the backlog appointment process.  Consequently, they cannot now complain that the process was a violation of the Consent Decree

or a product of defendants' contempt.  The defendants are entitled to summary judgement on this claim.

## 4

### i

Larkin alleges that many of the individuals eventually promoted to the HMS position were largely from the group of HMT II/III who were chosen for out-of-classification assignments prior to their appointment.  Docket № 8482 at 7 and 19.  According to Larkin, he was never recruited to apply for an out-of-classification assignment.[2]  He also claims that the out-of-classification assignments were not rotated among the HMT II/IIIs in violation of the

---

[2]   The requirements concerning the out-of-classification assignment of duties are set forth in Article 14, ¶2 of the Consent Decree, which provides:

**ARTICLE 14**

2.  Assignment of duties:

(a) To the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to black employees compared with white employees in the same lower classified jobs.

(b) The Highway Department will to the extent practicable not assign duties in such a way that any employee will gain an advantage in promotions, including reclassification, over other employees in the same classification.

Consent Decree.  *Id*. at 18.  Larkin's position is that had he been allowed to participate in out-of-classification work assignments, he would have been better prepared for work as an HMS, or received promotion to the HMS classification either through the backlog appointment process or through the regular appointment process that followed the reintroduction of the registers.

Defendants dispute Larkin's claims.  They assert that Larkin can show no harm for his failure to be given out-of-classification assignments.  Moreover, they claim that Larkin in his deposition did not complain about the lack of out-of-classification assignments but only does so in his response to defendants' summary judgment motion.  Defendants rely on the following exchange in Larkin's deposition to establish the point:

> Q.   Well, do you have any claim in this case related to an out-of-class assignment that you know of? I mean, we've talked about rotations. We've talked about training. Are you aware of any claim you may have about an out-of-classification assignment?
>
> A.   Well, there were some times, as a Technician I, and after a Laborer, that we did – I did Technician II work, such as bush hogging.
>
> Q.   Right.
>
> A.   You know, stuff like that.
>
>      . . .

Q.     . . . So your complaint would be that you were doing job duties
       that were out-of-class, and you should have only had to do the job
       duties that were in your classification that you were in? Is that
       what you're saying?

       MR. BLIZZARD: Object to the form.

A.     Yes.

Q.     . . . Is that it for your out-of-classification claim? Is that what the
       basis of your claim is?

       MR. BLIZZARD: Object to the form.

A.     At this time.

Docket № 8451-2 at 23-24 (depo. pages 78-79, 81).

The quoted deposition testimony shows that Larkin has little (or no)
understanding of Article XIV's obligations or the salutary role that
out-of-classification assignments could have on an ALDOT employee's
potential future promotion.  The testimony simply describes some
out-of-classification work which he did early in his ALDOT career.  The
testimony is not a repudiation of the requirements of Article XIV or the
advantages that out-of-classification assignments can sometimes provide in
ALDOT promotion.

## ii

The parties dispute in which counties Larkin was willing to work during the period of the Consent Decree.  Defendants, relying on Larkin's 2004 application for regular promotion to HMS, claim that Larkin limited himself to only three counties, Elmore, Pike, and Montgomery.  Docket № 8451 at 11 and Docket № 8451-2 at 25.  The defendants believe that this 2004 geographical limitation applies to the analysis of Larkin's out-of-classification claims prior to 2004.  Defendants make the point succinctly:  "Although it is true that Larkin submitted no applications for the [HMS] classification during the backlog appointment process and, therefore, did not limit his availability for appointment to any specific geographical location, the fact that he later limited his availability to 3 of 67 counties in his applications for regular appointments, suggests that he would have declined any backlog appointment offered outside that three county area."  Docket № 8451 at 13 n.7.

In response, Larkin points to the fact that in 1993, before the Consent Decree was approved and ALDOT registers abolished, he submitted an application for HMT II.  In that application, he stated that he would be willing to work in the Montgomery Area (Region 90); in the Phenix City/Troy Area (Region 91); and in the Dothan Area, (Region 94).  His application also indicated a willingness to accept work "involving extensive overnight travel."

13

Docket № 8483-15. These three regions comprise 15 different counties in Southeastern Alabama. *See* Docket № 8483-15 (map of ALDOT regions).

Between 1993 and 2004, Larkin never indicated that his geographical preferences had changed and the defendants have produced no evidence to show that it had. In fact, all the defendants can muster is an unsubstantiated claim that his 2004 application "suggests that he would have declined any backlog appointment offered outside that three county area." Docket № 8451 at 13 n.7. Suggestions are not evidence.

