IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


JOHNNY REYNOLDS, ET AL.,

     Plaintiffs,

                             CIVIL ACTION NUMBER
v.                           85-cv-665-MHT
                        **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

     Defendants.


**REPORT AND RECOMMENDATION  ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON CHRISTOPHER AZUBUIKE'S
INDIVIDUAL CONTEMPT CLAIM**

**I**

Before the Special Master is the defendants' Motion for Summary

Judgment on the individual contempt claim of Christopher Azubuike.  Docket

№ 8963. Mr. Azubuike has responded in opposition, (Docket № 8975), and

the defendants have replied, Docket № 8976. The motion is now ripe for

resolution.

Mr. Azubuike seeks instatement to the Civil Engineer Administration

classification—currently called Transportation Administrator—as well as

other make-whole relief and monetary damages for that period of time not covered by the 2001 Settlement Agreement. Docket № 8975 at 1.

## II

Claimant Azubuike is a native Nigeria educated in Nigeria through high school. Azubuike depo. at 12, Docket № 8965-1, (hereinafter "Azubuike depo."). He immigrated to the United States in 1977 and shortly thereafter enrolled in Alabama A&M University. Mr. Azubuike received a BS in Civil Engineering in 1982 and a MA in Urban Planning in 1989. Both degrees were awarded by AAMU. *Id*. at 13. Mr. Azubuike is not a professional engineer, having never taken the Professional Engineer Licensing exam nor for that matter the Fundamentals of Engineering exam. *Id*. at 15. He is a United State citizen. *Id.* at 10.

Prior to his actual employment with ALDOT, Mr. Azubuike had been on the Graduate Civil Engineer, ("GCE"), register in 1984 but removed from the register when ALDOT imposed the Engineer in Training requirement as a minimum qualification on the GCE classification. *Id*. at 23.

Following the entry of the Consent Decree in 1994, ALDOT was ordered to instate Mr. Azubuike as Civil Engineer V, ("CE-V"). His instatement was made pursuant to Article XIII Paragraph 10 of the Consent Decree. Docket №

8965-2 at 19, no. 3 (Request to Admit) and Docket № 1521 (notice of right to instatement). Mr. Azubuike then went to work in the Transportation Planning Bureau, Metropolitan Planning Section in Montgomery in 1995. Azubuike depo. at 22-23. Upon instatement to the CE-V classification, Mr. Azubuike was awarded more than $626,000 to compensate him for his improper removal from the GCE register. Furthermore, on instatement he was given an effective credited service date of 1983. *Id.* at 24.

Mr. Azubuike has remained a CE-V throughout his entire nineteen years of actual service at ALDOT and done essentially the same job and performed the same duties since 1994. As a CE-V, Mr. Azubuike's primary job duties are to keep local officials appraised on road projects designated for their areas. This includes information about the type, size, and nature of the project, and how the project will affect the urban areas in terms of traffic, land use, environmental concerns, and budget. *Id.* at 26-27. The failure of ALDOT to promote Mr. Azubuike is Mr. Azubuike's principal claim. *Id.* at 16-17.

The evidence is uncontested that when Mr. Azubuike started at ALDOT, his English proficiency was weak and he had difficulty making himself understood. Docket № 8965-2 at 19, ¶4 (Request to Admit). The record is also clear that Mr. Azubuike's limited engineering experience made it very difficult

to perform the duties of a CE-V in the Transportation Planning Bureau when he first arrived. As a result, and with the intention of strengthening his engineering and language skills so he could better perform the duties of a CE-V, Mr. Azubuike was moved from the Transportation Planning Bureau to the First Division. This move was made with the knowledge of plaintiffs' counsel. Docket № 8965-3. During this time, Mr. Azubuike regularly scored low on his performance evaluations achieving no better a ranking than "partially meets standards." Docket № 8965-8.

