IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


JOHNNY REYNOLDS, ET AL.,

      Plaintiffs,

                                    CIVIL ACTION NUMBER
v.                                 85-cv-665-MHT
                                 **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

      Defendants.


**REPORT AND RECOMMENDATION  ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON GLORIA FITZPATRICK'S
INDIVIDUAL CONTEMPT CLAIM**

**I**

Before the Special Master is the defendants' Motion for Summary

Judgment on the individual contempt claim of Gloria Fitzpatrick.  Docket №

8985.[1] Ms. Fitzpatrick has responded in opposition, (Docket № 8997), and the

defendants have replied, Docket № 9006. The motion is now ripe for

resolution.

---

[1]   Defendants' "Motion for Leave to Substitute Brief & Affidavit,"
(Docket № 8993), will be granted in a separately filed order.

Gloria Fitzpatrick's individual contempt claim has changed from when she first filed the claim in March 2003. Originally, she sought instatement to the Senior Right of Way Specialist classification, ("Sr. ROWS"), as well as back pay and other make-whole relief. In July 2006, however, Ms. Fitzpatrick was promoted to a higher classification than the one initially sought—Senior Real Property Valuation Analyst—and so she no longer seeks instatement into the Senior Right of Way Specialist classification. Docket № 8987-1 at 10-11 (hereinafter "Fitzpatrick depo."). Her claim today is limited to seeking back pay and other make-whole relief including monetary relief for the period not covered by the 2001 Settlement Agreement. Docket № 8997 at 1. According to Ms. Fitzpatrick, "absent the defendants' contempt she would have been appointed to [Sr. ROWS] between 2001 and 2006." *Id.*

## II

Gloria Fitzpatrick lives in Bullock County, Alabama, and is employed by ALDOT as a Sr. Real Property Valuation Analyst in the Sixth Division's Right - of-Way Section. Fitzpatrick depo. at 9-10.  In 1978 she was awarded a two-year Associates Degree from Draughon Junior College in secretarial science/ accounting. In 2004 she received a BS in psychology and business, and in

2007 she earned an MA in human resources. Both her BS and MA degrees were awarded by Troy University. *Id*. at 14-17.

Ms. Fitzpatrick began her ALDOT employment in September 1998 when she received a provisional backlog appointment as a Right-of-Way Specialist in the Seventh Division in Troy, Alabama. In March 1999, the court made Ms. Fitzpatrick's provisional appointment permanent. *Id.* at 42. A few months later in November 2000 she filed her first application for appointment to the Senior Right-of-Way Specialist classification and was placed on the register in July 2003. Docket № 8993-2 at ¶12 Declaration of Janet R. Thornton, hereinafter "Thornton declaration"). At the time she was placed on the Sr. ROWS register, Ms. Fitzpatrick's examination score was 47.15. Fitzpatrick depo. at 55. Several years later, in February 2004, Ms. Fitzpatrick again applied for the Sr. ROWS classification and retested for the position. As with her first examination, she was again placed on the register, this time in July 2004.  Her examination score of 31.80 was significantly lower than the score she achieved on her first examination. Thornton declaration at ¶12.

Pursuant to State rules, Ms. Fitzpatrick could not stay on the Sr. ROWS register beyond two years, and so was removed from the register in July 2006. Of course, by July 1, 2006, Ms. Fitzpatrick had been promoted to her current

higher job classification so the fact she did not reapply for the Sr. ROWS

classification and was removed from the register is obvious and

understandable. Fitzpatrick depo. at 71.

Throughout her tenure with ALDOT, including the time she was on the

Sr. ROWS register, Ms. Fitzpatrick applied for at least thirteen different state

jobs across a range of disciplines both within ALDOT and other state

agencies.[2] She testified that her multiple applications were undertaken in an

effort to secure a higher paying position. *Id.*

### III

### A

The relative burdens of proof in individual contempt claims have been

long established. In cases where a claimant seeks promotion to a job

classification the claimant contends was denied because of defendants'

contempt, he or she "bears the burden of proving by a preponderance of the

evidence that [they are] an 'actual victim' of the Defendants' contumacious

conduct and therefore entitled to make whole relief." Docket № 6928, at 13.

