IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

      Plaintiffs,

                          CIVIL ACTION NUMBER

v.                             85-cv-665-MHT

                        **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

      Defendants.

**REPORT AND RECOMMENDATION  ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON WILLIE FRANKLIN'S
INDIVIDUAL CONTEMPT CLAIM**

**I**

Before the Special Master is the defendants' Motion for Summary

Judgment on the individual contempt claim of Willie Franklin.  Docket №

9011. Mr. Franklin  has responded in opposition, Docket № 9025, and the

defendants have replied, Docket № 9031. The motion is now ripe for

resolution.

**1**

Willie Franklin lives in Elmore, Alabama, and is employed by ALDOT as a Civil Engineer Administrator in the Aeronautics Bureau. Docket № 9013-1 at 9, (hereinafter "Franklin depo."). He has worked in the Aeronautics Bureau since 2004. In 1982 he received a BS in Civil Engineering Technology from the University of Alabama. *Id.* at 11. Mr. Franklin is not a licensed engineer. *Id.* at 12.

He began his work with ALDOT in 1995 as a Civil Engineer V, ("CE-V") when he was employed by the Design Bureau to work on hydraulics.[1] He began his service. *Id*. at 24. In 1998 SPD changed Mr. Franklin's classification from a CE-V to a Civil Engineer Manager, ("CEM"). From 1998 through March 2000, Mr. Franklin worked as an Assistant Utilities Engineer in the Design Bureau.  In the Spring of 2004, ALDOT promoted Mr. Franklin through the backlog process to the Civil Engineer Administrator ("CEA") classification where he worked as the Assistant Bureau Chief and Assistant Director of Training in the Training Bureau. *Id.* at 26, 34. In March 2004, he was

---

[1]   Because Mr. Franklin was wrongfully removed from the defendants' employment register in 1983 due to the EIT requirement, the defendants, as a part of the Consent Decree, were required to hire him in 1995. Consent Decree at Article XIII ¶5(a). He was given a credited service date of March 1983. *Id*.

transferred as a CEA from the Training Bureau to the Aeronautic Bureau where he continues to work as a CEA to this day. *Id.* at 38.

**2**

Mr. Franklin first applied for the Civil Engineer Senior Administrator classification ("CESA") in July 2002 and took the CESA examination in August, achieving a sufficient score to be placed on the register but not A high enough score so that his name appeared on the CESA Certificate of Eligibles. Docket № 9013 at ¶13 (Thornton Affidavit). His application indicated he was available for appointment statewide and would work all shifts.  Mr. Franklin apparently again applied for the CESA examination in 2004 but the state's records indicated that he did not appear for the examination. Mr. Franklin maintains he was never notified of the test date for the second examination. Franklin depo. at 37.

His claims against the defendants are similar to the claims advanced by other individual contempt claimants. There are instatement claims, rotation and out-of-class assignment claims, as well as provisional, regular, and backlog promotion claims. At the time of his deposition, Mr. Franklin testified that he sought promotion to Civil Engineer Senior Administrator. *Id.* at 9-10. His promotion claim has undergone a significant change since the filing of

defendants' summary judgment motion and it is to the changing nature of that claim to which attention is now directed.

## II

In Mr. Franklin's brief in opposition to the motion for summary judgment, he seeks instatement as a Professional Civil Engineer III ("PCE III") in addition to his claim of instatement to the CESA classification.  Docket № 9025 at 1. Defendants object to the timeliness of his PCE III claim. They assert that it is too late to raise the PCE promotion issues since he asserted the claim for the first, and only time, in his response to the motion for summary judgment. Docket № 9031 at 13.

Mr. Franklin attempts to avoid the timeliness issue by suggests that there is a relationship between the CESA classification to which he has sought instatement from the outset, and the PCE III classification to which he now also seeks instatement. This relationship and how it pertains to his instatement claim is never explained except to the extent he relies on *Brown v. ALDOT*, 597 F.3d 1160 (11th Cir. 2010) and its discussion of the emergence of the PCE III classification.

The relationship between the CESA and the PCE III classifications is complicated and is the subject of extensive treatment by the Eleventh Circuit

in its *Brown* opinion. In response to changes in the state's engineering

licensing law, ALDOT and SPD established the PCE line in 2003 and 2004.

