IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

      Plaintiffs,

                                  CIVIL ACTION NUMBER
v.                               85-cv-665-MHT
                              **Special Master González**

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

      Defendants.

**REPORT AND RECOMMENDATION
ON INTERVENORS' SECOND MOTION FOR PARTIAL SUMMARY
JUDGEMENT RELATED TO ARTICLE XV RECLASSIFICATION ISSUES**

**I**

This matter is before the special master on intervenors' second motion

for partial summary judgment related to Article XV reclassification issues.

Docket № 9086. Nine intervenors seek summary judgment with respect to

their right to collect make-whole relief related to the failure of defendants to

timely reclassify them under the requirements of Article XV, Paragraph 1 of

the Consent Decree.[1] Intervenors also seek summary judgment with regard to

---

[1] In their initial brief, (Docket № 9086-1), the intervenors suggest the court use the
(continued...)

1

the formula they devised to calculate the amount of backpay allegedly owed

as a result of defendants' contempt of Article XV. Docket № 9137-2 at 1.

Defendants' liability for the failure to timely comply with Article XV's

reclassification requirement has been determined by the court and admitted

by the defendants.[2] As the court has reminded us, however, the finding of

liability "does not mean that any particular claimant is entitled to relief."

Docket № 8807 at 2.[3]  Because defendants have agreed that the nine

---

[1](...continued)
$7,756.25 average in lost pay for nine class members to reasonably determine the losses for the other 213 intervenor class members. *Id.* at 12-13. Defendants rightly objected to intervenors' suggestion on the basis of the long-standing principle that there is no presumption of classwide harm in individual contempt litigation. Each intervenor must first establish individualized harm before they are entitled to recover make-whole relief.

In their second brief in support of the motion for partial summary judgement, the nine intervenors make clear that they do not seek relief for the entire class but only for themselves. Docket № 9137-2 at 3-5. This admission resolves the concern of the defendants. Docket № 9138 at 25 (Defendants' Response to the Intervenors' Second Memorandum in Support of Second Motion for Partial Summary Judgement).

[2]  "[T]he practical effect of the Order [Docket № 8521 adopting the Special Master's recommendation Docket №  8465] appears to be a final determination of *__liability__* in favor of the Intervenors for any alleged damages flowing from delays in the implementation of the reclassifications after 1996." Docket № 8829-1 at 17 (Defendants' Memorandum of Law in Support of Motion to Certify March 12, 2012 Order for Interlocutory Appeal)(emphasis in original, parenthetical added).

[3]  *See also* Docket № 8829-1 at 17 ("If [the finding of liability for Article XV] is a correct interpretation of the Court's order, then only the fact of individual injury and the relevant damage calculations would remain for final disposition of the Intervenors' Article 15 claims.")(Defendants' Memorandum of Law in Support of Motion to Certify March 12, 2012 Order for Interlocutory Appeal)(emphasis in

(continued...)

intervenors moving for summary judgment were not reclassified in a timely manner, the burden on those nine persons is to prove they were actually harmed by defendants' contempt of Article XV. If they succeed in proving actual harm, they must then also prove their entitlement to make-whole relief.

The intervenors assert that the harm suffered is the failure of defendants to timely promote them into a higher job classification and the loss of pay as a result of the delay. The calculation of the make-whole damages to which the class members are allegedly entitled is determined using a formula devised by the intervenors that seeks to recoup lost pay.

The nine intervenors in their motion for summary judgment contend that there are no questions of fact as to the harm suffered by them or the appropriateness of the damage formula used to calculate the amount of backpay allegedly owed. Docket № 9086-1.

Defendants oppose intervenors' request for summary judgement. They argue intervenors are not entitled to any damages because Article XV's reclassification of employees is not tantamount to promotions to which automatic pay increases attach; rather, reclassifications were implemented

---

[3](...continued)
original, parenthetical added).

"in the same manner as reallocations without registers" and therefore no automatic pay increase attached. Docket № 9138 at 8. Moreover, according to defendants, even if Article XV reclassifications are in fact to be treated as promotions, the formula proposed by the intervenors erroneously calculates the alleged lost pay.

Whether the Article XV reclassification project resulted in promotions, or was a reallocation process to which no increase in pay attached is the threshold issue. If Article XV reclassification resulted in promotion, then the validity of the Intervenors' formula is relevant. If not, then the proposed formula does not apply to the intervenors' circumstances.

