IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY REYNOLDS, ET AL.,

    Plaintiffs,

v.

ALABAMA DEPARTMENT OF
TRANSPORTATION, ET AL.,

    Defendants.

CIVIL ACTION NUMBER
85-cv-665-MHT
**Special Master González**

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

**I**

This case is before the special master on defendants' motion for the entry of a protective order. Docket № 9322. The plaintiffs have responded to the motion, (Docket № 9334) and defendants have filed a reply to the response, (Docket № 9335). Defendants seek protection against plaintiff's notice of deposition under Rule 30(b)(6) of the Federal Rules of Civil Procedure.

Roy Holston and Alfred McQueen are seeking to depose a Rule 30(b)(6) representative regarding the following topics:

**Topic № 1:** The reasons Holston's position was not filled during the backlog process as an HMT II/III position.

**Topic № 2:** Any evolution or change in Mr. Holston's job duties between the entry of the consent decree and when he was placed into the HMT II/III classification.

**Topic № 3:** All efforts to expose Holston to the better in-house job duties for the HMT classification and to the better in-house job titles for the HMT II/III classification.

**Topic № 4:** All reasons why Holston was not provided HMT 2/3 EDP modules and training and rotation prior to his placement into that classification.

**Topic № 5:** All reasons McQueen was not selected on each CE/TT certificate of eligible upon which he appears.

**Topic № 6:** The scoring of McQueen's CE/TT examinations and the deficiencies identified thereby.

**Topic № 7:** All out of classification assignments to CE/TT in McQueen's division/bureau and the reasons he was not selected for such.

**Topic № 8:** The job assignments, job duties and training and rotation provided to each person selected for CE from a certificate of eligibles upon which McQueen appeared.

**Topic № 9:** All efforts to expose McQueen to the EA better in-house job titles.

**Topic № 10:** The status of Mr. McQueen's completion of the EDP training and rotation modules at the time the CE examination was first administered and at the time he took each of the CE/TT examinations.

Docket № 9322 at 1-2.

## II

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. PRO. 26(b)(1). While the scope of discovery is necessarily broad, it is not unlimited. A "court may, for good cause[1], issue an order to protect a party . . . from . . . undue burden or expense, including one or more of the following: . . . (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." FED. R. CIV. PRO. 26(c).

The Rules of Civil Procedure grant federal district courts "broad discretion to . . . decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). A protective order may "forbid inquiry into certain matters, or limit

---

[1] "Good cause has been defined as a sound basis or legitimate need to take judicial action." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, 303 F.R.D. 673, 676 (S.D. Fla. 2014), *aff'd sub nom. Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, 2015 WL 11921411 (S.D. Fla. 2015) (quoting *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir.1987)). (Footnote added).

3

the scope of disclosure or discovery to certain matters. As the Advisory Committee Notes provide, '[t]he Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.'" *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 355 (11th Cir. 2012) (citing FED. R. CIV. PRO. P. 26 Advisory Committee's Note (2000 Amendment)).

Defendants maintain they are entitled to a protective order prohibiting Mr. McQueen and Mr. Holston from taking 30 (b)(6) depositions because, in part, the information sought does not satisfy the proportionality requirements of Rule 26 (b)(1), and because the proposed topics are irrelevant to plaintiffs' individual contempt claims. Proportionality as a concept for guiding the limits of discovery is not new to the Federal Rules of Civil Procedure. First introduced in 1983, the proportionality requirement is intended "to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to the matters that are otherwise proper subjects for inquiry." FED. R. CIV. PRO. 26 Advisory Committee Note 2015 Amendment quoting Advisory Committee Note 1983.

Proportionality takes into consideration "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in

resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. PRO. 26.

> Proportionality requires counsel and the court to consider whether relevant information is discoverable in view of the needs of the case. When discovery does not relate to the actual issues in the case, then it does not meet the relevance and proportionality requirements.

> 'Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate.' As noted in the recent amendment to Rule 26(b)(1), 'multiple factors' are relevant in assessing proportionality and 'some cases may require a detailed balancing of these factors and the making of fine distinctions.' Because relevance is evaluated as part of a proportionality analysis of the requested discovery, the merits of the claim are considered.