What is known is that in 2006, Larkin, consistent with his 2004 application, declined an HMS appointment because he did not want to travel overnight since his children were young. Docket № 8451-2 at 17 (depo. page 53). Defendants' attempt to extrapolate from Larkin's 2004 application his intent for the prior ten years is unavailing and ignores the contrary evidence existing in Larkin's 1993 application.

Applying the deference that is due Mr. Larkin at this stage of the litigation, and on the record before the Court, it cannot be said that between Larkin's 1993 application for promotion to HMT II and his 2004 application for HMS, that Larkin intended to limit his availability to the three counties listed in 2004.

14

### iii

Standing alone, the fact that Larkin did not receive an out-of-classification appointment does not state a violation of the Consent Decree. Unless he has evidence establish that similarly situated white employees secured an advantage in promotion as a result of their having out-of-classification appointments, Larkin cannot withstand the defendants' motion.

In order to establish that his white co-workers had an advantage, Larkin alleges that "[v]irtually all of [the] persons promoted through the backlog appointment process were serving out-of-classification for at least three months before the April 7, 1999 job announcement, and for at least seven months before the backlog appointments were made."  Docket № 8482 at 11 (emphasis omitted).

Larkin contends that had he been given an opportunity to perform out-of-classification assignments his chances for promotion would have increased since he would have been exposed to the knowledge and skills necessary to perform the duties of the HMS classification.  As Larkin testified, "any extra knowledge would help." Docket № 8457-2 at 79.  The obvious advantages derived from out-of-classification work assignments are reflected in the fact that the Consent Decree specifically required that such assignments not be

used to favor one employee over another and that ALDOT make such assignments between blacks and whites at rates proportional to their representation in the job classification.  Article XIV ¶3(b)-(c).

Relying on employment records, Larkin identifies 11 ALDOT employees who worked out-of-classification and thereafter received promotion to the HMS classification between 1999 and 2000.  Docket № 8482 at 9-10.  Ten of the eleven persons identified by Larkin were appointed as HMSs in counties where Larkin indicated in 1993 a willingness to work.[3]  Four of the employees[4] were reclassified to HMS pursuant to Article XV and are therefore not appropriate comparisons for determining whether ALDOT employees gained an advantage in promotion through out-of-classification assignments. The remaining six employees[5] were appointed to the HMS classification through the backlog appointment process in part because of the experience they gained through out-of-classification assignments.  Docket № 8482 at 10. The importance in promotion to the HMS classification of the experience gained through out-of-classification assignments is evident from the

---

[3]  The ten employees are Allums, Askew, Cole, Dutton, Driggers, Grissett, Sorrells, Wilson, Wingard, and Yohn.  Docket № 8482 at 9-10.

[4]  The four employees are Askew, Grissett, Sorrells and Yohn.  Docket № 8501 at 12.

[5]  The six employees are Allums, Cole, Drigger, Dutton, Wilson, and Wingard.

comments on the Selection Forms for many of those persons identified by

Larkin and promoted to HMS through the backlog process. *See* Docket №

8483-17, 18, 20, 21, and 27 commenting positively on the supervisory

experience of various candidates.

Questions of fact remain concerning whether Larkin's lack of out-of-

classification assignments was the result of the defendants' contempt and

affected his ability to secure promotion to the HMS position.

**5**

Larkin claims that he was harmed when he was denied the opportunity

to rotate into the better job duties associated with the HMT II/III and HMS

classifications.  Docket № 8482 at 6.  With respect to the HMS position, the

better job duties include the Crew Leader Position, Lo-Boy Operator, District

Sign Inspector and Weigh Crew Leader.  *Id.*  Larkin claims that had he been

rotated into such duties, he would have been better prepared for promotion

to HMS.  Larkin also claims that he was not given sufficient time to perform

the superintendent responsibilities attendant to the HMS classification.

Docket № 8451-2 at 21 (depo. pages 67-68).

Not surprisingly, defendants assert that Larkins' out-of-classification

claim is not supported by the evidence and that any contempt of the Consent

Decree did not affect Larkin's promotion opportunities.  They point, for

17

example, to Larkin's undisputed participation in the Employment Development Program for the HMT II/III classification. *Id.* at 18 (depo. page 58).[6]

Participation in the Employee Development Program satisfied the rotation requirement contained in Article XIV of the Consent Decree. *See* Docket № 7899 at 21 ("The EDP module rotation system satisfies the requirements of Article XIV by ensuring that each participating employee is exposed to the range of duties and assignments that will best prepare that employee for promotion in his or her natural career path.")(adopted, in part, by the District Court in Docket № 7969, Supplemental Special Master Report and Recommendation on Compliance with Article XIV, adopted by the District Court in Docket № 8134). In fact, the May 2002 Settlement Agreement specifically defines "Rotation" as "the training and rotation module system developed by [Personnel Decisions Research Institute, Inc.]" *See* May 2002 Settlement Agreement (Docket №. 4700) at 5. Accordingly, as to any generalized complaints about rotation, Larkin's participation in the EDP met the obligation of the defendants under the Consent Decree. Nevertheless, in addition to his generalized complaints about the timing and implementation

---

[6]   His participation in the EDP ended in 2008 when he was promoted to the Transportation Maintenance Technician Senior classification.