As required by Article 15, Paragraph 1 of the Consent Decree, Mr. Azubuike's classification was reviewed in 1996. Azubuike depo. at 33. At that time he requested that his classification be changed to the Civil Engineer Administrator, ("CEA") classification.[1] *Id*. The request was never granted. In 1998, the CE-V classification was retitled and changed to Civil Engineering Manager, and Mr. Azubuike has remained in that classification for the duration of his employment with ALDOT.

---

[1]  In 1998, the CEA classification was changed to the "Transportation Administrator" classification. In order to avoid confusion, and because the parties use the old CEA designation in their briefs, the undersigned will follow the same convention throughout this R&R.

### III

### A

The relative burdens of proof in individual contempt claims have been long established. In cases where a claimant seeks promotion to a job classification the claimant contends was denied him because of defendants' contempt, he "bears the burden of proving by a preponderance of the evidence that he or she is an 'actual victim' of the Defendants' contumacious conduct and therefore entitled to make whole relief." Docket № 6928, at 13.

> In order to state a *prima facie* case for failure to promote by reason of the Defendants' contempt, a claimant must identify the promotion sought, when it was sought, and the training or experience that qualified the claimant for the promotion; or . . . that the claimant would have been qualified for a particular promotion but for the Defendants' contempt of specifically identified Consent Decree activities. The identification of the specific activities must contain a clear indication of how participation in the indicated activities would have made a claimant otherwise qualified for the promotion at issue.

> If a claimant comes forward with sufficient evidence to carry this non-onerous burden, then the claimant has created a 'rebuttable presumption' that he or she is a victim of the Defendants' contumacious conduct . . ..

> To rebut the presumption, the Defendants must show that the claimant did not receive the promotion due to legitimate reasons having nothing to do with Defendants' contempt. . . .  Thereafter, the claimant will have the opportunity to demonstrate that the

> Defendants' proffered reasons are a pretext for excusing its
> admitted contempt.

*Id.* at 13-15.

To the extent claimants can establish that they are actual victims of the

defendants' contumacious conduct, they can recover monetary damages for

such contempt for the period after May 29, 2001. Docket № 8310 at 7.

**B**

Summary judgment is authorized under Federal Rule of Civil Procedure

56(c) when all "pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavit, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, everything in the

record must demonstrate the absence of a genuine issue of material fact.

*Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). The party

seeking summary judgment bears the burden of demonstrating the absence of

a genuine dispute as to any material fact. *Herzog*, 193 F.3d at 1246; citing

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

When making the determination of whether summary judgment is

proper, the Court must view the evidence and all factual inferences in the

light most favorable to the party opposing the motion. *Hinson v. Edmond*, 192 F.3d 1342, 1348 (11th Cir. 1999). The Court also must "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555 (11th Cir. 1990).

## IV

### A

Defendants believe they are entitled to summary judgment on Mr. Azubuike's promotion and nonpromotion claims. With regard to his training claims, the defendants contend that Mr. Azubuike has received all the training to which he was entitled and all the training he sought. With regard to job rotation and out-of-class assignments, those claims allegedly fail due to the fact that Mr. Azubuike cannot show any violation of the Consent Decree and because his own actions, his inexperience and his job choices accounted for his inability to secure the job rotation and out-of-class assignments he now claims he should have received. Similarly, the defendants believe his promotion claims are unsustainable because he fails to link those claims to violations of the Consent Decree and because his location preferences and poor test performances eliminated him from consideration for a significant number of CEA appointments.

Mr. Azubuike contests defendants' arguments that they are entitled to summary judgment on his individual contempt claims. He raises several issues asserting among other things that the defendants' general history of noncompliance with the Consent Decree establishes the validity of his individual claims. He also purports to identify in his brief several persons who were promoted out-of-class or through the backlog process into the CEA classifications and who were allegedly less qualified than he for promotion. He accounts for his poor showing on the CEA exam by pointing to the defendants' alleged failure to provide him exposure to the range of duties required of a CEA, and tested on the CEA examination.