In order to state a *prima facie* case for failure to promote by
reason of the Defendants' contempt, a claimant must identify the

---

[2]   *See* defendants' brief, Docket № 89986 at 4, for a list of the various
State positions for which Ms. Fitzpatrick applied.

promotion sought, when it was sought, and the training or experience that qualified the claimant for the promotion; or . . . that the claimant would have been qualified for a particular promotion but for the Defendants' contempt of specifically identified Consent Decree activities. The identification of the specific activities must contain a clear indication of how participation in the indicated activities would have made a claimant otherwise qualified for the promotion at issue.

If a claimant comes forward with sufficient evidence to carry this non-onerous burden, then the claimant has created a 'rebuttable presumption' that he or she is a victim of the Defendants' contumacious conduct . . ..

To rebut the presumption, the Defendants must show that the claimant did not receive the promotion due to legitimate reasons having nothing to do with Defendants' contempt.  . . .  Thereafter, the claimant will have the opportunity to demonstrate that the Defendants' proffered reasons are a pretext for excusing its admitted contempt.

*Id.* at 13-15.

The standard is similar in the context of cases where the claimant contends that the defendants' contumacious conduct caused non-promotional harm. In those cases, the claimant bears the burden of proving by a preponderance of the evidence that he or she is an 'actual victim' of . . . contumacious conduct." *Id.* at 14. This is a non-onerous burden that creates a rebuttable presumption which can be overcome if the defendants establish by competent evidence "that the events complained of did not occur, or that they

5

were unrelated to the defendants' contempt." *Id.* Thereafter, the claimant will

have the opportunity to demonstrate that the defendants' proffered reasons

are a pretext for obscuring the defendants' admitted contempt. To the extent

claimants establish that they are actual victims of the defendants'

contumacious conduct, they can recover monetary damages for such

contempt for the period after May 29, 2001. Docket № 8310 at 7.

## B

Summary judgment is authorized under Federal Rule of Civil Procedure

56(c) when all "pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavit, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, everything in the

record must demonstrate the absence of a genuine issue of material fact.

*Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). The party

seeking summary judgment bears the burden of demonstrating the absence of

a genuine dispute as to any material fact. *Herzog*, 193 F.3d at 1246; citing

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

When making the determination of whether summary judgment is

proper, the Court must view the evidence and all factual inferences in the

light most favorable to the party opposing the motion. *Hinson v. Edmond*, 192 F.3d 1342, 1348 (11th Cir. 1999). The Court also must "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555 (11th Cir. 1990).

## IV

### A

Defendants believe they are entitled to summary judgment on Ms. Fitzpatrick's promotion and nonpromotion claims. With regard to her nonpromotion training claims, the defendants contend that Ms. Fitzpatrick received all the training to which she was entitled, all the training she sought and that her training claims were settled pursuant to her participation in the 2001 Settlement Agreement. Docket № 8986 at 6. With regard to her job rotation claims, the defendants believe those allegation fail because Ms. Fitzpatrick cannot show any violation of the Consent Decree since she participated in the Employee Development Program, ("EDP"), and because facts other than contempt affected her promotion opportunities.

Her out-of-class assignment claim allegedly fails because she was in fact assigned out-of-class to the Sr. ROWS classification and because no one gained

a promotion advantage over her since ALDOT did not promote anyone to Sr. ROWS who had an out-of-class assignment to the position. *Id*.

Similarly, the defendants believe Ms. Fitzpatrick promotion claims are unsustainable for several reasons. First, she has admitted that she longer seeks promotion to the Sr. ROWS classification since her current position, Sr. Real Property Valuation Analyst is a higher level classification than Sr. ROWS. Secondly, the promotion of individuals other than Ms. Fitzpatrick to the Sr. ROWS classification between 2001 and 2006 was done in conformity with the law and the requirements of the Consent Decree. Third, Ms. Fitzpatrick's location preferences significantly limited her promotional opportunities. *Id*. With respect to provisional and backlog appointments, Ms. Fitzpatrick's claims allegedly fail because during the relevant periods, she lacked the qualification to perform the duties of the Sr. ROWS classification. *Id*.