Docket № 9013-7 at ¶3 (Buster Affidavit). During this time, a number of

existing engineering classifications, including the CESA, were split into two

new groups—those that required a professional civil engineering license and

those that did not.[2] At the time of the division the PCE line included those job

classifications requiring licensure. As a result, some of the earlier civil

engineering classifications that were originally part of the CEA line were

moved into the PCE classification such as the Division Engineer position that

was at issue in the *Brown* case.

In *Brown*, the plaintiff "claimed that she was improperly denied a

promotion to the position of Division Engineer" in 2005. *Brown*, 597 F.3d. at

1177. Until the change in the state's engineering licensure law, ALDOT

traditionally used the CESA register to fill the Division Engineering positions

---

[2] "As a result of [the state's licensure] changes, ALDOT and SPD split the existing Civil Engineering Manager, ("CEM"), Civil Engineering Administrator, ("CEA"), and Civil Engineering Senior Administrator, ("CESA") classifications of the engineering management series into two groups — a licensed required group (which included the Professional Civil Engineer ("PCE") I, II and III classifications), and a non-licensed required group (which included the Transportation Manager, ("CEM/TM"), Transportation Administrator and Transportation Senior Administrator, ("CESA/TSA") classifications)." Docket № 9013-7 at ¶3 (Buster Affidavit).

and placement on that register did not require a civil engineering license. *Id*.

At the time the plaintiff in *Brown* sought promotion to Division Engineer,

ALDOT had started to use the new PCE III register. Brown challenged the use

of the PCE III register, claiming that the register did not result from the use of

valid selection criteria. *Id*. The defendants in *Brown* opposed the plaintiff's

claims of invalidity arguing that the PCE III register was established in order

to comply with state licensing law. The court disagreed.

Passage of the CESA examination had long been one of the minimum

requirements for promotion to Division Engineer prior to the adoption of the

PCE line. *Id*. at 1178. In fact, the state statutory provisions providing for the

requirement of an engineering license—which necessitated the establishment

of the PCE classification—specifically exempts from its reach employees of

ALDOT who worked for the agency prior to January 1, 1997.[3]

The Eleventh Circuit concluded that the jury could disregard the

defendants' proffered reason for bypassing the plaintiff for appointment as

---

[3] "This chapter shall not be construed to prevent or to affect any of the following: . . . (5)The practice of engineering or land surveying by any person who is employed by the Alabama Department of Transportation prior to January 1, 1997, in any engineering or engineering assistant classification series under the State of Alabama Personnel Board, Merit System." Ala. Code § 34-11-14(5).

Division Engineer—the lack of an engineering license—since the license requirement did not in fact apply and because the plaintiff ranked higher on the CESA register than did the person ultimately promoted. *Id.* at 1178. As a result, the jury was free to conclude that the plaintiff was more qualified for the position even without an engineering license, than the individual appointed.

Mr. Franklin alleges in his brief that he "was precluded from taking the PCE examination due to the lack of a professional license" and that the "use of this invalid qualification is a direct violation of the Consent Decree." Docket № 9025 at 3. Clearly, Mr. Franklin comes within the statutory exception to the engineering licensure law since he was an employee of ALDOT prior to January 1, 1997. There is no evidence in the record, however, that he has ever sought promotion to the PCE line during these contempt proceedings.  In fact all of the evidence, both documentary and testamentary is that the only promotion Mr. Franklin seeks is to the CESA classification. In his response to defendants' Request for Admission, for example he is asked to admit that the only instatement claim he is alleging relates to his desire for CESA appointment.

1.    Admit that in your individual contempt claim complaint, you seek instatement solely to the classification of Civil Engineering Sr. Administrator (CESA) (20484).

Response: Denied. I am also seeking the associated  pay classification with the instatement into the classification of Civil Engineering Senior Administrator (CESA) (20484) and full make whole relief.

Docket № 9013-6 at 18.

Other than noting his general claim to make-whole relief, Mr. Franklin admits that he seeks promotion to the CESA classification. No mention is made with respect to any other classification. Pursuant to Rule 36 of the Federal Rules of Civil Procedure, a matter admitted "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." No such motion has been filed.