## II

### A

#### i

Some background on the reclassification provisions and implementation of Article XV, ¶1 is appropriate. The history of litigation surrounding Article XV is complicated and protracted. The Article grew out of negotiations between intervenors, plaintiffs, and defendants. In 1993, before the intervenors' involvement, the plaintiffs and the defendants negotiated the terms of a settlement agreement that included many race-conscious

provisions.  Among the race-conscious provisions was Article XV that dealt with employee job reclassification at ALDOT.  As originally proposed, Article XV limited the opportunity for job reclassification to ALDOT's African American employees.  By January 1994, the Adams intervenors had joined the lawsuit and objected to the race-conscious provisions of the proposed decree, including those contained in Article XV.  Because of the intervenors' objections, the district court directed the parties to negotiate anew with each other in an attempt to resolve the objections.

As noted, the intervenors objected to the race-conscious nature of the proposed article, arguing that the reclassification of ALDOT employees should be performed without regard to race.  *See* Docket № 506.  The parties agreed on the need for race neutrality and by letter dated February 3, 1994, the plaintiffs informed the court that there was an agreement to revise the language of Article XV.  As reported to the court by the plaintiffs, "the only change to . . . Article [XV is] to remove the word 'black' from each place that it appears so that the intervenor-movants can participate in the reclassification process." Docket № 7300 at 7, quoting Docket № 518 at 24.

On March 16, 1994, the Court approved the Consent Decree containing the agreed-to Article XV revisions. Docket № 553. Article XV's requirement

that job reclassification under the Consent Decree be performed in a uniform manner across all ALDOT employees, was described by the Eleventh Circuit:

> Article 15 required the Department to conduct a study of all its employees (regardless of race) to determine if any employees were being assigned duties associated with a higher job classification (and thus higher pay level) than the one they currently had. If the study uncovered an employee "spending a majority of [his or her] working time in the performance of the duties and responsibilities of a higher job classification," the Department was required to reclassify the employee at the higher level (and therefore increase that employee's salary). Article 15 also required the Department "to monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on a regular or non-emergency basis are within the job description for [the] job they are holding."

*Reynolds v. Roberts*, 207 F.3d 1288, 1293-94 (11th Cir. 2000) (modifications and parenthetical in original).

In anticipation of the court's approval of the Consent Decree, the State Personnel Department, ("SPD"), prepared a position description questionnaire to be answered by all ALDOT employees. This questionnaire, known as a "Form 40," was used to gather the information SPD needed to determine whether an ALDOT employee was entitled to reclassification under the provisions of Article XV, ¶ 1, of the Consent Decree.  The Form 40 elicited from the employee a description of the job duties the employee performed.

The employee's statement of actual duties listed on the Form 40 were then compared to the official position description of the job actually held by the employee.

What became apparent to SPD when working with the completed forms was that in answering the questions, some employees did not provide adequate information to enable SPD to make an appropriate reclassification decision. In May 1996, SPD allowed ALDOT employees an opportunity to request a second review of their position to make sure they were properly classified in light of any changes in an employee's actual job duties since 1994, and because of ALDOT's new job classification structure.  By July 1996, all employees were notified of their placement in the new structure.  SPD allowed employees who disagreed with their classification to request reviews and submit additional information.  As a result of this secondary review, it was determined that approximately 800 ALDOT employees were due to be reclassified of which 213 were intervenor class members. Docket № 9086-1 at 7.

Litigation regarding the meaning and reach of the Article continued for many more years including litigation to establish the burden of proof for

proving Article XV claims.[4] By June 2009, intervenors filed a motion for partial summary judgement claiming that their class members previously identified by defendants as persons entitled to reclassification, but not actually reclassified in a timely manner were due make-whole contempt relief. Docket № 8415.

In their response, defendants asserted they were in compliance with Article XV in December 1996, and that the delays in implementing the Article's requirements were the fault of plaintiffs' delaying tactics. Docket № 8444. In August 2009, the special master issued an R&R rejecting defendants' proposed December 1996 date and instead found that defendants did not come into compliance with Article XV until May 27, 2003. *Id.* at 13-14. Defendants' objections to the R&R were overruled by the court and the date of Article XV, ¶1 compliance was conclusively established as May 27, 2003. Docket № 8807, *see also* Docket № 8310 at 29 ("The defendants were in compliance with Article XV as of May 27, 2003, and consequently, no claim for contempt of Article XV is sustainable after that date.").