*Runton by & through Adult Advocacy & Representation v. Brookdale Senior Living, Inc.,* No. 17-60664-CIV, 2018 WL 1083493, at *6 (S.D. Fla. Feb. 27, 2018)(internal citations omitted).

### III

### A

The defendants' motion seeks to prevent Mr. Holston from conducting Rule 30(b)(6) discovery with respect to the following topics:

> **Topic № 1:** The reasons Holston's position was not filled during the backlog process as an HMT II/III position.

Defendants argue this topic is irrelevant to Mr. Holston's ICC because the backlog appointments process cannot serve as a basis for contempt claims. Docket № 9233 at 5. As noted by defendants, backlog appointments were the product of agreements between counsel that were approved by the court. *See* R&R Docket № 8734 at 9-10, adopted by Docket № 8788. Mr. Holston concedes the point but argues the court "has never held . . . that the failure to fill or create a vacancy cannot be challenged as opposed to challenging a particular appointment." Docket № 9334 at 2. According to Mr. Holston, in his case the defendants were not filling an existing vacancy in an HMT II/III position, but rather had created a new position into which Mr. Holston should have been placed. *Id.* at 3.

Defendants dispute Mr. Holston's characterization. They argue that the HMT I position is the same position that Mr. Holston occupied when promoted to the HMT II/III classification. In other words, the HMT II/III position Mr. Holston held[2] was not a vacant or new position during the backlog process, but his original HMT I position now reclassified as an HMT II/III position. To establish this point, defendants claim that Mr. Holston's HMT I position, and the HMT II/III position into which he was promoted have the same PCQ

---

[2] Mr. Holston is no longer employed by ALDOT.

number.[3] Docket № 9335 at 9. According to defendants, "[t]he position was reclassified as an HMT II/III position in April 2004 based on Defendants' earlier August 1996 assessment of the duties Holston was performing." *Id*. The delay in the position's reclassification and the appointment of Mr. Holston into the new classification was, according to defendants, the result of the eight-years of litigation over the Article XV reclassification process.

 Defendants have offered to make Steve Dukes available to testify on whether the HTM II/III position into which Mr. Holston was promoted 2004 was the same HTM I position that Mr. Holston held prior to the reclassification. Docket № 9335 at 5. Plaintiff shall be permitted to depose Mr. Dukes as to the origin of the position into which Mr. Holston was reclassified. Exploring issues as to why Mr. Holston did not receive an earlier backlog appointment into a different HMT II/III position will not be permitted, as that line of questioning has been foreclosed by earlier court rulings regarding the nature of the backlog appointment process.

---

[3] A PCQ number is a unique numeric identifier for each position.

> **Topic № 2:** Any evolution or change in Mr. Holston's job duties between the entry of the consent decree and when he was placed into the HMT II/III classification.

Defendants have conceded that they "do not dispute Holston's deposition testimony that his duties remained essentially unchanged throughout his employment as an HMT I until SPD reclassified his job to an HMT II/II on April 17, 2003. Docket № 9322 at 6. Mr. Holston argues that because defendants failed to agree to a stipulation to this effect, they must therefore submit a 30(b)(6) witness to "offer testimony about any alleged evolution of his job duties." Docket № 9334 at 4.

Defendants' objection to this topic is sustained. There is no dispute between the parties about the nature of Mr. Holston's job duties prior to his reclassification. At a later date should there be an issue as to the effect of defendants' concession, that issue will be resolved at the appropriate time.

> **Topic № 3:** All efforts to expose Holston to the better in-house job duties for the HMT classification and to the better in-house job titles for the HMT II/III classification.