18

of the EDP program—which are unavailing—Larkin also make a specific claim

with respect to the failure of the defendants to properly rotate him through

the supervisory aspects of the job classification.  Larkin claims he received

some rotation into the supervisory or superintendent duties of the

classification, but just not enough.  Docket № 8451-2 at 21 (depo. page 68).

The job rotation requirement is found in Article XIV ¶3:

3.  Job duties which better prepare employees:

(a) Within 90 days following the effective date of this Settlement
Decree, the Highway Department and the Personnel Department
will identify the job assignments or duties for examination or
promotion (including reclassification) than other assignments or
duties within such classification.

(b) The assignments and duties identified will include, but not be
limited to, any assignment or duty which would receive a greater
value or number of points in T & E rating, a classification or pay
review, or in selection from a COE.

(c) For each assignment or duty so identified, the Highway
Department will, to the extent practicable, develop a means for
assuring that employees on the job are periodically rotated into
such assignments and duties and that black employees are
assigned to such duties and assignments at rates proportional to
their representation in the job classification.

Paragraph 2(b) of Article XIV the Consent Decree also requires that

ALDOT "will to the extent practicable not assign duties in such a way that any

employee will gain an advantage in promotions, including reclassification,

over other employees in the same classification."  Larkin has alleged that at

19

least three similarly-situated white employees gained an advantage in promotion over him because they had an opportunity to rotate through the supervisory duties while appointed to the HMT II/III classification. Docket № 8482 at 5 and Docket № 8451-2 at 21-22 (depo. pages 70-71, 75).

Ronnie Ott, Kenneth Sorrells and Dick Wingard are identified by Larkin as having performed supervisory duties that, in turn, gave them an advantage in their ultimate promotion to the HMS classification. The importance of the supervisory experience gained by Sorrells and Wingard in the promotion process is evident from the comments on the Selection Forms completed by the interviewers who assessed their suitability and competency for performing the duties of the HMS classification. *See* Docket № 8483-24 (Sorrells) and Docket № 8483-26 (Wingard). There is sufficient evidence in the record to create an issue of fact as to whether Larkin was disadvantaged in his individual promotion opportunities by virtue of the defendants' contempt Article XIV, ¶3, and the failure of Larkin to be rotated through the supervisory duties of the classification.

Defendants argue that because Larkin, in his deposition, offered the opinion that the promotion of Sorrells and Wingard was the result of discrimination, (Docket № 8451-2 at 25 (depo. page 86)) that he was barred by a previous settlement agreement from making any claim that those

promotions serve as proof of the effects of defendants' contempt on his promotion opportunities.  Docket № 8451 at 30.

By virtue of his participation in the May 2002 Settlement Agreement, (Docket № 4700), Larkin had previously been compensated for any instatement claims he may have had based on the defendants' alleged discrimination.  The 2002 settlement resolved all discrimination claims, including instatement claims with the exception, however, of instatement claims based on the defendants' contempt of the Consent Decree.  Docket № 4700 at 41-42,  *see also* Docket № 8310 at 20 (R&R)("The Settlement Agreement clearly retains the right to pursue individual instatement claims related to allegations of contempt.  On the other hand, the Defendants paid a very considerable sum to resolve all noncontempt instatement claims up through the date of the Fairness Hearing.  Why the Defendants would have agreed to a settlement that left the Plaintiffs free to pursue instatement as a remedy for contempt into the very job position released by the Promotion Class Settlement is unclear").

Larkin may well believe that discrimination was one of the motivating forces that resulted in advantaging white ALDOT employees who received out-of-class assignments and job rotation opportunities, but that is not the entirety or even the focus of his claim, however.  Evidence in the record

21

clearly supports an inference that Sorrells and Wingard had an advantage in

promotion because of their access to job rotation and out-of-class

assignments.  Larkin was not provided the opportunity to participate in such

activities.  The defendants are not entitled to summary judgment on Larkin's

job rotation claim.[7]

## 6

Once the minimum qualifications for the HMS classification were

approved, SPD issued HMS employment Registers and Certificates of Eligibles,

in June 2004.[8]  Larkin claims that but for the defendants' contempt, he would

have been promoted to HMS through the regular appointment process.