**B**

**1**

Mr. Azubuike claims that his inability to secure promotion to the CEA classification is, in part, related to an alleged breach of the Consent Decree's requirements concerning training, job rotation, and out-of-classification assignment opportunities. As a result of these breaches, he argues that he was unable to secure the necessary test scores on the CEA examination that would have allowed for his promotion. Docket № 89656-1 at 4 Intg. Resp., № 9 ("I have been denied promotions." . . . "I have been denied training, job

assignments, and job rotations, . . . that would have better prepared me for promotion"); *see also* Azubuike depo. at 17-18. While Mr. Azubuike's inability to secure an adequate score for promotion on the CEA examination is not contested, he nevertheless fails to rebut the defendants' evidence that the alleged lack of training was <u>not</u> the "but for" cause of his failure.

Between 1995 when Mr. Azubuike began work at ALDOT, and December 2006 when the Consent Decree was terminated, Mr. Azubuike received more than 2,256 hours of training over 107 courses. Docket № 8966-7 (Training History for Azubuike).[2] Article XVI of the Consent Decree required ALDOT "to ensure to the extent practicable that interested [African American] employees . . . receiv[e] their fair share of participation in . . . training courses." Docket № 553, Consent Decree Art. XVI, ¶2(c). Mr. Azubuike has failed to show that he did not receive a "fair share" of training courses. In fact he testified that he was permitted to participate in all the training courses that he asked to attend. Azubuike depo. at 123. The only exception he points to is that he was not trained on the Voyager computer modeling program

_____

[2]  When the training cutoff date is carried forward to November 1, 2012, the actual number of training courses is 136 and the training hours are over 2,455. Docket № 8966-7 and Azubuike depo. at 119.

used to project traffic patterns between 1995-98.[3] Azubuike depo. at 124-25. According to Mr. Azubuike, his poor job performance reviews between 1995 and 1998 were because he could not use the Voyager platform. *Id*. at 125.

Mr. Azubuike's claims with respect to a lack of Voyager training are insufficient to raise an issue of fact respecting his allegations that he was denied training. He has not pointed to any evidence supporting a contention that his lack of Voyager training affected his ability to adequately perform on the CEA examination. In point of fact, the 2003 and 2006 CEA examinations administered to Mr. Azubuike did not contain any questions regarding computer traffic modeling software.  Docket № 8966-2 at ¶6 (Maury Buster Aff.).

The unrebutted evidence in the record shows that Mr. Azubuike received a "fair share" of training as required by the Consent Decree. He has failed to introduce evidence that would establish the existence of a material question of fact as to a causal connection between his alleged lack of training, his indisputably poor CEA examination scores and his lack of promotion.

---

[3] In 2011 and 2012, Mr. Azubuike received two training courses on Voyager. Azubuike depo. at 124-25.

**2**

Mr. Azubuike testified that he was denied job rotation opportunities that would have better prepared him for the CEA examination and thus improved his promotional opportunities. Azubuike depo. at 109-110. The job rotation requirements of the Consent Decree are located in Article XIV and require "[t]o the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to [African American] employees compared to white employees in the same lower classified jobs." Docket № 553 at Art. XIV ¶2(a). The primary purpose behind Article XIV was to enable ALDOT's African American employees to secure the experience necessary to enable them to perform at the levels required to secure promotion.

To affect the job rotation requirements of Article XIV, the parties devised and created the Employment Development Program, ("EDP").[4] The EDP is a voluntary program available in almost all ALDOT job classifications. The program is structured as a series of modules, where each module covers a particular subject area, such as supervisory skills, contract reading and the

_____

[4] *See generally*, R&R at Docket № 7899 at 16-24, for a description and analysis of the purpose and function of the EDP (adopted by the court at Docket № 7969).

like. Within each module, the employee is to complete a number of training activities, through either classroom training or on-the-job training. The training modules utilize the established minimum qualifications for a particular job classification. The knowledge, skills and abilities ("KSAs") that form the basis for the selection procedures relevant to the job classification are the same ones for which an employee receives training through EDP. An employee who successfully completes the modules for his or her classification receives training in the same qualifying KSAs that appear in the minimum qualifications and examinations. The court has held that the EDP satisfies the job rotation requirements of the Consent Decree because it ensures that participating employees are exposed to the range of duties and assignments that are required for promotion within ALDOT.  Docket № 7899 at 21 ("The EDP module rotation system satisfies the requirements of Article XIV by ensuring that each participating employee is exposed to the range of duties and assignments that will best prepare that employee for promotion in his or her natural career path").