Ms. Fitzpatrick contests defendants' arguments that they are entitled to summary judgment on her individual contempt claims. As previously noted, Ms. Fitzpatrick contends that but for defendants' contempt she would have been promoted to Sr. ROWS between 2001 and 2006. Docket № 8997 at 2. She alleges that she was denied promotion despite the fact that "defendants admit that [she] was qualified for the position" as early as September 2001. In

addition to generalized arguments concerning the history of defendants'
contempt of the Consent Decree, Ms. Fitzpatrick alleges that by using
consultants to perform the duties of the Sr. ROWS classification, the
defendants effectively denied her the right to perform the job requirements
actually tested on the examination or to secure job promotion. *Id.* at 4.

Ms. Fitzpatrick also alleges that she was denied the benefit of the
training and rotation requirements of the Consent Decree when she was
forced to sit for the Sr. ROWS examination without completing the relevant
EDP training modules. Finally, she contends that the alleged failure to use
structured oral interviews violated Article VIII of the Consent Decree. *Id.* at
12-13.

**B**

**1**

**a**

Ms. Fitzpatrick alleges that her inability to secure promotion to the Sr.
ROWS classification between 2001 and 2006 was due, at least in part, to the
defendants' breach of the Consent Decree's requirements concerning job
rotation and training.

The job rotation requirements of the Consent Decree are located in Article XIV and require "[t]o the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to [African American] employees compared to white employees in the same lower classified jobs." Docket № 553 at Art. XIV ¶2(a). The primary purpose behind Article XIV was to enable ALDOT's African American employees to secure the experience necessary to enable them to perform at the levels required to secure promotion.

To affect the job rotation and training requirements of Article XIV, the parties devised and created the Employment Development Program, ("EDP").[3] The EDP is a voluntary program available in almost all ALDOT job classifications. The program is structured as a series of modules, where each module covers a particular subject area, such as supervisory skills, contract reading and the like. Within each module, the employee is to complete a number of training activities, through either classroom training or on-the-job training. The training modules utilize the established minimum qualifications for a particular job classification. The knowledge, skills and abilities ("KSAs")

---

[3] *See generally*, R&R at Docket № 7899 at 16-24, for a description and analysis of the purpose and function of the EDP (adopted by the court at Docket № 7969).

that form the basis for the selection procedures relevant to the job

classification are the same ones for which an employee receives training

through EDP. An employee who successfully completes the modules for his or

her classification receives training in the same qualifying KSAs that appear in

the minimum qualifications and examinations. The court has held that the

EDP satisfies the job rotation requirements of the Consent Decree because it

ensures that participating employees are exposed to the range of duties and

assignments that are required for promotion within ALDOT. Docket № 7899

at 21 ("The EDP module rotation system satisfies the requirements of Article

XIV by ensuring that each participating employee is exposed to the range of

duties and assignments that will best prepare that employee for promotion in

his or her natural career path").

**b**

Ms. Fitzpatrick took the Sr. ROWS examination twice, the first time on

May 7, 2002, and the second on April 28, 2004. Both examinations were

identical. Docket № 9007-4 at ¶16, (Declaration of Megan Royster); Docket №

8996-1 at ¶8, (Fitzpatrick Declaration). Ms. Fitzpatrick contends that prior to

the examinations, she had been deprived of the training and job rotation

opportunities that would have better prepared her for the examinations. *Id.*, and Fitzpatrick depo. at 18-19.

The defendants admit that Ms. Fitzpatrick did not enroll in the EDP until January 7, 2003, seven months after she first took the Sr. ROWS examination. Docket № 9006 at 5. Her first test returned a score of 47.15 and as a result, she secured placement on the register for the classification. Fitzpatrick depo. at 55; Thornton declaration at ¶12.

By the time Ms. Fitzpatrick took the Sr. ROWS examination for the second time—late April 2004—she had been enrolled in the EDP program for sixteen months. At the time of her EDP enrollment, Ms. Fitzpatrick had a meeting with the EDP coordinator to review the Right Of Way Specialist EDP courses and the various training modules that were available. As part of that January 2003 meeting, Ms. Fitzpatrick and the coordinator reviewed the seven training modules and related module activities that comprised the Right-of-Way EDP. The stated purpose of the meeting was to evaluate Ms. Fitzpatrick's training needs and to assess the extent to which she may have already completed some of the EDP module activities. Docket № 9007-7[4]

---

[4] The EDP Module Evaluation Meeting Form describes the purpose of the January 2003 meeting: "the Employee Development Program Modules assigned to this employee's position were reviewed, and module activities

(continued...)