Furthermore during his deposition Mr. Franklin never made any claims with respect to instatement to any classification other than CESA and his training claims were also tied to the CESA classification.[4] Franklin depo. at 13-14, 40. Indeed the majority of questions during his deposition focused on his

---

[4]  Mr. Franklin's October 2003 contempt complaint states that "[d]uring the period of the defendants' contempt, Willie P. Franklin sought appointment to 20484–Civil Engineering Admin and 20485–Civil Engineering Sr. Admin." Docket № 9013-8 at 2. No mention is made of the PCE classification.

8

various contempt claims and how those claims related or did not relate to his allegations with respect to promotion to the CESA classification.

The law is well settled that a response to a pending motion for summary judgment is not the appropriate or accepted method for alleging new claims. *See, e.g.*, *Herring v. Secretary, Department of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005)(stating "[a]s we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.")(internal quotes omitted); *New Hampshire Ins. Co. v. Wiregrass Const. Co.*, 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011) (same); *Abrams v. Ciba Specialty Chemicals Corp.*,  663 F.Supp.2d 1220, 1232 at note 16 (S.D. Ala. 2009)(providing that "new arguments are impermissible in reply briefs"); *Evans v. Infirmary Health Services, Inc.*, 634 F.Supp.2d 1276, 1285 n.14 (S.D. Ala. 2009)(instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

Until his reply brief, Mr. Franklin never asserted a claim for promotion to the PCE III classification and the defendants never conducted any discovery with regard to the claim.  In past R&Rs on motions for summary judgment, I have considered allegations and arguments by individual contempt claimants that were not timely asserted, but raised for the first time in reply briefs. In

9

those instances, the newly raised claims either related to the identification of comparators who had not previously been disclosed by the claimant but whose existence was known, or should have been known by defendants,[5] and arguments that had potentially significant impact on remaining claims and for which I believed the parties would benefit from a consideration of the issues raised.[6]

In this instance there are no such exigencies. Here, Mr. Franklin attempts to assert a new claim regarding instatement to a specific job classification of which he was aware for many years prior to his claim being heard. Instatement issues are fundamental to almost all contempt claims being considered. It would be materially unfair to allow this untimely and previously known claim to go forward. Doing so would deny the defendants the right of meaningful discovery and the ability to present a prepared defense. The right of meaningful discovery directed at the claims and theories of litigants undergirds our civil litigation system.

---

[5]  *See e.g.,* Docket № 8989 at 16 n.9 (Azubuike R&R);

[6]  *See e.g.,* Docket № 9021 at n.8 (Fitzpatrick R&R regarding ALDOT's use of outside consultants to perform specific job duties).

# III

## 1

The relative burdens of proof in individual contempt claims have been long established. In cases where a claimant seeks promotion to a job classification the claimant contends was denied because of defendants' contempt, he or she "bears the burden of proving by a preponderance of the evidence that he or she is an 'actual victim' of the Defendants' contumacious conduct and therefore entitled to make whole relief." Docket № 6928, at 13.

> In order to state a *prima facie* case for failure to promote by reason of the Defendants' contempt, a claimant must identify the promotion sought, when it was sought, and the training or experience that qualified the claimant for the promotion; or . . . that the claimant would have been qualified for a particular promotion but for the Defendants' contempt of specifically identified Consent Decree activities. The identification of the specific activities must contain a clear indication of how participation in the indicated activities would have made a claimant otherwise qualified for the promotion at issue.

> If a claimant comes forward with sufficient evidence to carry this non-onerous burden, then the claimant has created a 'rebuttable presumption' that he or she is a victim of the Defendants' contumacious conduct . . ..

> To rebut the presumption, the Defendants must show that the claimant did not receive the promotion due to legitimate reasons having nothing to do with Defendants' contempt. . . . Thereafter, the claimant will have the opportunity to demonstrate that the

Defendants' proffered reasons are a pretext for excusing its
admitted contempt.

*Id.* at 13-15.