In April of 2001, intervenors and defendants entered into a $8.35M settlement agreement that included $2.4M earmarked as damages for the

---

[4] *See supra.* at p. 2 and Docket № 6928 at 13-15.

delay in reclassification. Docket № 4923, Exhibit 1 at 1. Under the terms of the settlement agreement, all claims for noncompliance with the reclassification requirements of Article XV, ¶1 were resolved as of the date the court held the fairness hearing on the settlement which was May 29, 2001. Therefore, the only Article XV reclassification claims for damages that can now be maintained are those accruing after May 29, 2001. (*See* R&R Docket № 8310 at 7-8, 10 (concluding that the no damages for defendants' contumacious conduct can be maintained for the period before May 29, 2001.).

Defendants believe that the accrual of damages for the failure to reclassify ceased May 27, 2003, the date they were found to be in compliance with Article XV, ¶1. *See* Docket № 8465 at 14 adopted by Docket № 8807 (establishing date of defendants' compliance with Article XV, ¶1). As the court previously noted, "Defendants were in compliance with Article XV as of May 27, 2003, and consequently, no claim for contempt of Article XV is sustainable after that date." Docket № 8399 at 8 (R&R adopted by Docket № 8425). While Plaintiffs cannot maintain an action for Article XV contempt after May 27, 2003, the effects of defendants' contempt on the pay of ALDOT employees who were not reclassified in a timely manner did not stop on May 27, 2003,

9

and the intervenors are entitled to make-whole monetary relief for the time after the date of the fairness hearing.

The proper date from which to assess whether ALDOT employees were entitled to reclassification was determined long ago.  In June 1997, the court ruled "that the article XV reclassification procedure, established by [the] consent decree[] is properly analyzed on the basis of the Form 40s filled out by employees of the Alabama Department of Transportation in early 1994, contemporaneous with the entry of the decree." Docket № 1931. That was the moment "defendants were to take a snapshot of the ALDOT employees for purposes of identifying who was working out of class and needed to be reclassified." Docket № 8843 at 2 (defendants' statement on further proceedings under Article XV). By 1998, defendants had identified those individuals working for ALDOT who were entitled to reclassification. (*See* Exhibits 2148 and 2188 admitted in the January 1998 reclassification hearing before Judge Coody.)  Intervenors have accepted defendants' identification (Docket № 9086-1 at 6) and in November 2012, the counsel for intervenors picked ten class members people whose claims for salary adjustments would be tested through the summary judgment process. Those ten class members are: Clayton A. Baggett; Rory E.

Briggs; Charles C. Chambless, Jr.; Earl M. Coleman, Jr.; Roland R. Darby; Brian J. Dunaway; Joseph L. Fresolone; Joseph A. Harrelson; Douglas A. Hoggle; and Donald R. Johnson. Of the ten intervenor class members, Brian Dunaway was determined by counsel for the intervenors not to have any lost pay after May 2001, and was therefore excluded from the intervenors' summary judgment analysis.[5]

## ii

## B

According to defendants, the intervenors have mischaracterized the nature of the Article XV reclassification project as requiring promotion to which an increase in salary would attach.  For defendants, the reclassification project did not result in promotions, but rather implemented a unique provision of the Consent Decree otherwise unknown to the State Personnel Department and not covered by any of its regulations. As defendants explain it, the reclassification project did not include any of the indicia of promotion:

> [Article XV] reclassifications, which were a court-ordered process
> and not codified in the State Personnel Department . . .
> regulations, . . . did not treat the reclassification as promotions.
> The parties did not agree to, and the Court did not order, an
> automatic two-step pay increase for all persons reclassified at the

---

[5] Defendants have a pending motion for summary judgment on Brian Dunaway's Article XV contempt claims. Docket № 9118.

time of reclassification. The parties did not agree to, and the Court did not order, another two-step pay increase six months after reclassification. The parties did not agree to, and the Court did not order, that an employee's anniversary date would be six months after the date of reclassification. The parties agreed, and the Consent Decree simply states, that people would be placed in a higher job classification if they were performing the job duties of that higher classification. ECF No. 553 at 45. The employee received the benefit of the higher salary range, which increased the ceiling for the step increases and also provided the benefit of meeting a job prerequisite, but not an automatic raise. **Intervenors, through their [damages] calculations, presumptively treat the reclassification as a promotion as if it was ordered by the Court or agreed to by the parties.**

Docket № 9138 at 8 (emphasis added, parenthetical added).