Defendants object to producing a 30(b)(6) witness to discuss Mr. Holston's rotation—or lack thereof—through the various job duties of the HMT job classification. The basis of their objection is that this topic is irrelevant to the resolution of Mr. Holston's ICC because the delay in

reclassifying Mr. Holston's HMT I position to an HMT II/III position was the fault of plaintiffs and their eight-year litigation effort to enjoin the Article XV reclassification process. Docket № 9322 at 6. As stated by the defendants, it was "the advocacy of Plaintiffs' counsel and not the contumacious conduct of Defendants [that] delayed Holston's proposed reclassification.[4]

Defendants also take the view that because Mr. Holston decided not participate in the Employee Development Program, ("EDP") that his contempt claim based on defendants' alleged failure to expose him to the better in-house job duties for HMT II/III necessarily fails. *Id.* at 9 and Docket № 9335 at 10-12. Finally, defendants believe that the alleged lack of exposure to better in-house job duties, job rotation or training is irrelevant to his contempt claims since he has failed to identify any similarly situated white comparators who obtained such exposure and were subsequently promoted to HMT II/III in advance of Mr. Holston. Docket № 9335 at 11.

The arguments raised by defendants are largely unaddressed by Mr. Holston. His response is that he should have been given training and rotation to better prepare him for promotion to HMT Superintendent, and that the

---

[4] SPD first proposed Mr. Holston for reclassification to the HMT II/III in August 1996. Mr. Holston's reclassification was held in abeyance until April 2004 when he was finally reclassified.

failure to do so was "a direct contumacious act that affected his career path and promotions." Docket № 9334 at 5.

The objection to producing a 30(b)(6) witness to testify about the efforts of ALDOT to expose Mr. Holston to the better in-house job duties for the HMT II/III classification and related better in-house job titles is sustained. However, consistent with defendants' suggestion of using targeted interrogatories as an alternative to a 30(b)(6) witness,[5] Mr. Holston shall be permitted to propound up to two interrogatories specifically dealing with the issues covered by Topic № 3 since the issues are important and were central to the Consent Decree.

> **Topic № 4:** All reasons why Holston was not provided HMT II/III EDP modules and training and rotation prior to his placement into that classification.

Mr. Holston testified in his deposition that he declined to participate in the Employee Development Program for the HMT line of progression. Docket № 9322-5 at 27-28, pp. 97-99. He claims that he declined to participate in the EDP program because he believed that such training was relevant only to his HMT I position and therefore would not be helpful in his pursuit to be

---

[5] See Docket № 9335 at 20. The Middle District of Alabama has previously allowed interrogatories in place of Rule 30(b)(6) topics where appropriate because interrogatories "are more convenient, less burdensome, and less expensive than a 30(b)(6) deposition." *Colonial BancGroup, Inc. v. PricewaterhouseCoopers, LLP*, Case Nos. 2:11-cv-746- BJR and 2:12-cv-957-BJR, 2016 WL 9687545, *6 (M.D. Ala., June 20, 2016).

promoted to HMT II/III. *Id.* Mr. Holston's understanding of the EDP and how it operated to satisfy the Consent Decree's requirements of training and job rotation is erroneous. In a prior R&R, the program was described as follows:

> [The EDP is] a voluntary program available in almost all job classifications currently in place at ALDOT. The program is structured as a series of modules, where each module covers a particular subject area, such as supervisory skills or contract reading. Within each module, the employee is to complete a number of training activities, either through classroom training or on-the-job training. The module is designed to be completed within a set period of time, usually a number of months, before the employee can rotate to the next module.
>
> In developing the modules, PDRI used the same job analysis SPD utilized in establishing minimum qualifications and examinations. The knowledge, skills and abilities ("KSAs") that form the basis for these selection procedures are the same ones for which an employee receives training through EDP. An employee who successfully completes the modules for his or her classification receives training for the same qualifying KSAs that appear in minimum qualifications and examinations, except for those KSAs for which training is impossible. Thus, an EDP participant receives training not only for his current classification but also in the duties and assignments needed for advancement to the next classification.

Docket № 7899 at 18 (R&R) quoting Docket № 7777 at 4-5. R&R approved and adopted by Docket № 7969.

As defendants correctly point out, Mr. Holston as an HTM I employee would have enrolled in the EDP for the HMT I job classification and in doing so would have received training in the skills and knowledge necessary to obtain promotion to the next job classification in the Highway Maintenance job progression, which in Mr. Holston's case would have been HMT II/III. Docket № 9322 at 10. "The EDP module rotation system satisfies the requirements of Article XIV by ensuring that each participating employee is

11

exposed to the range of duties and assignments that will best prepare that employee for promotion in his or her natural career path." Docket № 7899 at 21.