Once the regular appointment process was underway, Larkin submitted

an application for the HMS position on November 3, 2004.  Docket № 8451-9

He was placed on the Register in March 2005 with a score of 58.80.  Docket №

---

[7]  Larkin's allegations with respect to Ronnie Ott are not well placed. Ott was hired from a COE issued several months before Larkin submitted an application for regular promotion.

[8]  The regular appointment process has essentially four steps.  First, a candidate submits an application for appointment.  Second, the candidate submits to examination for the classification sought.  Third, depending in large part upon performance on the examination, the SPD establishes a register of potential candidates and ranks the candidates based on scores.  Fourth, the higher-ranking candidates on the register are then placed on a Certificates of Eligibles issued by SPD that is forwarded to ALDOT and from which ALDOT then conducts interviews and extends offers of employment or promotion.

8457-2 at 9 (depo. page 22).  On his application, Larkin specifically limited his availability  to three counties:  Montgomery, Pike, and Elmore and indicated he would not accept work involving overnight travel.  Docket № 8451-9 at 5.

From the reestablishment of the HMS Register in June 2004 through the termination of the Consent Decree in December 2006, there were 33 HMS appointments made from Certificates of Eligibles, 12 of which went to African Americans.  Docket № 8451-3 at 12.  Of the 33 HMS appointments, only nine were made during the time that Larkin was listed on the register and of those nine, only four were appointed in the three counties in which Larkin indicated a willingness to work and one of those four was American Indian.  *Id.* and Docket № 8454-2 at 50-51 and Docket № 8451-2 at 25.

Of the four positions available in the three counties corresponding to Larkin's location preferences, he declined one of the positions because it required overnight travel.  *See* Docket № 8454-2 at 17 (depo page 51 "Q. . . . And in the counties that you chose, of those four appointments, one of those counties required overnight travel, so that eliminated you, too, right?  You weren't going to take a job, according to your application, that required overnight travel, in that correct?  A.  That's correct").  That position went to Craig Hayles.  *Id.*

A second of the four appointments went to Harold Hagler who was employed in an HMS position that required overnight travel, a condition of employment that Larkin did not meet having clearly indicated that he was unwilling to travel overnight. Docket № 8501-1 at 2 ¶9. The third appointment went to Samuel Latham. This appointment, too, required overnight travel and so Larkin, pursuant to his expressed desire was not considered for the appointment. Docket № 8451-3 at 25.

The final appointment went to James Huggins. This position, in Elmore County, did not require overnight travel and was within the county area specified by Larkin in his application. Huggins, however, was already working in Elmore County at the time of the appointment while Larkin worked in Montgomery County. Docket № 8451-2 at 51.

Larkin, states that "virtually all of the individuals promoted [to HMS] had been in a supervisory position with ALDOT for an extended period of time before being promoted through the Certificate of Eligibles process." Docket № 8482 at 13. It is almost certainly the case that Huggins had some prior supervisory experience, but the evidence does not reflect the nature of that experience nor how or whether it provided Huggins an advantage in promotion. It is the case that Larkin had a higher application score, 58.80

24

versus Huggins score of 53.89, Docket № 8451-3 at 25 and Docket № 8451-2 at 9 (depo. page 22).

The only evidence in the record that explains why Huggins was chosen for the HMS position in Elmore County is the defendants' evidence that he was selected because he worked in the County at the time of his appointment. Larkin has not produced any evidence that the proffered reason for Huggins' employment is a pretext to mask the effect of the defendants' contempt on Larkin; nor has Larkin introduced any evidence comparing his qualifications to those of Huggins.  The defendants are entitled to summary judgment on Larkin's instatement claim involving ALDOT's regular promotion process.

## B

The training requirements contained in the Consent Decree are found in Article XVI:

> 2. <u>Regular Training Courses</u>:  During the term of this [Consent Decree], the State Highway Department will offer training courses to employees subject to and in accordance with the following subsections:
>
> . . .
>
> (b) The training courses to be offered to such employees are set forth in the attached Appendix __ to this [Consent Decree] and a course or courses designed to clarify and update black employees on the procedures to be followed and qualifications, training, and experience to be credited in filling higher classified jobs within the Highway Department.

(c) The Highway Department will monitor the enrollment of employees taking training courses in order to ensure to the extent practicable that interested black employees are receiving their fair share of participation in such training courses.

(d) The training courses to be offered pursuant to the Training section of the [Consent Decree] will be started within 120 days after the effective date of the [Consent Decree] . . . .