Mr. Azubuike testified that he participated in the EDP program as a CEM, and completed it around 2008, but that he "got nothing out of it." Azubuike depo. at 112, 114. As part of his claim, Mr. Azubuike alleges that he

was denied rotation opportunities and that the substitution of EDP participation for actual job rotation does not affect his rotation contempt claim because he did not complete the EDP program in advance of his CEM examinations. Docket № 8975 at 27-28. Mr. Azubuike's argument would carry the day if there was evidence that the defendants prevented him from completing the EDP in a timely manner. There is no such evidence, however.

Mr. Azubuike enrolled in the CEM EDP module in August 2000. Azubuike depo. at 112. He did not complete the module until 2007 or 2008 after he had taken the CEA promotion exam in 2003 and 2006. *Id*. at 114. Mr. Azubuike devotes a number of pages in his brief to rehashing the slow and arduous history of defendants' compliance—and noncompliance—with Article XIV's rotation and training requirements. Docket № 8975 at 19-28. The sum of his argument is that the training requirements of the Consent Decree were to be in place before the administration of job exams. What is missing is whether the delay in establishing the EDP affected Mr. Azubuike's exam performance. Unfortunately for Mr. Azubuike, he has failed to point to any evidence establishing a disputed material fact or rebutting the defendants' evidence with regard the EDP.

By his own admission, Mr. Azubuike began his participation in the EDP program in November 2002 and completed it around 2008. He sat for the CEA

promotion exam twice:  first in 2003, and then again in 2006. There is no evidence in the record from which the court could find that the failure of Mr. Azubuike to complete the EPD prior to either of his two examinations was the result of the defendants' contempt. By the time he sat for the CEA exam in 2006, Mr. Azubuike had participated in the EDP program for approximately three years and at any rate, he was placed on the CEA register after both the 2003 and 2006 examinations.

The Consent Decree did not require the defendants to ensure that African American employees of ALDOT completed the EDP in advance of promotion examinations. The fact that the program was available and offered to employees met the requirements of the Consent Decree. Certainly, had the defendants interfered with or thwarted Mr. Azubuike's ability to complete the program the analysis would be substantially different. There is no evidence of such interference and generalized arguments about the efficacious effects of rotation and training on test performance do not meet the individualized burden a claimant bears in proving his or her contempt allegations.

Furthermore, Mr. Azubuike testified in deposition that his poor performances on the CEA examinations[5] were due, at least in part, to physical

---

[5]   Mr. Azubuike's 2003 CEA examination resulted in a test score of 21.89. The mean score for all test takers was 37.88 and for African American test

(continued...)

conditions. The first test in 2003 was given "just [after he] c[a]me out of surgery." Azubuike depo. at 96-97. The 2006 test was administered at a time he was suffering from "jet lag" following his return from Nigeria. *Id*. at 97. He has not taken another CEA examination since his last attempt in 2006.

Mr. Azubuike has failed to produce evidence that would allow him to proceed with his contempt claim related to job rotation. His participation in the EDP satisfied the defendants' obligations under Article XIV ¶3 and there is no evidence to support a claim that his failure to complete the EDP prior to his 2006 examinations was the result of defendants' contempt.