In her review of the seven EDP Right-of-Way Specialist Modules and their corresponding courses and on the job training and experience components, Ms. Fitzpatrick noted that as of January 2003, she had previously completed 85% of the training courses (17 of 20), and 74% (23 of 31), of the on-the-job training and experience tasks offered by the ROWS EDP. Docket № 9007-1.

During the term of the Consent Decree, there were two regular appointments to the Sr. ROWS classification from certification lists that corresponded with Ms. Fitzpatrick's geographical preferences. Thornton declaration at ¶28; Fitzpatrick depo. at 119-20.  She was included on both certification lists but was not appointed in either instance.

Ms. Fitzpatrick's first appearance on a certification list for Sr. ROWS was in 2003 with a score of 47.15. Thornton declaration at 28 Appendix Table 2. She was not selected for the vacant Sr. ROWS position which went instead to another African American female, Linda Anderson. Ms. Anderson was chosen despite the fact that her score was lower then Ms. Fitzpatrick's. *Id*. Ms.

---

[4](...continued)
that have already been completed were identified and documented." Docket № 9007-7 at 2. The module activities assessment is reflected in Docket № 9007-1.

Fitzpatrick testified that in her view, she was more qualified for promotion than Ms. Anderson based on her belief that Ms. Anderson lacked experience in the right-of-way section. Fitzpatrick depo. at 122.

Several things about Ms. Anderson's appointment are true:  First, she began working at ALDOT eleven years before Ms. Fitzpatrick was first employed. Second, contrary to Ms. Fitzpatrick's understanding, Ms. Anderson had in fact worked as a right-of-way specialist in the Seventh Division for several years prior to her appointment as a Sr. ROWS. *See* Docket № 8988-17 (Linda Anderson's SPD Individual History Report). Third, there is no evidence that Ms. Anderson's appointment violated the Consent Decree, in fact Ms. Anderson was herself a member of the plaintiff class. Lastly, the fact that Ms. Anderson was selected for the Sr. ROWS position with a lower test score than Ms. Fitzpatrick shows that the failure of the defendants to have the Sr. ROWS EDP fully in place prior to Ms. Fitzpatrick's first examination did not reduce her chances of selection. If in fact, Ms. Anderson had a lower test score and was nevertheless selected, Ms. Fitzpatrick cannot successfully contend that a higher score would have aided her selection prospects. Ms. Fitzpatrick has not introduced any evidence to suggest otherwise.[5]

---

[5]   To be sure, the availability of the EDP was an essential component of the defendants' compliance with the Consent Decree. Had Ms. Anderson

(continued...)

14

Ms. Fitzpatrick took the Sr. ROWS examination for the second time in April 2004. By that time she had participated in the EDP for sixteen months and completed a significant percentage of the program. Curiously, even after participating in the EDP for over a year, on taking the examination for a second time, Ms. Fitzpatrick scored significantly lower, 31.80, than she did on the first exam.

Once the 2004 certification list was released and after the interview process in which Ms. Fitzpatrick participated, ALDOT appointed Michel Pickett, a Caucasian male, to a Sr. ROWS position in the Right-of-Way Bureau in Montgomery on December 22, 2004. Docket № 8988-5 at 2. Mr. Pickett's exam score was 66.08 placing him second overall on the certification list. Docket № 8988-7 at 2. Ms. Fitzpatrick placed eighth on the list. *Id*; Fitzpatrick depo. at 127-28. In addition to placing significantly higher on the certification list, Mr. Pickett also had at least three years of experience as an Engineer Assistant in the Right-of-Way Bureau beginning some three years before Ms. Fitzpatrick began her employment with ALDOT. Fitzpatrick depo. at 129. When ask specifically how Mr. Pickett's appointment violated the Consent

---

[5](...continued)

secured a higher examination score than Ms. Fitzpatrick, or had she in fact participated herself in the EDP and thereby gained an unfair testing advantage, the result could very well be different.

Decree, Ms. Fitzpatrick answered, "I felt I was more qualified. He got more training. If I had gotten the training like he did, then I would have been — I probably would have scored higher than he did." *Id*. at 130. Ms. Fitzpatrick goes on to state that the training she believed was missing was not the training that she received through the EDP, but the "hands-on training" Mr. Pickett got from his supervisor. *Id.* at 133. She admitted that her statement about the advantage that Mr. Pickett got was speculation on her part.  "Q. But you're speculating as to what training he had? A. I'm speculating." *Id*.