The standard is similar in the context of cases where the claimant

contends that the defendants' contumacious conduct caused non-promotional

harm. In those cases, "the claimant bears the burden of proving by a

preponderance of the evidence that he or she is an 'actual victim' of . . .

contumacious conduct." *Id.* at 14. This is a non-onerous burden that creates a

rebuttable presumption which can be overcome if the defendants establish by

competent evidence "that the events complained of did not occur, or that they

were unrelated to the defendants' contempt." *Id.* Thereafter, the claimant will

have the opportunity to demonstrate that the defendants' proffered reasons

are a pretext for obscuring the defendants' admitted contempt. To the extent

claimants establish that they are actual victims of the defendants'

contumacious conduct, they can recover monetary damages for such

contempt for the period after May 29, 2001. Docket № 8310 at 7.

**2**

Summary judgment is authorized under Federal Rule of Civil Procedure

56(c) when all "pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavit, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, everything in the record must demonstrate the absence of a genuine issue of material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog*, 193 F.3d at 1246; citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

When making the determination of whether summary judgment is proper, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Hinson v. Edmond*, 192 F.3d 1342, 1348 (11th Cir. 1999). The Court also must "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555 (11th Cir. 1990).

## IV

### 1

Defendants believe they are entitled to summary judgment on Mr. Franklin's promotion and nonpromotion claims. With regard to his nonpromotion training claims, the defendants contend that he received all the

13

training to which he was entitled and all the training he sought, and that he cannot show harm from any delay in completing the post-2004 Employee Development Program, ("EDP"), training classes. Docket № 9012 at 6-7.

With regard to his job rotation and job assignment claims, the defendants believe those allegations fail because Mr. Franklin cannot show any violation of the Consent Decree since he participated in the EDP, and because he cannot identify an appropriate comparator who gained a promotion advantage as a result of job rotation or job duty assignment. Finally, the defendants also believe his rotation claims come to naught because any lack of rotation was not the but-for cause of his promotion failure. *Id*. at 7.

Mr. Franklin's out-of-class assignment claim allegedly fails because he in fact performed the higher-level duties of the CESA and because no one gained a promotion advantage over him as a result of performing out-of-class assignments. *Id*. Similarly, the defendants believe his promotion claim is unsustainable for several reasons. First, because there was only one regular promotion to the CESA classification during the term of the Consent Decree once the CESA register was reestablished in 2003, and the person promoted from the register was more qualified than Mr. Franklin. Second, Mr. Franklin

14

in fact benefitted from the backlog promotion process when he was appointed to the CEA classification. *Id.* at 8. And third, his provisional promotion is untenable because ALDOT had legitimate, non-contumacious reasons for promoting candidates other than Mr. Franklin to the CESA classification. *Id.* at 7.

Mr. Franklin contests defendants' arguments and maintains that but for defendants' contempt he would have been promoted to CESA. He asserts that he should have been promoted to the CESA classification as early at 1995. Docket № 9025 at 15. He maintains that the failure of the defendants to provide the EDP classes, the loss of opportunity to rotate job duties and work out-of-classification prior to his taking the CESA examination was a breach of the Consent Decree that affected his examination performance and harmed his promotion opportunities. *Id.*

Claimant Franklin also challenges the fact that the defendants failed to call for a Certificate of Eligibles, ("COE"), when Roslyn Cook-Deyampert was placed on leave in April 2002 from her CESA position. According to Mr. Franklin, the failure to call for a COE violated Article VII of the Consent Decree which required ALDOT to request a COE within 30 days of a permanent opening occurring. Article VII ¶1. Mr. Franklin believes he should have been

provisionally appointed to Ms. Cook-Deyampert's CESA position. Docket №
9025 at 8.

## 2

## A

## i

Mr. Franklin alleges that his inability to secure promotion to the CESA
classification was due, at least in part, to the defendants' breach of the
Consent Decree's requirements concerning training and job rotation.

Article XVI, ¶2 of the Consent Decree sets forth the training
requirement, and Paragraph "c" specifies that ALDOT "will monitor the
enrollment of employees taking training courses in order to ensure to the
extent practicable that interested black employees are receiving their fair
share of participation in such training courses."

The job rotation requirements of the Consent Decree are located in
Article XIV and require "[t]o the extent practicable, the duties and
responsibilities of higher classified jobs will be assigned on a proportionately
equal basis to [African American] employees compared to white employees in
the same lower classified jobs." Consent Decree at Art. XIV ¶2(a). The primary
purpose behind Article XIV was to enable ALDOT's African American

employees to secure the experience necessary to enable them to perform at the levels required to secure promotion.