Article XV, ¶1 does not use the terms "promote," or "promotion." Instead, it uses the terms "reclassify" and "reclassification." The requirement of the Article is that each ALDOT employee should be in the classification that actually corresponds with the duties being performed by that employee at the time the Consent Decree was approved.[6]

---

[6] Article XV, ¶1 of the Consent Decree provides in relevant part as follows:

**1. Reclassification program**: Following the effective date of this Decree, the following steps will be taken:

(a) All employees then working for [ALDOT] in the classified service will be provided with a Form 40 on which they may list the job duties which they are performing and the percentage of time spent on each such job duty. Such filled-out Form 40s will be subject to review and approval or revision by

(continued...)

Defendants contend that the reclassification requirement of Article XV is similar to the reallocation process used by SPD except that it does not require the reclassified employee to be on a register as the reallocation rule does. Docket № 9138-2 at ¶17 (Dukes Aff.). Instead, as explained above, reclassification relied on the Form 40s and the analysis of the duties the employee was actually preforming for ALDOT. The distinction between reclassification under the Consent Decree and reallocation pursuant to SPD's

---

[6](...continued)

       such employee's supervisor or supervisors. Any disagreement will be resolved by a job study analysis by the Personnel Department, subject to challenge by plaintiffs' counsel.

       (b) To the extent that such completed Form 40s establish that the subject employee is spending a majority of [his or her] working time in the performance of the duties and responsibilities of a higher job classification, or is spending an amount of time on such duties and responsibilities substantially equal to that of a majority of incumbents in such higher job classification, [ALDOT] will request the Personnel Department to reclassify such employee to the higher job which is most appropriate for the duties and responsibilities on which the employee is spending a majority of his or her working time, and the Personnel Department will approve such request if such request is consistent with the findings of Personnel's classification review and its classification plan.

Article XV, ¶1(a)-(b).

13

regulations was the subject of considerable litigation between the parties in the late 1990s.

Under SPD regulations there are two ways an ALDOT employee can be promoted. First, an employee can be promoted through a competitive process, or second the position he occupies can be reallocated to a higher job classification. Promotion through a competitive process is the usual means of advancement within ALDOT. In this regard moving to a higher position (job classification) generally depends on submitting an application, taking an examination and based on the examination results, making it onto a certificate of eligibles. It is from the certificate of eligibles that the employee to be promoted is selected. Docket № 9138-2 at ¶12 (Dukes Aff.).

When promoted, the employee is paced within the pay grade closely equivalent to his or her current pay and then given a five-percent or two-step increase in salary. *Id*. If the promoted employee satisfactorily completes an approximately six-month probationary period, he or she receives another two-step or five-percent increase in salary. *Id*. The day the employee obtains permanent status in his or her new job classification—at the end of the six-month probationary period—becomes the employee's anniversary date on which annual performance reviews are done. If in the year the performance

14

review is conducted the State is awarding step increases, then the employee may be eligible for an increase depending on his or her performance appraisal outcome. Reallocation under SPD rules involves a significantly different process.

When SPD determines that an employee is performing a task associated with a different job classification than the employee's current classification, SPD may reallocate the position number to a higher job classification. *Id*. at ¶13. Once the position is reallocated to a higher job classification, ALDOT may then assign the incumbent employee whose job classification was reallocated to the new position provided the employee was on the employment register and had the experience and skill necessary to perform the new position. *Id*.

If the employee is placed in the new job classification as result of a reallocation, the employee receives permanent status at that time without serving a probationary period. Consequently, the employee does not receive the five-percent, or two-step increase in salary associated with those promoted through the competitive process at the conclusion of the probationary period. *Id*. In point of fact, the employee reallocated to a new position does not receive any automatic salary increase. "If the employee's salary in the prior job classification is within the pay grade range available to

15

the new higher job classification, the employee will assume the step within the new classification's pay grade that matches the employee's salary." *Id*. If the employee's salary in the prior classification is less than the salary available in the higher classification, the employee will be given the minimum pay in the new classification.

Given the different effect on an employee's salary between a promotion and a reallocation, it is obvious why the intervenors and defendants are at odds. If reclassification under Article XV ¶1 was intended to function as a promotion, then the make-whole relief to which the intervenors may be entitled could be considerable. If, on the other hand, as defendants believe, the parties intended Paragraph 1's reclassification requirement to operate as a reallocation under SPD rules, then the make-whole relief potentially owed the intervenors could be significantly less, and the backpay formula developed by the intervenors inappropriate as a means of determining the range of make-whole relief.

## C

The intervenors position is that Article XV was intended to remedy years of delay in making promotion at ALDOT, and therefore, employees entitled to reclassification are necessarily also entitled to an increase in pay

consistent with the higher job category into which they were advanced.
Docket № 9137-2 at 5.