Mr. Holston declined to participate in the EDP and consequently, requiring defendants to produce a witness to testify about why he was not provided with HMT II/III EDP modules would be pointless and not advance his contempt claim. Defendants' objection to Topic № 4 is sustained.

B

In addition to the specific objections to the several 30(b)(6) deposition topics noticed in Alfred McQueen's ICC case, defendants make a generalized objection which they describe as follows: "The most significant flaw regarding the proposed 30(b)(6) topics for claimant Alfred McQueen is the fact that they do not concern the denial or delay of promotion opportunities until **after** he filed his March 5, 2003 individual contempt claim." Docket № 9335 at 13 (emphasis in original).

Defendants further argue that Mr. McQueen's 30(b)(6) topics are irrelevant "because it is undisputed that ALDOT made no appointments, and had no authority to make appointments, to the CE/TT classification before the March 5, 2003 individual contempt claim deadline. In fact, due to delays caused by the no-overlap litigation, SPD did not create the new CE register until July 16, 2003, *i.e.*, after McQueen filed his March 5, 2003 individual contempt claim. Thus, McQueen did not become eligible for promotion to the CE/TT . . . classification until after the March 5, 2003 individual contempt claim deadline. Even after SPD created the new CE register on July 16, 2003, it made no appointments from that register due to the impending change to the Civil

Engineering job series and, in particular, the establishment of the Transportation Technologist . . . class." Docket № 9322 at 11-12 (emphasis omitted). "In sum, McQueen's claims that Defendants delayed his promotion to the CE/TT job classification . . . are simply unripe for this litigation and must be pursued, if at all, 'in appropriate administrative proceedings or in separate lawsuits outside the context of the current individual contempt claim litigation." Docket № 9335 at 14, quoting Docket № 8406 at 4 (R&R).

Defendants' general objection would be well taken if Mr. McQueen were attempting to add a new claim for instatement after March 5, 2003.[6] But that is not the case. Mr. McQueen's pre-March 2003 ICC specifically sought instatement to the CE/TT classification and alleges that the defendants delayed his CE/TT promotion as a result of contumacious conduct. Docket № 9322-6 at 6-7, pp. 16-18. (McQueen Depo.).[7]

Presumably, Mr. McQueen's ICC rests on the belief that the failure to promote him to the CE/TT classification until after March 2003 was the result of defendants' contempt. Whether Mr. McQueen is correct is not before the court on defendants' motion for a protective order. The strength of Mr. McQueen's claim will be tested at a later date whether at trial or on the basis of a dispositive motion. The fact that Mr. McQueen's

---

[6] The court directed that the only instatement claims at issue in these current individual contempt proceedings are those claims specifically identified in Plaintiffs' March 2003 submission. Docket № 7476 at 3. The Court reasoned that "[b]ecause the March 2003 deadline was the product of a number of extensions, the plaintiffs had a generous, . . . period of time to put the class members' claims together and file them. Any claim or extension of a claim that came after [March 2003] is now too late." *Id*. Instatement claims arising after March 2003 may be "pursue[d] . . . in appropriate administrative proceeding or in separate lawsuits . . . ." *Id*. at 4-5.

[7] "Q. Have I adequately summarized your two main claims here: That you had a promotion delay due to the defendants' contempt, and then adverse effect on your promotion chances because of training, job rotations, and out-of-class assignments? Is that a fair statement? A. Correct" Docket № 9322-6 at 7, p.18.

promotion may not have occurred until after March 2003 does not answer the question of whether defendants' contempt of the Consent Decree was responsible for the delay in the claimant's promotion.

> **Topic № 5:** All reasons McQueen was not selected on each CE/TT certificate of eligible upon which he appears.
>
> **Topic № 6:** The scoring of McQueen's CE/TT examinations and the deficiencies identified thereby.