3. The training courses provided for by this Article will be offered to the employees eligible therefore, with such employees having the option to accept or decline the training courses. Offers and declinations of training opportunities shall be documented in writing and signed by the affected employee.

The evidence establishes that Larkin received regular training opportunities from March 1998 through August 2006. In all, he received 486.50 hours of training in almost 90 different courses. Docket № 8451-7 (Larkin's State training record). In his affidavit filed in response to defendants' motion for summary judgment, Larkin claims he would have participated in more training opportunities had they been available. Docket № 8483-1 at ¶12.[9] Through his deposition testimony, Larkin alleges he was denied the same training opportunity on heavy equipment operation that was provided to white ALDOT employees. Docket № 8451-2 at 19 (depo. page 60-61).

---

[9] The defendants have filed a motion to strike Larkin's affidavit. Docket № 8501. That motion will be dealt with by separate order.

According to Larkin, because his training session was cut short by several hours, he was denied adequate heavy equipment training. *Id*. at 20 (depo. pages 64-65). Larkin, testified that he believed the curtailed training was the result of his supervisor being concerned that Larkin may take his job. *Id*. (depo. page 65). Other than Larkin's statement, there is no other evidence to support his allegation. Conversely, defendants contend that Larkin's training was cut short because he was performing the task too slowly. Docket № 8451 at 24. But as Larkin explained, his assignment was to be trained for the day on the heavy equipment and the fact that he may have been moving slowly was to be expected.

> A. . . . But the job was to train me. So it wasn't a big deal with the people that sent us out there.
> . . .
>
> A. That was supposed to have been training exercise. So if it took all day training, then all day would have been fine.
>
> Q. I guess my question is a little confusing. Were you actually assigned – in addition to you getting the training, were you actually assigned a job to complete on the crew . . . that day? So, for example, Mr. Larkin, if I said, Okay, I'm going to let you train on the heavy equipment today, but we've still got to get this job done, clear this ditch, do this et cetera and so on, that's what I'm asking you. Is that what the case was?
>
> A. No.
>
> . . .

Q. . . . You're telling me you were suppose to have full eight-hour training shift?

A.  Right.

Docket № 8451-2 at 20 (depo page 65-66, 67).

Further into his deposition, Larkin testifies about the practical effect of the loss of heavy equipment training on his promotion opportunities.  The testimony makes clear that at least as far as the defendants were concerned, the shortened training opportunity on the heavy equipment had no effect on Larkin's promotion prospects to the HMS classification or on his test performance.

Q.  Was there a requirement – for you to qualify for the [HMS] position, was there a requirement that you had to have a certain amount of training or experience on heavy equipment?

A.  I don't think it's a certain amount as long as you was qualified to, to my knowledge.

Q. . . . And would you agree with me that the training on that equipment would have nothing to do with the score that you made on the exam for the position?

    Mr. Blizzard: Object to the form.

A.   Which exam?

Q.  For the [HMS] position.

A.  I really can't say that, that it wasn't, because the test itself that we had to take required you to have equipment knowledge.

28

Q.  Did you feel like you had it?

A.  Yes.
. . .

Q.  . . . Would you agree with me that that would have no effect on the promotions that you've turned down; in other words, if you turned down a promotion, it has nothing to do with the fact you didn't get training

A.  Are we speaking about the one that I did turn down?

Q.  Yes, sir.

A.  That wouldn't have had anything to do with it, that equipment training.

*Id*. at 23 (depo. pages 76-77).

Larkin has not produced any evidence that the alleged failure of the defendants to provide him with adequate heavy equipment training affected his promotion opportunity to HMS.  In fact the evidence is to the contrary.  As previously discussed, in December 2005, Larkin turned down a promotion to the HMS classification for entirely reasonable and appropriate reasons.  The promotion offer was made many years after Larkin claims the defendants failed to provide him adequate heavy equipment training.  There is no evidence that the lack of heavy equipment training affected the decision of the defendants to promote or not promote Larkin to HMS.

Other than the claim regarding a lack of adequate training on heavy equipment, Larkin makes only generalized statements about the failure of defendants to timely implement the training requirements of the Consent Decree.  These generalized statements do not establish the causation between the defendants' contempt and the specific harm required to entitled a claimant to relief.  The defendants are entitled to summary judgment on Larkin's training claim.

## IV

**ACCORDINGLY**, it is Recommended that the defendants' Motion For Summary Judgment, Docket № 8450, be GRANTED IN PART and DENIED IN PART.

Objections to this Report and Recommendation must be filed with the Clerk of Court by December 5, 2011.  Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED this 2nd day of November 2011.

/s/ C. A. González
SPECIAL MASTER