### 3

### i

Mr. Azubuike alleges that ALDOT violated Article XIV, ¶2 of the Consent Decree by denying him out-of-classification assignment opportunities that would have better prepared him for the CEA examination. Docket № 8975 at 12. Well after the close of discovery, and in reply to defendants' motion for summary judgement, Mr. Azubuike for the first time identifies three white

---

[5](...continued)
takers it was 33.64. Of the 123 examinees place on the register as a result of the 2003 test, Mr. Azubuike ranked 122. Docket № 8966-2 at ¶4 (Affidavit of Maury Buster). In the 2006 administration of the CEA examination, Mr. Azubuike earned a score of 32.84 which gave him the lowest score of any CEA candidate taking the examination in 2006. *Id*. at ¶5.

comparators he alleges were give preferential promotion opportunities as a result of receiving out-of-classification assignments.[6] *Id.* at 8-9. The three comparators he alleges were given out-of-classification assignments are not appropriate comparators because they were appointed to the positions for legitimate non-contumacious reasons and their appointment did not disadvantage Mr. Azubuike's promotion opportunities or violate the Consent Decree.

The Consent Decree's requirements with respect to out-of-classification assignments are set forth in Paragraph 2 Article XIV of the Consent Decree, which provides in part:

### ARTICLE XIV

2. Assignment of duties:

>    (a) To the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to black employees compared with white employees in the same lower classified jobs.

---

[6] The defendants strongly object to Mr. Azubuike's untimely identification of the three comparators contained in his reply brief and ask the court to disallow his arguments based on the comparators. Docket № 8976 at 9-11. The defendants correctly argue that Mr. Azubuike failed to name any comparators during written discovery or in his deposition. That fact would normally counsel strongly in disallowing the late introduction. Nevertheless,  because the comparators actually do not support Mr. Azubuike's claim, it is best to analyze why that is so in the hope of providing the parties future guidance.

(b) The Highway Department will to the extent practicable not assign duties in such a way that any employee will gain an advantage in promotions, including reclassification, over other employees in the same classification.

"The fact that [Mr. Azubuike] did not receive an out-of-classification appointment does not state a violation of the Consent Decree unless [he] can establish that similarly situated white employees had an advantage or were treated differently than he." Docket № 8723 at 11 (R&R) adopted Docket № 8738. In fact, "[t]he Consent Decree does not require the complete elimination of out-of-classification assignments. "It simply requires to the extent practicable, that proportionality in out-of-classification assignments be sought and that those who are assigned duties out of their classification not gain an advantage in promotions over other employees in their same classification." Docket № 7899 at 14 adopted Docket № 7969.

## ii

Mr. Azubuike identifies three white ALDOT employees who he claims were allowed to work out-of-classification and who received an advantage in promotion as a result:  James Kelley, Scott George and Dewey Phillips.

The unrebutted evidence establishes that ALDOT made eight CEA out-of-classification assignments across the State during the period of the Consent Decree. Docket № 8977-1. None were made in the Transportation Planning

Bureau where Mr. Azubuike worked and of the eight assignments, one went to an African American.

**4**

**i**

James Kelley was placed out-of-classification into a CEA position (Acting Division Construction Engineer) in April 2000 and stayed in the position until 2003. Docket № 8974-3 at 2. He was promoted to CEA from a Certificate of Eligibles in February 2005. The evidence establishes that Mr. Kelley was temporarily appointed to the CEA position as a result of a cascading effect due to promotions within the 6th Division and because he had significant experience in the Construction Section of the 6th Division going back to 1993. Docket № 8977-6; 8977-1; and 8977-2. He was also a licensed professional engineer at the time of his out-of-classification appointment. Docket № 8977.

In contrast, Mr. Azubuike was working in the Transportation Planning Bureau and had virtually no construction or design experience and no project management experience in the area of construction. Azubuike depo. at 153. In his deposition, Mr. Azubuike described the nature of his experience at ALDOT as mostly administrative.

Q. . . . Given your body of knowledge,  would you agree with me

that your area of specialty in engineering is – is more in the area

of administrative rather than construction related?

A.     Yes.

*Id*. at 156.

The simple fact is that Mr. Azubuike did not have the experience

necessary to perform the job duties of Acting 6th Division Construction

Engineer and he admitted as much.[7] There is no evidence Mr. Azubuike points

to which establishes that the appointment of Mr. Kelley was made in violation

of the Consent Decree or that it adversely affected his own promotion

opportunities. Furthermore, Mr. Kelley was placed on the CEA register in

October 2004 with an examination score of 48.6 and subsequently listed on

the Certificate of Eligibles in November. Mr. Azubuike's scores would not have

enabled him to be placed on the Certificate of Eligibles.