There is no evidence in the record on which Ms. Fitzpatrick can establish a material issue of fact concerning whether Mr. Pickett's supposed "hands-on-training" gave him an unfair advantage during examination for the Sr. ROWS position or lead to his appointment to the Sr. ROWS classification.

The Consent Decree did not require the defendants to ensure that Ms. Fitzpatrick completed the EDP in advance of promotion examinations. *See* Docket № 8989 at 14 (R&R). The fact that the program was available and offered to employees met the requirements of the Consent Decree. Certainly, had the defendants interfered with or thwarted Ms. Fitzpatrick's ability to complete the program the analysis would be substantially different. There is, however, no evidence of such interference.

16

In support of her rotation and training claim based on a failure to complete EDP training, Ms. Fitzpatrick raises a number of arguments that must be explored. First, in her sworn affidavit she contends that:

> In April 2004, I was informed that the training bureau was "unable to provide the required courses within the specified time frame." Thus, both times I took the Senior Right of Way classification examination, I had not been provided the training and rotation required by the Consent Decree. The Senior Right of Way examination covered topics that were contained in the EDP training modules.

Docket № 8996-1 at ¶8 (Fitzpatrick declaration).

It is true that Ms. Fitzpatrick could not complete the EDP before her second examination and she asserts that she would have performed better on the examination had she done so. *Id*. The EDP module that Ms. Fitzpatrick contends she was not able to complete prior to her second examination related to assisting attorneys in condemnation proceedings. Docket № 9007-1 at 9-10. This was one of the few ROW Specialist EDP modules for which Ms. Fitzpatrick in January 2003 admitted having little experience.

As referenced in her affidavit, on April 2, 2004, the EDP administrator sent Ms. Fitzpatrick a "Module Timing Variance Form" indicating that the module dealing with assisting attorneys could not be completed in the time

specified in the EDP module since "Circuit Court cases were not available during the specified time frame." Docket № 9007-2 at 2.

The defendants correctly contend that they cannot be responsible for the failure to complete the module since "ALDOT does not exercise control over the availability of relevant Circuit Court cases or the court's docket." Docket № 9006 at 9. Moreover, Ms. Fitzpatrick does not allege that the concepts included in the unscheduled module were in fact examined in the Sr. ROWS test. She simply makes the generalized claim that she would have performed better on the test had she been able to complete the full EDP program.

The delay in offering the attorney module is not indicative of the defendants' contempt. The EDP is complex and the fact that the court's schedule and ALDOT's testing schedule did not mesh is no fault of the defendants and does not support a claim of individual contempt.

Ms. Fitzpatrick has also testified that she was not allowed to do the mapping and negotiation duties that were part of the Right of Way Specialist job description and which were tested on the SR. ROWS examinations. Fitzpatrick depo. at 162-64; Fitzpatrick declaration at ¶9. In her deposition, Ms. Fitzpatrick was asked directly what evidence she had that her alleged lack of mapping and negotiation experience affected her chances of being

promoted. She answered none.[6] More to the point, in completing the January 2003 EDP Module Evaluation Meeting Form,[7](Docket № 9007-1), Module 2, "Performing Negotiation and Acquisition Duties," she indicated that she had completed all of the On-the-job Training and Experience requirements and all but one of the requirements under the training course section. Docket № 9007-1 at 15. The On-the-job Training component specifically mandated that Ms. Fitzpatrick "[w]orking with a knowledgeable ROW Specialist or Sr. ROW Specialist" have the opportunity to "negotiat[e] with at least 8 different property owners" and in doing so conduct the following activities: use and apply the state's eminent domain laws; review negotiation documents for accuracy and compliance with regulations; visually inspect property to be acquired; and contact property owners to identify and discuss acquisition offers and counter offers with property owners. *Id*.

Similarly, with regard to mapping, Ms. Fitzpatrick in January 2003 claimed to have on-the-job training and experience with regard to reading maps, researching court deeds, plats and tax records, and pulling tax maps. *Id*.

---

[6] **Q.** "And what evidence do you have that not doing mapping and negotiations up until 2004, what evidence do you have that that affected your promotability to the senior right-of-way specialist position?" **A.** "I don't have anything." Fitzpatrick depo. at 165.