To affect the job rotation and training requirements of Article XIV, the parties devised and created the Employment Development Program, ("EDP").[7] The EDP is a voluntary program available in almost all ALDOT job classifications. The program is structured as a series of modules, where each module covers a particular subject area within each classification. As part of each module, the employee is to complete a number of training activities, through either classroom training or on-the-job training. The training modules utilize the established minimum qualifications for a particular job classification. The knowledge, skills and abilities ("KSAs") that form the basis for the selection procedures relevant to the job classification are the same ones for which an employee receives training through EDP. An employee who successfully completes the modules for his or her classification receives training in the same qualifying KSAs that appear in the minimum qualifications and examinations.

_____

[7] *See generally*, R&R at Docket № 7899 at 16-24, for a description and analysis of the purpose and function of the EDP (adopted by the court at Docket № 7969).

The court has held that the EDP satisfies the job rotation requirements of the Consent Decree because it ensures those participating employees are exposed to the range of duties and assignments that are required for promotion within ALDOT. Docket № 7899 at 21 ("The EDP module rotation system satisfies the requirements of Article XIV by ensuring that each participating employee is exposed to the range of duties and assignments that will best prepare that employee for promotion in his or her natural career path").

### ii

Mr. Franklin's training records establish that between February 1995 and August 2002—when he took the CESA examination—he attended 88 separate training courses offering more than 800 hours of instructional time. Docket № 9013-16. He also participated in the Engineer Training Orientation Program, ("ETOP"), when he first joined ALDOT. Franklin depo. at 47. The ETOP rotated newly-hired ALDOT engineers through various transportation engineering functions. *Id.* at 47-48. Mr. Franklin completed the ETOP rotations.

Mr. Franklin has identified two training courses which he asked to take in 2004: Introduction to ALDOT State Budgeting, and Advanced

Communication Skills. *Id.* at 48-49.[8] He did not request the courses until 2004, two years after taking the CESA examination. There is no evidence in the record to which he points that would allow a finder of fact to conclude that the failure to take the two courses identified above affected his promotion opportunities or constitutes contempt by the defendants. In point of fact, the only material evidence in the record on Mr. Franklin's training claim is that he received a "fair share" of training and most of that training prior to his August 2003 CESA examination.

**3**

Mr. Franklin claims that his promotion chances were harmed because of the failure to provide him job rotation opportunities. Docket № 9025 at 15. In particular, he contends that ALDOT denied him the opportunity to rotate into the managerial duties performed within the civil engineering line or progression.

---

[8]   During his deposition, Mr. Franklin identified one other training course, CPM II, that he wanted to take but was unable to do so. Franklin depo. at 49. He was, however, unable to recall when he requested the training or through whom it was requested. No discussion of the CPM II course is contained in Mr. Franklin's brief and therefore the matter is not further discussed here. The initial brief of the defendants does address the CPM II allegation and points to the absence of evidence to support any contention that the failure to take the CPM II course affected Mr. Franklin's exam performance or promotion chances. Docket № 9012 at 10 n.12.

The defendants maintain that Mr. Franklin's rotation claim fails as a matter of law for several reasons.  First, because he participated in the EDP, second because no other ALDOT employee gained a promotion advantage over him as a result of a job rotation opportunity, and third because the only individual appointed to the CESA classification from the register on which Mr. Franklin appeared did not gain an unfair promotion opportunity by virtue of ALDOT's rotation practices. Docket № 9031 at 7.

### A

Since he participated in the EDP for the CEA classification from 2004 through approximately 2008, the defendants believe that Mr. Franklin's rotation claim cannot proceed as a matter of law. Docket № 9012 at 12. Defendants rely on a line of R&Rs holding that the EDP satisfies the rotation requirements of Article XIV by ensuring that participating employees are exposed to the range of duties and assignments best preparing them for promotion.[9]

The decisions on which the defendants rely are factually distinguishable. In this instance, the fact is that the applicable EDP was not

---

[9]  *See* Docket № 9021 at 16 (Fitzpatrick R&R); Docket № 8989 at 14 (Azubuike R&R); Docket № 8531 at 6-7 (Bennington R&R); and Docket № 7899 at 21 (R&R motion for summary judgment on compliance with Article XIV).

available prior to the time Mr. Franklin took the CESA examination and therefore could not function as a substitute for the Consent Decree's rotation requirement.