In support of their position, intervenors point to the statement in
*Reynolds II* quoted above that if the study required by Article XV uncovers an
employee spending a majority of his or her working time in the performance
of the duties and responsibilities of a higher job classification, ALDOT "was
required to reclassify the employee at the higher level (and therefore increase
that employee's salary)." *Reynolds II*, 207 F.3d at 1293-94.

Defendants dismiss intervenors' reliance on *Reynolds II*, arguing that the
quoted section is "*dicta*" and "not a mandate by the [] Circuit to increase each
reclassified employee's salary." Defendants go on to describe the circuit's
language as "a rhetorical comment that erroneously described the process of
reclassifying . . . and, in so doing, . . . included language not found in Article
XV." Docket № 9138 at 9. If the only argument relied upon to establish the
intervenors' claim were the quoted section of *Reynolds II*, then serious
material questions of fact would remain as to what was intended by the term
"reallocation," but intervenors point to a wealth of other statements in the
record and decisions by the court to buttress their contention that

reclassifications were not intended to be synonymous with SPD's well-established practice of reallocating job position to a higher classification.

At the end of a 1998 hearing on Article XV before Judge Coody, the court issued a lengthy decision. The decision was ultimately rejected by the district court as a result of the holding in *Reynolds I*, but Judge Coody did specifically note that reclassification and reallocation were different creatures, since "[r]eclassification under the decree is not dependent on conformity to [SPD] rules." Docket № 2651 at 24. Steve Dukes acknowledged the same when he testified that reclassifications are a creation of the decree while reallocations are permitted as part of SPD's regulations. *See* Steve Dukes' testimony before Judge Coody, Docket № 9173-1 at 44.

Mr. Dukes also testified that reclassifications were not promotions and therefore employees who were reclassified were not automatically entitled to a pay raise. *Id.* at 47. This is simply another way of saying that SPD viewed reclassification under Article XV as tantamount to reallocation under SPD regulations.

In 1996, defendants' counsel, Lisa Borden, described the purpose of the reclassification project as follows:

> Plaintiffs' newly announced proposal that the Form 40 reclassifications be delayed until new registers are established

18

would defeat the purpose of the project, and would likely render it completely meaningless. **The Form 40 project was intended to remedy the plight of employees who had been performing duties and responsibilities of a higher classification but, for various reasons, had been unable to obtain a promotion**. The inability of ALDOT to make substantial promotions during the last several years results from a number of factors, including hiring freezes imposed by the governor's office and restrictions on provisional appointments.

Docket № 1083 at 6 (emphasis added).

Defendants respond to Ms. Borden's words by arguing that intervenors' have taken the words out of context in that she was reacting to plaintiffs' argument that Article XV reclassification should be delayed until ALDOT's employment registers could be reestablished. Docket № 9138 at 11. Defendants are correct that Ms. Borden was responding to plaintiffs' contention that the reclassification project should be delayed, but that does not alter the meaning conveyed by the statement that defendants understood the reclassification process was intended to address the serious delays faced by ALDOT employees in being promoted.

Defendants also point to the 1996 media blitz SPD's Transportation Team developed to explain to ALDOT employees what would occur as a result of the reclassification process. Docket № 9138-2 at ¶16 (Dukes Aff.). The purpose behind the media blitz was to ensure ALDOT employees got

19

consistent information about the changes coming to the organization as a
result of Article XV. In order to achieve consistency in how the coming
changes were described, the Transportation Team developed a script to be
read at meetings. *Id.* In discussing reclassification under Paragraph 1 of
Article XV, the script explained that reclassified ALDOT employees would be
placed "into the appropriate class at their current rate of pay or the minimum
of their new pay range whichever is higher." *Id.*

There is no evidence in the record that the court, the plaintiffs, or the
intervenors ever approved of the content of the Transportation Team's script.
The script was created by the defendants for the use of the defendants, and
was the defendants' interpretation of the requirements of Article XV.[7]

Finally, it must be remembered that the reallocation process existed
prior to the approval of the consent decree and was well known to the
Consent Decree's negotiators. In Article XV, ¶2, for example, the negotiators

---

[7] Defendants point out that the special master had previously described the use of
the script in an earlier R&R and its message that ALDOT employees were not
necessarily entitled to receive an increase in pay if they were reclassified. Docket №
9138 at 17-18. Defendants are correct, but the issue being considered at that time
dealt with plaintiffs' request for civil contempt of Article XV. Docket № 7532 (R&R).
The statement of facts to which defendants point merely recounted the history of
the parties' effort to implement Article XV, it was not a finding that the
Transportation Team's Article XV script accurately described the requirement of the
Article.

specifically placed limitations on filling ALDOT jobs by reallocation in certain situations.[8] The fact of the matter is, that if the negotiators of the Consent Decree had intended reclassification and reallocation to be the same they would have said so.