Defendants contended that they had no authority to make any appointments to the CE/TT classification before the March 2003 ICC deadline because of problems created by the Article II no-overlap litigation. *See generally* Docket № 9335 at 13 n. 11 for a discussion of the procedural history of the Article II no-overlap litigation. They also argue that because no one was appointed to the CE/TT classification prior to the March 2003 ICC deadline, that questions about why Mr. McQueen was not selected for a CE/TT position are irrelevant. Docket № 9335 at 15. Defendants also assert that because Mr. McQueen participated in the 2001 settlement and therein released all claims of discrimination as of May 2001, and because he testified in his deposition that the delay in his promotion to the CE/TT classification was the result of an alleged discriminatory performance evaluation by his white supervisor in April 2000, that the proposed 30(b)(6) topics have no plausible bearing on any ICC claim asserted by Mr. McQueen. *Id.* at 16.

Defendants' arguments may or may not portend the end of Mr. McQueen's ICC—that, however, is a matter for determination either at trial or by dispositive motion. Nevertheless, Mr. McQueen has not shown how this proposed discovery will advance his claim of contempt. The claimant asserts that defendants have "refused to answer any discovery questions or produce any documents about the persons selected on the COEs upon which Mr. McQueen appeared, or to produce the selection packets for those positions upon which he appeared on the COE, or to explain any out-of-classification assignments." Docket № 9334 at 6-7. The way to address defendants' alleged failure to provide discoverable information is to move the court to compel discovery. That was not done. Defendants should not be required to produce a 30(b)(6) witness to testify on these topics.

> **Topic № 7:** All out of classification assignments to CE/TT in McQueen's division/bureau and the reasons he was not selected for such.
>
> **Topic № 8:** The job assignments, job duties and training and rotation provided to each person selected for CE from a certificate of eligibles upon which McQueen appeared.
>
> **Topic № 9:** All efforts to expose McQueen to the EA better in-house job titles.

With respect to these three topics, the motion for a protective order should be granted, but consistent with defendants' suggestion of using

targeted interrogatories, Mr. McQueen will be permitted to propound a limited number of interrogatories.

The recurring basis for defendants' objections to these topics is that Mr. McQueen has failed to identify any white comparators who received out-of-classification assignments , job rotations,  or specialized training and who thereby gained a promotional advantage. Defendants point to the fact that when asked about white comparators during his deposition, Mr. McQueen could identify none. Docket № 9335 at 17. In many instances, the ability to discover the identity of such comparators is locked away in defendants' files. In the end there may be no such persons and certainly at this stage it appears that Mr. McQueen knows of none.[8] Nevertheless, defendants have not said there are none, only that McQueen could not identify any.

Mr. McQueen will be allowed to propound up to a total of six interrogatories on the issues covered by Topics 7-9.

> **Topic № 10:** The status of Mr. McQueen's completion of the EDP training and rotation modules at the time the CE examination was first administered and at the time he took each of the CE/TT examinations.

---

[8] In his response to the motion for protective order, Mr. McQueen for the first time identifies a number of white ALDOT employees whom he contends held out-of-classification assignments and thereby gained an advantage over him. Docket № 9334 at 7-8. Defendants' argue that none of the identified ALDOT employees are appropriate comparators. Docket № 9335 at 17-18. Whether the proposed comparators are valid is not now before the court.

Defendants are entitled to a protective order with respect to Topic № 10. Mr. McQueen has not addressed the substance of the defendants' objections with respect to Topic № 10. Moreover, the extent of Mr. McQueen's participation in the EDP is reflected in his employment and training records of which he is in possession.

## IV

**ACCORDINGLY**, it is RECOMMENDED that defendants' Motion for a Protective Order, (Docket № 9322) be GRANTED but that the claimants be allowed to propound limited interrogatories as more fully set out in the Report and Recommendation.

The interrogatories shall be propounded within five days of the date this R&R becomes final. Defendants shall respond to said interrogatories within the time permitted by the applicable rules or in such shorter time as they may decide.

Objections to this Report and Recommendation must be filed with the Clerk of Court by July 18, 2019. Failure to file objections in a timely manner constitutes a waiver of the right to review by the District Court.

IT IS SO RECOMMENDED this 21st day of June 2019

/s/ C. A. González
SPECIAL MASTER