---

[7] "Q.  Is it your testimony, Mr. Azubuike, that it's not fair for a construction section to pick some who has been in construction for five or six years over you who is in transportation planning? "A.  That one I don't have a problem. That is a person who has always been working in there. But if construction bureau get somebody from some other place to come there to work, what prevents them –."  Azubuike depo. at 105.

## ii

ALDOT assigned Scott George as the acting Pavement Management Engineer, ("PME"), from February 2002 through May 2004.  Docket № 8977-1.  His appointment was within a different bureau—Materials and Testing—than the bureau employing Mr. Azubuike. The defendants have produced unrebutted evidence that, like Mr. Kelley's appointment, Mr. George's out-of-classification appointment was made on a non-contumacious basis and did not affect Mr. Azubuike's promotion opportunities.

The Materials and Testing Bureau is responsible for testing and inspecting all materials used for roadway and bridge construction and maintenance. The PME oversees the Pavement Management System and the engineers working therein.  Docket № 8977-12. In fact, the knowledge and skills required for the position are so specialized that the September 2003 effort to fill the position from a Certificate of Eligibles had to be abandoned because not one of the candidates had the subject matter expertise necessary to perform the essential duties of the job. *Id*.

As in the situation with Mr. Kelley, Mr. George was working in a different bureau than Mr. Azubuike. In point of fact, Mr. Azubuike had no experience in the relevant areas and at any rate, Mr. George was appointed to the CEA classification on February 6, 2004, more than five months before Mr.

Azubuike was placed on the CEA register. As a consequence, Mr. George's appointment could not have affected Mr. Azubuike's promotion opportunities.

### iii

The final comparator discussed by Mr. Azubuike is Dewey Phillips. Mr. Phillips began his employment with ALDOT in 1993 as a Civil Engineer Administrator.  Docket № 8975 at 9. In August 1998, Mr. Phillips was placed out-of-classification in the position of Assistant Maintenance Engineer, Permits and Operations in the Maintenance Bureau. As a result of the backlog promotion process, Mr. Phillips was promoted to the CEA classification in late July 1999. As with his other two comparators, Mr. Phillips' ALDOT background and training is distinguishable from Mr. Azubuike's to such an extent that he is not a valid comparator. First, Mr. Phillips was a licensed P.E. at the time of his out-of-classification appointment and furthermore, he worked in an altogether different bureau. There is no evidence that Mr. Azubuike can point to which would establish that the appointment of Mr. Phillips individually harmed him in his own effort to secure a CEA assignment out-of-classification. The only "evidence" proffered are very generalized arguments related to the well-established history of the defendants' contempt.  Such generalized evidence does not meet the claimant's burden of showing individualized harm.

## C

Between 1994 and the termination of the Consent Decree in 2006, ALDOT used three types of appointments: provisional, backlog and regular appointments from certification lists.[8] In 1999, existing provisional appointments were largely made permanent through the agreed-to backlog process.  Docket № 3802 at ¶1.

Since Mr. Azubuike's initial employment with ALDOT in 1994, his lack of facility with English affected his job performance to the extent that he was

_____

[8] The defendants cite repeatedly the expert report of Janet Thornton, Docket № 8965-6, in laying out the facts of Mr. Azubuike's employment history with ALDOT and the history of ALDOT's employment practices with respect to the CEA classification. The expert report itself is hearsay and cannot be used by the court unless an exception to the hearsay rule applies, and no affidavit from Dr. Thornton attesting to her conclusions has been filed in the record.

In the future, defendants should at a minimum file an affidavit from Dr. Thornton attesting to her conclusions so that they can be considered. It would also be appropriate that the report of Dr. Thornton make clear the documents in the record on which she relies and to designate their location by docket number.  The fact that a claimant does not dispute—or even address—many of the conclusions in Dr. Thornton's expert report does not  *ipso facto* mean that the court can consider the report's conclusions or findings at summary judgment.