[7] *See supra*. at n. 4.

at 3. The only task that Ms. Fitzpatrick claims not to have completed dealt with reading and interpreting construction and right-of-way plans.

Except for the two areas identified, by early 2003, more than a year before taking her second ROW examination, Ms. Fitzpatrick claimed to have the vast majority of the training and on-the-job experience she would have had if she had completed the EDP prior to her second examination.

Ms. Fitzpatrick attempts to create a material question of fact by alleging in her affidavit that she would have performed better on the examination if she had more experience with mapping and negotiation.  Fitzpatrick declaration at ¶9. In support of her allegations, she avers not to have known the answers to the mapping and negotiation questions on the examination and that had she performed mapping and negotiation duties, she "could have answered the questions." *Id*. Other than her own statement, Ms. Fitzpatrick offers no evidence to support her claim, and in fact with regard the negotiation, all of the evidence in the record is to the contrary and shows that Ms. Fitzpatrick had extensive experience with negotiations. As concerns her mapping allegations, she offers no evidence but her own allegations in an affidavit; allegations that arguably contradict her deposition testimony that she had no evidence that the alleged lack of mapping and negotiation experience affected her promotability or her examination performance. "[A]

party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Those opposing summary judgment are not "relieved of [their] own burden of producing . . . evidence that would support a jury verdict." *Id*.

Her participation in the EDP satisfied the defendants' obligations under Article XIV ¶3 and there is no evidence to support a claim that her failure to complete the EDP prior to the 2004 examinations was the result of defendants' contempt.

**c**

For the first time in this litigation an individual contempt claimant is asserting that ALDOT's use of consultants to perform specific job duties damaged her promotional opportunities and violated several Consent Decree provisions regulating hiring by ALDOT. Docket № 8997 at 4-5. In this instance, the uncontradicted evidence establishes that the decision to use consultants to perform specific Sr. ROWS duties did not violate the Consent

Decree and was undertaken for legitimate non-contumacious reasons that did

not disadvantage Ms. Fitzpatrick.[8]

Ms. Fitzpatrick makes her case with regard to the use of consultants as

follows:

> Vacant positions in SPD classifications which were assigned to
> consultants were required to be filled through the provisional
> process . . . or by the permanent process after it was developed.
> Failure to fill the vacancies and failure to call for a certificate of
> eligibles is a violation of Article VII. . . .
>
> . . . The use of consultants damaged Fitzpatrick both by denying
> her experience and by holding the vacancy and not filling the
> position.
>
> . . .
>
> Contempt also occurred with regard to the other decree
> provisions  designed to level the playing field for African-
> Americans in promotion and examinations . . . .

Docket № 8997 at 4-5.

---

[8]  By separate motion, the defendants have moved to strike the entirety
of Ms. Fitzpatrick's argument concerning ALDOT's use of consultants. Docket
№ 9005. (A separate order will be entered on defendants' motion.) They
argue, persuasively, that the newly raised allegation regarding the use of
consultants should be disallowed as untimely and contrary to Ms.
Fitzpatrick's deposition testimony and the entirety of her discovery
responses. Generally I would agree with defendants, but as with the untimely
claims of Mr. Azubuike, (*see* Docket № 8989 at 16 n.9), analyzing Ms.
Fitzpatrick's out-of-class  "consultant theory" makes sense if for no other
reason than to provide the parties future guidance.

There are three individuals identified by Ms. Fitzpatrick whom she alleges were given consulting positions (or transferred) in violation of the Consent Decree. Patrick Anthony, Ken Crook, and Douglas Dark. Docket № 8997 at 11-12. Each allegation will be reviewed in turn.

**i**

Ms. Fitzpatrick identifies Patrick Anthony as a consultant who performed Sr. ROWS job duties in the Sixth Division office from 2002 through 2010. Fitzpatrick declaration at ¶5 and Docket № 8997 at 13. According to Ms. Fitzpatrick, she "could have been provisionally appointed to this position or could have been appointed from a register . . . if defendants had called for a certificate . . .." *Id*. at ¶5.