In the Fitzpatrick R&R, the claimant had taken the Sr. ROWS examination twice, and prior to the second examination, she had been participating in the EDP for sixteen months.  Docket № 9021 at 15. Similarly, Mr. Azubuike took the CEA examination twice, first in 2003 and then again in 2006. While he had not completed the relevant EDP by the time of his examinations,[10] it was nevertheless available and he was enrolled in the program in 2002, well before he took the promotion examination. Docket № 8989 at 13-14.

"If [the] EDP is going to be the substitute for the rotation requirement of Article XIV, then [the EDP modules] must be complete." Docket № 7899 at 22 (footnote omitted). In this instance the EDP was not available at any time prior to Mr. Franklin having taken the CESA examination and therefore could not serve as a substitute for the rotation practice that was intended to

---

[10]  "The Consent Decree did not require the defendants to ensure that African American employees of ALDOT completed the EDP in advance of promotion examinations. The fact that the program was available and offered to employees met the requirements of the Consent Decree." Docket № 8989 at 14.

improve the test performance of ALDOT's African American employees. The defendants have admitted that the EDP was not available at the time Mr. Franklin took the CESA examination. Docket № 9031 at 10 n.5 ("Franklin ignores the fact that Defendants could not implement the EDP for the CESA classification until after the Court approved the minimum qualifications for the classification, which was delayed until the no-overlap litigation concluded in August 2003, *i.e.*, after Franklin took the 2002 CESA exam").

## B

While Mr. Franklin may not have had an opportunity to participate in the EDP in a timely fashion, he nevertheless fails to point to a material question of fact that could, if believed, show that he was harmed by the defendants' contempt of the job rotation requirement.  Article XIV, ¶2 of the Consent Decree mandates that "[t]o the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to black employees compared with white employees in the same lower classified jobs." Mr. Franklin cannot identify any similarly situated white employees who gained an advantage over him with respect to performance on the CESA examination *or* promotion by virtue of participating in the job rotation opportunities available at ALDOT. In fact, he makes no such allegation. That alone is sufficient to defeat his rotation claim.

Q.    You didn't see anybody in your bureau who
      would fit that description, a white who was in a
      CEA classification that got rotated into CESA
      duties ultimately was promoted to the CES a
      position?

A.    In my current bureau?

Q.    Uh-hun

A.    No, sir, there are none.

Q.    What about the prior bureau?

A.    There were none there either.

Franklin depo at 52-53.

## C

Though not articulated in his brief in any firm sense, Mr. Franklin

testified during his deposition that ALDOT violated Article XIV, ¶2 by denying

the opportunity to work out-of-class, which he believes would have better

prepared him for examination and promotion to CESA.[11] Franklin depo. at 86-

87. The Consent Decree's requirements with respect to out-of-classification

assignments are set forth in Paragraph 2 Article XIV of the Consent Decree.[12]

---

[11]   While Mr. Franklin does not expend much, if any, effort in defending
his out-of-class allegations, the defendants have extensively briefed the issue
in both their principal brief and in their reply brief.

[12]   Article XIV, ¶2 of the Consent Decree reads:

(continued...)

"The fact that [Mr. Franklin] did not receive an out-of-classification appointment does not state a violation of the Consent Decree unless [he] can establish that similarly situated white employees had an advantage or were treated differently than he." Docket № 8723 at 11 (R&R) adopted by Docket № 8738.

Mr. Franklin testified that while he never formally received an out-of-classification assignment, he nevertheless performed out-of-class work when he took over the CESA duties of his supervisor, Roselyn Cook-Deyampert, in the Training Bureau when she was on administrative leave over an approximately two-year period. Franklin depo. at 87-89. He testified further that he became familiar with Ms. Cook-Deyampert's CESA duties during this time. *Id.* at 89.

---

[12](...continued)

      2.    Assignment of duties:

      (a) To the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to black employees compared with white employees in the same lower classified jobs.

      (b) The Highway Department will to the extent practicable not assign duties in such a way that any employee will gain an advantage in promotions, including reclassification, over other employees in the same classification.