Intervenors have established that there are no material issues of fact with respect to whether reclassification under Article XV, ¶1 was intended to be handled in the same manner as reallocations under SPD regulations. The answer is clearly not. The issue now is whether there are material questions of fact related to the formula used by intervenors to calculate the make-whole relief the nine intervenors may be entitled to.

**D**

Intervenors contend that increases in an employee's pay reclassified under Article XV should be calculated in the manner used to calculate the pay of a person promoted pursuant to standard SPD practices. According to the intervenors, "[a]nything less than the pay that goes with a promotion fails to give meaning to the duty to compensate the employee for performing the duties of the higher paying job." Docket № 9137-2 at 12.

---

[8] "*Limit on filling jobs by reallocation*: A permanent opening in a classification may not be filled by reallocation when a black eligible is on the register for the class to which the position is being reallocated . . . . Article XV, ¶2 (emphasis on original).

The parties agree on how the pay of an ALDOT employee is traditionally adjusted following a regular promotion.[9] The question is whether there is anything unique in the reclassification process that creates issues of material fact as to how pay increases are to be calculated once an individual is promoted through the Article XV reclassification process.

Steve Dukes notes the following in his affidavit when describing the intervenors' backpay formula: "The Intervenors granted each reclassified employee a two-step promotional raise. In actuality, employees that were reclassified were not given promotional raises since the reclassification automatically gave them permanent status in the new job classification. "The Intervenors also gave reclassified employees a probationary raise. Reclassified employees did not receive probationary raises since they were not required to serve a probationary period. "Another mistake was that when they gave the probationary raises, they adjusted the employees' anniversary dates. "This mistake would adjust when an employee was eligible for annual raise review and possible merit increases, *i.e.*, the timing of anniversary/raise dates. These errors impact the calculations of damages and will subsequently impact the calculations of interest on damages." Docket № 9138-2 at ¶ 22.

---

[9] *See supra.* at 14-16.

Promotions under Article XV's reclassification project were not made consistent with SPD policy and regulations. The whole endeavor was *sui generis;* on this all agree. The issue is how to calculate the pay—and in this case the backpay—that the nine intervenors may be entitled to. Several questions of fact remain as to the appropriate method for calculating backpay.

Reclassified employees did not serve a probationary period before being permanently assigned to the new classification into which they were promoted. Are they nevertheless entitled to the two-step (5%) increase that other ALDOT employee who did serve the six-month probationary period received? According to defendants they are not, Intervenors assume they are because that is how pay raises are determined in ordinary SPD promotion situations.

The establishment of the anniversary date from which future step increases and merit raises are calculated has considerable impact on an employee's salary. In their model, the intervenors change the anniversary date to six months after reclassification to correspond with the second two-step increase normally allotted to an employee at the end of the probationary period. (Docket № 9086-1 at 9). Defendants, however, set the anniversary date as the date of the reclassification, not six months later. Docket № 9098 at

¶6 (Dukes Aff.). When the anniversary date is established can have significant effect on an employee's salary.

These are material questions of fact that will require additional evidence to determine the appropriate compensation for those promoted, or who should have been promoted, through the Article XV reclassification project. At this time such material questions of fact prohibit the grant of summary judgment as to the formula used by the Intervenors.

Intervenors seek summary judgment with respect to an award of prejudgment interest. Docket № 9086-1 at 11-12. Defendants raise both legal and factual defenses to the intervenors' entitlement to summary judgement on this claim. The issue of whether intervenors should receive prejudgment interest should be denied without prejudice until such time as it is established how the make-whole relief for these nine intervenors should be calculated. At that time determining whether intervenors are entitled to prejudgment interest and if so in what amounts should be a straightforward proposition.

### III

**ACCORDINGLY** it is Recommended that Intervenors' Second Motion for Partial Summary Judgement, (Docket № 9086) be GRANTED IN PART, DENIED IN PART, and DENIED IN PART WITHOUT PREJUDICE.

Objections to this Report and Recommendation must be filed with the Clerk of Court by October 4, 2016. Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED this 19th day of September 2016.


/s/ C. A. González
SPECIAL MASTER