While hearsay evidence in some situations may be admissible on summary judgement, (*see Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)(explaining that hearsay evidence offered on summary judgment may be considered so long as it would be admissible at trial for some purpose), here it is best that if the defendants want the conclusions of Dr. Thornton considered they offer those conclusions in such a way that the obvious problems are avoided.

required "to participate in a separate training program to develop the language skills necessary to perform the essential duties of [his initial position]" Docket № 8965-2 at 19, ¶4 (Request to Admit). Moreover, his performance evaluations as a CE-V between 1994 and 1998 were poor. Docket № 8965-8 (Performance Evaluations 1994-95 through 1997-98)(except for the 1998 evaluation, Mr. Azubuike did not receive a higher evaluation than "partially meets standards." In 1998 he received a "meets standards" evaluation, but just barely).

There is no evidence in the record that Mr. Azubuike points to that suggests the existence of a material question of fact with regard to his failure to be provisionally appointed to the CEA classification. In fact, the evidence is to the contrary. The simple fact is that at the time of ALDOT's provisional appointment process, Mr. Azubuike had not yet mastered the performance of the CE-V duties—duties that required less skills and knowledge than the CEA classification that he now claims was denied to him. There was no contumacious conduct in denying Mr. Azubuike a provisional appointment to the CEA classification.

As with his claims regarding the provisional appointment process, Mr. Azubuike's allegations that the defendants' contumacious conduct prevented him from securing a backlog appointment is not sustained by the record. The

23

backlog appointment process took place over three rounds. The fact that Mr.

Azubuike "was not appointed through the provisional or backlog process is

not alone sufficient to make out a claim that he was injured as a result of

defendants' contempt." Docket № 8650 at 11 adopted at Docket № 8740.

The defendants have carried their burden of establishing the absence of

any question of material fact giving raise to a claim that Mr. Azubuike was

denied a provisional or backlog appointment for contumacious reasons. Mr.

Azubuike cannot rebut the defendants' arguments by relying on the general

history of their contempt and the fact that the use of provisional and backlog

appointments were necessitated by the failure to create timely content valid

selection procedures as mandated by the Consent Decree.  Docket № 8975 at

17. Such generalized objections do not aid the cause of claimants like Mr.

Azubuike. Furthermore, the plaintiffs agreed with the defendants on those

individuals who would receive backlog appointments. The defendants are

entitled to summary judgment on Mr. Azubuike's backlog and provisional

appointment claims.

The reason for Mr. Azubuike's failure to secure a regular promotion to

the CEA classification from the Certificate of Eligibles is clear and did not

result from the defendants' contempt. Rather the failure to secure a regular

appointment to the CEA classification had to do with Mr. Azubuike's very low

test scores and own choices about his willingness to work outside the

Montgomery area. Mr. Azubuike admitted in deposition that his geographical

choices greatly reduced his chances of an appointment as a CEA.  Azubuike

depo. at 50-51. More important, it was Mr. Azubuike's low scores that

prevented him from being placed on the CEA Certificate of Eligibles. Finally,

Mr. Azubuike testified that he knows of no individual who was appointed

from the CEA register whose appointment he believes he should have

received.  *Id.* at 82-83.

There is no evidence Mr. Azubuike can point to which establishes that

the defendants violated the Consent Decree when they failed to promote him

to the CEA classification through the regular appointment process. In point of

fact, Mr. Azubuike's own failures made him ineligible for inclusion on the CEA

Certificate of Eligibles from which he could have been appointed.

## V

**ACCORDINGLY**, it is Recommended that the defendants' Motion For

Summary Judgment, Docket № 8963, be GRANTED.

Objections to this Report and Recommendation must be filed with the

Clerk of Court by October 1, 2013. Failure to file objections in a timely manner

constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED this 3rd day of September 2013.


/s/ C. A. González
SPECIAL MASTER