Patrick Anthony was never an employee of ALDOT, but rather, worked for the engineering consultant firm, Volkert in the Sixth Division's Right-of-Way Section. Docket № 8988-13 at ¶3 (Declaration of William Ashurst). Following the resignation in January 2004 of Diane Osborne, the Sixth Division's incumbent Sr. ROWS, the decision was made to abolish Ms. Osborne's position leaving only one Sr. ROWS in the Division, a position held by an African-American woman.  Docket № 9007-4 at ¶¶6-8 (Declaration of Meghan Royster) and Docket № 9007-3 at ¶8 (Declaration of J. Tom Hall). Ms.

23

Osborne's position was in fact abolished by SPD in January 2004. Docket № 9007-3 at ¶7.

The unrefuted evidence is that Mr. Anthony was specifically hired to negotiate the purchase of land tracts for the Sixth Division road projects. Docket № 9007-3 at ¶9. Other than negotiating for the purchase of land, Mr. Anthony did not perform the other duties required of a Sr. ROWS while working at the Division. *Id.* at ¶10. And at any rate, the Sr. ROWS position to which Ms. Fitzpatrick points no longer existed after January 2004, consequently, there was no Sr. ROWS position into which she could have been promoted. In point of fact, the evidence establishes that she benefitted from the loss of the Sr. ROWS position since according to her supervisor in the Sixth Division "because the State Personnel Department abolished [the Sr. ROWS position in January 2004] there was no Sr. ROWS vacancy to fill; and ALDOT promoted Fitzpatrick to the Sr. RPVA classification." *Id* at ¶8. The Sr. RPVA is a higher classification than Sr. ROWS.

**ii**

Ken Crook was backlog appointed Senior Real Property Valuation Analyst working in ALDOT's Right-of-Way Bureau in July 1999. Docket № 9007-4 at ¶9. At that same time and in the same Division as Mr. Crook, Sharon Grant was appointed to the Sr. ROWS classification. *Id.* In January 2001, Ms.

Grant resigned from ALDOT and ALDOT then requested that SPD abolish the Sr. ROWS position she held, which SPD did in July 2001. *Id*. In deciding not to fill Ms. Grant's now vacant position, Mr. Crook was asked to perform some of Ms. Grant's former duties together with his Sr. RPVA duties starting in January 2001. *Id*. at ¶¶12-15.

At the time Mr. Crook assumed some of Ms. Grant's former duties, Ms. Fitzpatrick admits she had not yet met the minimum qualifications required to secure promotion to the Sr. ROWS position. Fitzpatrick depo. at 148. Moreover,  Ms. Fitzpatrick alleges that "[r]ather than filling the vacancy, the defendants placed [Mr. Crook] in [Ms. Grant's] office" in violation of a number of Consent Decree provisions. Fitzpatrick declaration at ¶3. Other than making the accusation, she offers absolutely no evidence from which it can be determined that the defendants eliminated Ms. Grant's position and shifted some of her responsibilities to Mr. Crook in an effort to thwart compliance with the Consent Decree and hinder her promotional opportunities. The only argument—not evidence—advanced by Ms. Fitzpatrick is that the defendants' failure to call for a certificate of eligibles within 30 days violated Article VII of the Decree. Docket № 8997 at 13. The argument is simply not supported by the plain reading of Article VII.

Article VII provides in relevant part as follows:

25

1. *Request for COE*: When a permanent opening occurs in a classified position at [ALDOT] and such job opening is to be filled, [ALDOT] will request a COE . . . within 30 days, provided that

> (a) This is not intended to require the filling of a job and will apply only where it is [ALDOT's] decision to fill the job.
>
> . . .

2. *No delay in requesting a COE*: [ALDOT] will not delay requesting a COE for a permanent opening in a job which is to be filled for any purpose of avoiding . . . the certification or appointment of black eligibles on the register for such job.

. . .

The first paragraph of Article VII very clearly states that the requirement to request a COE within 30 days only applies to a job classification which ALDOT has determined should be filled. If the classification or position is not to be filled then ALDOT is under no obligation to request a COE. As to Article VII's second paragraph, there is simply no evidence in the record to which Ms. Fitzpatrick had pointed or which the undersigned has located that would allow a fact finder to conclude that the defendants failed to call for a COE to fill Ms. Grant's—or for that matter Ms. Osborne's—position because of a desire to limit Ms. Fitzpatrick's promotion opportunities.

26

### iii

Finally, Ms. Fitzpatrick alleges that Douglas Dark's employment at ALDOT as a consultant violated the Consent Decree and thwarted her promotion opportunities. Again, the evidence does not support the allegation.