The only white comparator assigned out-of-class to the CESA classification during the term of the Consent Decree was Clay McBrien who served out-of-class for four months between November 2004 and March 2005. Mr. McBrien's brief stint working out-of-class as a CESA did not lead to a permanent CESA appointment. In fact, he never took the CESA examination. He was ultimately appointed to a PCE III position, but not until several years later. Docket № 9013-15 (McBrien's SPD employment record). There is no evidence to which Mr. Franklin points that would create a material question of fact regarding whether Mr. McBrien received or gained an unfair advantage over him in promotion because of his brief out-of-class assignment to the CESA classification. Mr. Franklin's out-of-classification claim fails as a matter of law.

## D

Mr. Franklin alleges that the defendants denied him provisional, backlog, and regular promotion over the span of the Consent Decree. Franklin depo. at 13-14. His brief, however, fails to point to any disputed material issues of fact that would create a question for trial. With respect to his regular promotion claim, he fails to offer any rebuttal to the defendants' evidence that the single individual appointed to the CESA classification while Mr. Franklin was on the CESA register was appointed for legitimate noncontumacious

reasons. Nor does he refute the defendants' position that at the time ALDOT was appointing individuals provisionally and through the backlog process to the CESA classification, Mr. Franklin was serving in the entry-level CEM classification and not in the classification from which CESAs were appointed. Docket № 9012 at 30-32.

### i

Several facts are uncontroverted: First, that because of the change in the state's engineer licensure laws, SPD and ALDOT began phasing out the CESA classification in 2003. Docket № 9013-7 at ¶3 (Buster Affidavit). Second, the last register for the CESA classification was established in August 2003 and no new CESA examinations have been given since 2004. *Id.* at ¶4. Third, until the new register was established, ALDOT could not make regular appointments to the CESA classification. *Id*. And fourth, during the term of the Decree only one person, Ronnie Baldwin, was appointed to the CESA classification by ALDOT. *Id*.

Mr. Franklin does not challenge the 2005 promotion of Mr. Baldwin to the CESA classification—the only regular promotion from the register on which Mr. Franklin appeared. Franklin depo. at 66 ("**Q**. . . .  Is it your position that you should have been promoted to the CESA position that Mr. Baldwin got, instead of him, given his qualifications? **Mr. Adams**: Object to the form. **A.**

26

Are you asking me that I should have -- are you asking me that I should have gotten that particular CESA? **Q.** Yes, sir. **A**. Not particularly"). Moreover, the defendants have articulated many noncontumacious factors leading to the appointment of Mr. Baldwin to which Mr. Franklin has offered no rebuttal.[13]

## ii

Mr. Franklin contends that he should have been regularly or provisionally appointed to the CESA position left vacant during Rosalyn Cook-Deyampert's administrative leave and subsequent termination in 2002. Docket № 9025 at 7-8. From the time Ms. Cook-Deyampert was placed on leave, December 2001, Mr. Franklin performed her CESA duties until he was transferred to his current position in the Aeronautics Bureau in March 2004. Franklin depo, at 88-89; Docket № 9032-2 at ¶6 (Buster Supplemental Affidavit).

---

[13]   At the time of his CESA appointment, Mr. Baldwin had scored significantly higher than Mr. Franklin on the CESA examination, and, unlike Mr. Franklin, appeared on the COE from which the selection was made. He was also a licensed P.E. and had 20 years more working experience at ALDOT than Mr. Franklin and ten years more experience as a CEA than did Mr. Franklin.  Other than recounting a general history of noncompliance with the Decree, Mr. Franklin has offered no evidence to rebut the defendants' position that it was these factors, unrelated to contempt, that led the defendants to promote Mr. Baldwin to the CESA classification rather than Mr. Franklin.

ALDOT was under no obligation to fill Ms. Cook-Deyampert's position unless it first determined that the position should be filled.[14] As explained in the defendants' brief, "ALDOT made no promotion to Cook-Deyampert's CESA position while she was on mandatory leave for the obvious reason that her leave status did not create a 'permanent opening' under Article VII, ¶1 that ALDOT intended to fill." Docket № 9031 at 22. There was, according to the defendants' the possibility that Ms. Cook-Deyampert would return to her pervious CESA position once the related litigation about her representation was resolved. Docket № 9032-2 at ¶6 (Buster Supplemental Affidavit).