Douglas Dark took an early retirement from ALDOT in August 1998. Docket № 9007-3 at ¶4. At the time of his retirement, Mr. Dark was negotiating with landowners over the acquisition of property needed to complete an important road project in Montgomery. Because Mr. Dark possessed considerable experience and expertise in property acquisition ALDOT made the decision to rehire him as a consultant immediately upon his retirement. *Id.* According to J. Tom Hall, Mr. Dark's supervisor and the Sixth Divisions, Right-of-Way Acquisition Manager, "[n]o active state employee possessed Dark's level of knowledge and experience, and the loss of Dark's institutional knowledge would have been detrimental to the Division." *Id.* As a consultant Mr. Dark did not perform all the regular duties of a Sr. ROWS, but limited his activities to negotiation and relocation activities.

Mr. Dark was employed as a consultant to ALDOT one month prior to Ms. Fitzpatrick joining ALDOT in September 1998. Pursuant to the minimum requirements necessary for promotion to Sr. ROWS, Ms. Fitzpatrick would

have had to work for at least three years performing a variety of activities before being eligible for promotion. Fitzpatrick depo. at 148.

As the defendants note, terminating ALDOT's consulting agreement with Mr. Dark simply because Ms. Fitzpatrick met the minimum three-year requirement for promotion is not mandated by the Decree. Docket № 9006 at 24. More importantly, Ms. Fitzpatrick offers no evidence that she was competent in September 2001—even if she met the minimum requirements—to perform the duties then being performed by Mr. Dark.

ALDOT was in need of the services provided by Mr. Dark and Ms. Fitzpatrick has failed to point to any evidence that could sustain a finding that she would have been hired into the position that Mr. Dark occupied but for the defendants' contempt.

## 2

Ms. Fitzpatrick claims that she was injured by the defendants' non-compliance with Article VIII's requirement that ALDOT use non-discriminatory "standard format interview questions" when interviewing candidates for a particular position. Article VIII, ¶2. Ms. Fitzpatrick was interviewed for the Sr. ROWS positions in 2003 and 2004 prior to the defendants coming into compliance with Article VIII. Though she does not expressly say so, the implication she leaves is that her Sr. ROWS interviews

were conducted without the use of standard format interview questions.

Docket № 8997 at 12-13. The fact is that Ms. Fitzpatrick fails to allege or point

to any evidence that the interview process used was flawed or racially

discriminatory. Indeed the interview process used by ALDOT led to one

African American hire out of the two vacant positions for which she

interviewed. Perhaps the most important fact, however, is that although the

defendants may not have been found in compliance with Article VIII prior to

Ms. Fitzpatrick's interview, the uncontradicted evidence in the record shows

that with respect to Ms. Fitzpatrick, the defendants did in fact conduct

structured oral interviews as required by Article VIII.

Megan Royster, an employee of SPD testified by affidavit that "[b]ased

on my research, with the assistance of Dr. Maury Buster (SPD Chief

Industrial/Organizational Psychologist), Ms. Fitzpatrick went through the

Structured Oral Interview ("SOI") process on two occasions for vacancies in

the Sr. ROWS classification. The SOIs were conducted in November 2003 and

November 2004." Docket № 9007-4 at ¶17(parenthetical in original). Also, in

the record are the ALDOT Structured Interview Packets and Evaluation Forms

for Ms. Fitzpatrick's 2003 and 2004 interviews confirming the use of the SOI

process.  Docket № 9007-10 and 9007-11.

29

The unrefuted evidence is that Ms. Fitzpatrick was indeed interviewed using an SOI process. The fact that the defendants had not yet been found in compliance with Article VIII generally did not mean that Ms. Fitzpatrick was herself denied the structured oral interview process. Moreover, she has failed to assert or point to evidence that would support the contention that the actual interview process utilized was otherwise deficient.

## V

**ACCORDINGLY**, it is Recommended that the defendants' Motion For Summary Judgment on Gloria Fitzpatrick's Individual Contempt Claim, Docket № 8985, be GRANTED.

Objections to this Report and Recommendation must be filed with the Clerk of Court by January 10, 2014. Failure to file objections in a timely manner constitutes a waiver of the right to review by the district court.

IT IS SO RECOMMENDED this 2nd day of December 2013.


/s/ C. A. González_____
SPECIAL MASTER