Moreover, in September 2003 when it was decided to terminate Ms. Cook-Deyampert's employment with ALDOT, the decision was also made to eliminate her former CESA position and replace it with a Training EDP manager position, a lower level classification than the CESA position occupied by Ms. Cook-Deyampert. *Id.* at ¶3. This restructuring was approved by the court in January 2005. Docket № 7643.

---

[14] *"Request for COE*. When a permanent opening occurs in a classified position at [ALDOT] and such job opening is to be filled, [ALDOT] will request a COE for such job opening within 30 days. . . ." "(a) This is not intended to require the filling of a job and will apply only where it is [ALDOT's] decision to fill the job." Article VII, ¶1 and ¶1(a).

There is no evidence in the record to support the allegation that the defendants' refusal to fill the CESA Training Bureau position during the pendency of Ms. Cook-Deyampert's administrative suspension constitutes contempt of the Consent Decree. Had ALDOT intended to fill the vacancy, then Mr. Franklin would have been the logical person to promote given the fact that he performed the duties for several months.

To be administratively suspended is not equivalent to creating a permanent vacancy in the position from which the employee is suspended. The fact that almost immediately upon the decision to terminate Ms. Cook-Deyampert, ALDOT and SPD eliminated the CESA classification in the Training Bureau and restructured the position with court approval does not provide evidence that the defendants acted in a contumacious manner in refusing to fill the CESA position with Mr. Franklin.

**4**

Mr. Franklin began employment with ALDOT as a CE-V in January 1995. Franklin depo. at 24. He remained in that classification until June 1998, when he was reclassified to a CEM. *Id.* at 24-25; Docket № 9013-3 at ¶8 (Thornton Affidavit). In March 2000, he was promoted to the CEA classification. *Id*.

ALDOT made only eight provisional appointments to the CESA classification, and all such appointments were made in 1998. *Id.* at ¶17. All

29

but one of the provisional CESA appointments were made permanent through the backlog process. *Id.* at ¶16.

Mr. Franklin has failed to present evidence that would create a material question of fact with respect to his provisional and backlog appointment claims. As a preliminary matter, Mr. Franklin was backlog appointed to the CEA classification in April 2000 and began work as the Assistant Bureau Chief and Assistant Director of Training in the Training Bureau, working under the supervision of Ms. Cook-Deyampert. Franklin depo. at 26, 34. In March 2004 he transferred as a CEA to the Aeronautics Bureau. *Id.* at 27. At the time ALDOT was appointing individuals provisionally—and through the backlog process—to the CESA classification, Mr. Franklin was serving as a CEM, the entry-level classification in the Engineering Management Series.[15] ALDOT has submitted uncontradicted evidence in the form of an affidavit from Dr. Maury Buster, Chief Industrial/Organizational Psychologist for the State that provisional appointments to the CESA classification came from persons serving at the CEA and not CEM level as Mr. Franklin. Docket № 9013-7 at ¶8.

Mr. Franklin offers no evidence to refute the conclusion of Dr. Buster,

---

[15]   Between 1998 and 2004, the Engineering Management Series proceeded as follows from lowest to highest classification: CEM, CEA, CESA, and GCE.

nor has he even alleged that any of the candidates provisionally appointed in 1998 to the CESA classification were appointed directly from the CEM entry-level classification rather than from the CEA.  There is no evidence in the record to allow the court to find that the failure of Mr. Franklin to receive a backlog or provisional appointment to the CESA classification resulted from the defendants' contempt. The fact that he was not provisionally or backlog appointed the CESA classification in 1998 "is not alone sufficient to make out a claim that he was injured as a result of defendants' contempt." Docket № 8650 at 11. Without specific evidence from which the court could find that the defendants' contempt resulted in the failure of Mr. Franklin to receive a provisional or background appointment, there is no entitlement to contempt relief.

## V

**ACCORDINGLY**, it is Recommended that the defendants' Motion For Summary Judgment on Willie Franklin's Individual Contempt Claim, Docket № 9011, be GRANTED.

Objections to this Report and Recommendation must be filed with the Clerk of Court by February 28, 2014. Failure to file objections in a timely manner constitutes a waiver of the right to review by the district court.

31

IT IS SO RECOMMENDED this 4th day of February 2014.


/s/ C. A. González_____
SPECIAL MASTER